RECEIVED
USDC, CLERK GREENVILLE,

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**     2026 JUN -5  PM 3: 47
**GREENVILLE DIVISION**

|  |  |
|---|---|
| Nathan Chambers,<br><br>        Plaintiff,<br><br>Vs.<br><br>County of Greenville,<br>Greenville County Sheriff's Office,<br>John Hobart Lewis *In His Official Capacity*,<br>Louis Michael Ortiz,<br>James Carson Glass,<br>Jason Michael Owens,<br>Ryan Adam Freeman,<br>Walter Dodson Bryson,<br>Hannah Rae Stouffer,<br>        Defendants. | <u>C/A No. 6:25-cv-01068-TMC-KFM</u><br><br><br><br>**PLAINTIFF'S RETURN AND**<br>**MEMORANDUM IN OPPOSITION**<br>**TO DEFENDANTS' MOTION TO**<br>**DISMISS OR IN THE ALTERNATIVE**<br>**FOR SUMMARY JUDGEMENT** |

---

**NOW INTO COURT COMES** the Plaintiff in the above captioned action, of whom has

received the Motion To Dismiss Or In The Alternative Motion For Summary Judgement (ECF#

67) and the accompanying Memorandum of Law[1] (ECF#67-1) filed by the Defendants in the

instant case, and hereby responds in opposition to the Defendants' motion by way of this Return

hereof. It is the Plaintiff's position that the Defendants' motion to dismiss should be denied

because discovery sanctions are not warranted in this case. Furthermore, the Plaintiff will show

that summary judgement is improper because there are genuine disputes of material fact on each

element of Plaintiff's claims and the Defendants are not entitled to immunity. The Plaintiff

respectfully requests that the Court deny the Defendants' motions in their entirety.

In support of the Plaintiff's position that Defendants' motion *sub judice* should be denied, the

Plaintiff respectfully shows unto this Court the following, to wit:

---

[1] **Hereinafter: Defendants' Memo or Def's. Memo.**

# I. INTRODUCTION & BACKGROUND

This matter is before the Court regarding the Defendants' Motion To Dismiss Or In The Alternative Motion For Summary Judgement, wherein the Defendants seek dismissal of this action as a discovery sanction pursuant to Rule 37, FRCP as well as under Rule 41(b), FRCP for failure to prosecute, or in the alternative an order granting summary judgement as to all claims pursuant to Rule 56, FRCP.

# II. PROCEDURAL HISTORY

This action initially arose in June 2024 when the Plaintiff filed a Complaint (ECF#1-1) in the Greenville County Court of Common Pleas. The Plaintiff brought federal claims for violations of his constitutional rights pursuant to 42 U.S.C § 1983 as well as state law claims for abuse of process, false arrest, common law false imprisonment, and gross negligence. In February 2025, the action was removed to the United States District Court based on federal question jurisdiction. An Amended Complaint (ECF#46) was filed that joined additional Defendants and added three (3) causes of action. The Defendants have answered and the parties engaged in discovery. The Defendants filed a Motion To Dismiss Or In The Alternative Motion For Summary Judgement (ECF#67) on 23rd January, 2026. The Plaintiff now hereby responds in opposition.

# III. RELEVANT FACTS

**(A) Factual Relevancies Specific To The 28th June Incident And The Liability Forming Conduct Perpetrated Thereon**

On 28th June, 2022, the Plaintiff contacted Greenville County emergency services (911) in order to obtain emergency medical assistance for his fiancée, Rachel Parsons who was experiencing a suspected opioid overdose. Defendants Ortiz, Glass, Freeman, Stouffer, and

Owens initially responded and arrived at the incident location. Plaintiff allowed the Defendants into the residence for the limited purpose of providing medical assistance for Ms. Parsons. After Ms. Parsons regained consciousness, the Defendants began accosting Ms. Parsons and Plaintiff. Exhibit D (Ortiz BWC footage) at 04:40-04:56. Immediately thereafter, the first of many searches transpires as Defendant Ortiz begins superfluously shining his flashlight around the Plaintiff's bedroom in an intrusive fashion and then utilizes said flashlight to harassingly illuminate the Plaintiff's *habitus*. *See*, Exhibit D at 04:46-06:00. Also, the Deputy Defendants' actions are prodromic of the ensuing detention of the Plaintiff at this time. *See*, Id.

The callous, insensitive, despotic and continuously escalating aggressive behavior exhibited by Defendant Ortiz persists thenceforth as depicted in the BWC video evidence; whereupon the Plaintiff was ordered by Defendant Ortiz to sit in a chair with his hands in his lap. The custodial nature of the interaction between Plaintiff and the Defendants now officially commences. *See*, Exhibit D at 10:20-11:00. Defendant Ortiz began engaging in an intrusive and invasive search of Plaintiff's chattels without a warrant. Id. at 12:26-13:09. The Plaintiff lawfully and non-confrontationally expressed his objection to such search due to the nature of the search being violative of the Plaintiff's constitutional rights guaranteed under the fourth amendment. *See*, Id. Plaintiff reiterates his legitimate serious concerns and rightful objections after observing Defendant Ortiz engaged in such acts. At this time, Defendant Ortiz then becomes visibly irate, and makes an aggressive, abrupt approach to Plaintiff to detain him. Whereupon, Ortiz handcuffs Plaintiff without any reasonable justification. *See*, Id at 13:09-14:00.

It is clear that the scene was secure, and the Plaintiff was not posing any threat to the safety of law enforcement nor anyone else. Moreover, at all times relevant hereto, the Plaintiff was

compliant with all of the Defendants' orders regardless of unreasonableness and in spite of their hostile, confrontational, and insensitive attitudes toward Plaintiff and his recently resuscitated fiancé. Additionally, the Plaintiff gave absolutely no indication that he sought to destroy evidence nor flee the scene. As such, the Defendants' contention that Plaintiff was acting erratically or that the detention of Plaintiff was justified because of a need to secure the scene is not supported by the evidence. *See generally,* Exhibit D as well as Exhibit E.

In fact, Plaintiff did not interfere with EMS personnel, no furtive movements were made, and Plaintiff was not arguing with Defendant Freeman while he was rendering aid to Parsons. The Plaintiff was, however, understandably effected by the traumatic experience he just endured by having to singlehandedly resuscitate his own fiancée. During the entire course of events giving rise to the instant case, the Deputy Defendants never took into consideration the fact that Plaintiff was actively engaged in the resuscitation of his fiancée for a significant period of time prior to the Defendants' arrival, and that but for the medical interventions performed by Plaintiff, his spouse would not have survived. The Defendants admit this much in the Code 5 Report. *See,* Exhibit L (discussing positive result of Narcan® administered by Plaintiff).

Therefore, not only is the Defense's version of the facts entirely unsupported by the evidence, the Defendants— when baselessly characterizing Plaintiff's behavior as erratic— entirely neglect to give deference to the fact that it is reasonable to be substantially effected by the traumatic event that the Plaintiff had just experienced and as such, it is expected that one would likely exhibit visible signs of psychological distress immediately thereafter and for a considerable period of time subsequent to such experience. Further compounded by the fact that Plaintiff was also extremely worried about his daughter at this time as well. All of which was exacerbated

immensely because the Deputy Defendants refused to allow Plaintiff access to his daughter. Plaintiff was in fear of being arrested should he attempt to depart the bedroom area to do so.

Furthermore, the allegations[2] by the Defendants regarding the "erratic behavior" discussed *supra*, the "furtive movements" and an alleged argument with Defendant Freeman are vague and lack the sufficient specificity to allow Plaintiff to the opportunity to provide an informed specific response thereto. However, in order to thoroughly refute the meritless arguments advanced by the Defendants, Plaintiff will attempt to address the only instance in which the Defendants may be referring to. The instance in question appears to have arisen as a result of Ms. Parsons asking Plaintiff for a blanket after telling him that she is cold. *See,* Exhibit E at 04:35-04:45. Whereupon, Plaintiff attempts to procure a blanket from the bed to provide to Ms. Parsons. There is nothing furtive about this action. *See,* Id.

Subsequently, however, Defendants excoriate Plaintiff for attempting to procure said blanket for his ailing, recently resuscitated fiancé. *See,* Id. Naturally, the Plaintiff was considerably troubled that the cabal of— now unwelcome— law enforcement officers were preventing him from being able to tend to the needs of his spouse while she was experiencing a serious medical condition. Nevertheless, the Plaintiff did not cause a disturbance. Notwithstanding the foregoing, the evidence clearly shows that the aforesaid reasons are not in fact what caused Defendant Ortiz to take Plaintiff into custody but such reasons are merely attempts to manufacture an *ex post facto* justification for Plaintiff's arrest. *See,* Exhibit D at 13:09-14:00.

Defendant Ortiz resumed the intrusive search of Plaintiff's belongings without a warrant. Notably, Defendant Ortiz was rummaging through items plied on a chair near the bedroom

---

[2] *See,* **Def's. Memo. (ECF#67-1)** at pg. 21.

entrance; while engaged in this action, Defendant Ortiz located Plaintiff's tactical outer-carrier vest that had various equipment attached to it that is commonly used by law enforcement. Defendant Ortiz picks up the vest, handles it, and closely inspects the vest; all while also disturbing other items on the chair. *See*, Id. at 14:46:47-14:47:17. Defendant Ortiz perpetrates yet another unlawful search by removing items from in or around the vest, inspecting an item, then returning it to the area in which it was originally located. Id. at 14:49:08-14:49:25. Thus far, Defendant Ortiz has perpetrated no less than three (3) unauthorized and unconstitutional warrantless searches.

Defendant Glass removed Plaintiff from the residence. While Defendant Glass was doing so, Plaintiff attempted to comfort his distraught daughter. At this time, Defendant Glass used excessive force when he slammed Plaintiff's face and body into the minor child's crib, causing injury to Plaintiff and serious distress to the minor child. *See*, Amend. Comp. (ECF#46) at ¶ 76-78. *See also*, Exhibit C (Affidavit of Nathan L. Chambers). The Plaintiff was then forced to sit outside in the summer heat, while in handcuffs and restricted from moving for an extended period of time. During the four (4) hours that followed, the Plaintiff's liberty was abridged when he was forced to remain under guard by Defendant Glass, was not free to leave, and subjected to an unlawful detention that became tantamount to a de facto arrest. *See*, Exhibit F (CAD Report).

The Plaintiff made it clear to Defendant Glass that the consent to enter or remain inside the Plaintiff's residence was limited in scope to providing emergent medical assistance to Ms. Parsons and that the continuation of the Defendants presence in any manner was not consensual. Defendant Glass acknowledged such revocation of consent but advised that any decision related

to the Defendants' departure or cessation of their activities inside Plaintiff's residence and upon his curtilage could only be made by his supervisor. *See*, Exhibit C.

It appears that the Defendants endeavored to amuse themselves and mock Plaintiff by utilizing Plaintiff's own personal miranda card to mirandize the Plaintiff. Therefore, in order to carry out this stunt, Defendant Freeman entered Plaintiff's bedroom devoid of a search warrant, and conducted a search of Plaintiff's chattels in order to locate the miranda card, then seized Plaintiff's property by removing the miranda card from its plastic card holder. *See*, Exhibit E (Freeman BWC) at 16:32. Defendant Freeman then mirandized Plaintiff while reading from Plaintiff's miranda card. *See*, Exhibit E at 16:38-16:57.

Indisputable evidence abounds regarding the Defendants' endeavors to procure a search warrant. Defendant Owens expressly declared to the Plaintiff that they were in the process of obtaining a search warrant and were awaiting its arrival. *See*, Exhibit D at 41:20-41:40. *See also*, Exhibit C. Moreover, the evidence shows that Defendant Bryson was directly responsible for the obtainment and execution of the search warrant. *See*, Exhibit D at 35:54-36:04 (Owens discussing search warrant acquisition and Bryson's involvement therewith). Id. at. Defendant Bryson then arrives, makes entry into residence, and accompanies other Defendants during yet another warrantless nonconsensual search of Plaintiff's bedroom and chattels where Plaintiff's private personal property is handled, manipulated and invasively searched by the Defendants. *See*, Id. at 54:45-1:00:01 and Exhibit D (Ortiz BWC2) at 00:01-05:00

Defendant Owens interrogated the Plaintiff about law enforcement equipment found in Plaintiff's residence. The Plaintiff makes it clear that he does not hold himself out to be a law enforcement officer and does not display any patch, badge, or item in public. *See*, Exhibit D at

41:40-43:10. *See also*, Id. at 49:20-51:00. Cf. Exhibit D (Ortiz BWC2) at 00:01-03:10. The Defendants are well aware of the fact that merely possessing law enforcement equipment is not illegal. The admissions made by Defendant Owens, Bryson, and Ortiz clearly evince the Defendants' awareness of this fact. *See*, Exhibit D (Ortiz BWC2) at 02:50-03:10. Consider Defendant Owens telling declaration of which was *in haec verba*, to wit: "there's no evidence he's impersonating a cop." *See*, Id. Despite this incontrovertible fact, the Defendants still conspire to carry on with their nefarious scheme to manipulate Plaintiff into involuntarily acquiescing to a search where there is clearly no probable cause nor reasonable articulable purpose to conduct said search in light of the fact that the Defendants clearly admit that there is no probable cause to support any criminal charges. *See*, Id.

Extremely important here is the fact that Plaintiff specifically inquired with Defendant Glass as to Defendant Bryson's role with the Sheriff's Office and his purpose for being on scene. Defendant Glass declared that Defendant Bryson was an investigator and that he was on scene to conduct a search related to the search warrant that Defendant Owens previously informed Plaintiff of in the presence of Defendant Glass. Plaintiff was at all times under the belief, based on representations by the Deputy Defendants, that they were currently engaged in conducting a search pursuant to a lawful search warrant. In fact, they were not.

According to the video evidence captured by Ortiz's BWC, Defendants Owens, Bryson, and Ortiz were in the midst of conducting one (1) of the multiple unlawful searches and while doing so, concluded that there was no reasonable objective basis to actually obtain search warrant. Defendants also concluded that the law enforcement equipment[3] of which they were currently

---

[3] **Which was only discovered through the fruits of the initial illegal intrusive search without a warrant and without legal justification, *ab initio*.**

inspecting— yet again— was not illegal to posses, that probable cause could not be established, and the Plaintiff did in fact have a logical explanation as to why he owned such equipment. *See*, Exhibit D (Ortiz BWC2) at 03:00-3:58.

Following their collective agreement regarding the aforesaid lack of probable cause, the Defendants then carry out a nefarious scheme with the intention of coercing Plaintiff into providing consent for an additional intrusive search after they had already conducted no less than five (5) warrantless searches. *See*, Id. (Ortiz BWC2) at 03:45-05:08. Defendant Owens approaches Plaintiff while he is still in custody and begins to inveigle Plaintiff into acquiescing to the search in bad faith. *See*, Exhibit C. *See also*, Exhibit E (Ortiz BWC2) at 07:14-08:54. At all times relative thereto, Plaintiff believed that the Defendants were in possession of a search warrant. Plaintiff did not consent to the search. Plaintiff believed that they were informing him of their intentions to conduct yet another search. However, regarding this interaction, Plaintiff mistakenly interpreted their specious display of civility as an attempt to be courteous to Plaintiff when Defendant Owens expressly conveyed that Plaintiff could personally observe the impending search and object if Plaintiff felt the search was encroaching into other areas of the house that would needlessly invade the privacy of his father. Chillingly, the Defendants nevertheless immediately reneged on this promise and closed the door in Plaintiff's face. *See*, Exhibit E (Ortiz BWC2) at 08:38-09:00

Even assuming *arguendo*, that the Defendants produced some smoke and mirrors effect of consent by their disingenuous assurance that the Plaintiff could object to the search, such pseudo-consent automatically became invalid upon Defendants' repudiation of their promise by preventing Plaintiff (while his liberty was still abridged) from having the ability to observe the

search thus depriving him of the opportunity to revoke consent. Even in the light most favorable to the Defendants, such consent (there was none) would have been conditional. Furthermore, Plaintiff did in fact vehemently object to Defendant Glass, of whom did nothing to alert the other Deputy Defendants conducting the search of Plaintiff's objection. *See*, Exhibit C.

The Plaintiff *never* had the intention— either express nor implied— for the aforementioned discussion regarding limitation of the search's scope to be construed as consent to search. Plaintiff was under the strict belief that the issue of consent was no longer even applicable due to the Defendants' representations that they were purportedly in possession of a search warrant. Thus, in light of such false representations and intentionally perpetuated ambiguities by the Defendants, the Plaintiff did not believe that he had any choice in the matter.

Additionally, had consent actually been given, the Deputy Defendants would have been required by GCSO policy to obtain *written consent* from the Plaintiff via the agency's Consent To Search Form.[4] No such form was ever signed by the Plaintiff much less presented to him, nor was the Plaintiff advised that he had the right to withhold consent. Had the Defendants actually obtained valid, informed consent to search they would have been required to inform the Plaintiff that he has a right to withhold consent pursuant to GCSO policy. *See*, Exhibit J at pg. 4. Defendants never advised Plaintiff of this right either verbally or in writing.

The Defendants contacted SCDSS to request that child protective services personnel respond to the scene to conduct an investigation (civil) and case determination regarding the status of the minor child pursuant to S.C. Code Ann. § 63-7-920. As clearly depicted in the Ortiz BWC footage, Defendant Owens and Defendant Ortiz discuss the situation regarding the minor child

---

[4] **General Order 219 (Search / Seizure) promulgates agency policy regarding the requirement of written consent when searching a premises without a warrant.**

and their intentions with how to proceed. During this interaction, it becomes readily apparent that the Defendants are not conducting a criminal investigation regarding the condition of the minor child nor anything relative thereto, but are merely carrying out the duties of a mandatory reporter. *See*, Exhibit D at 33:14-35:52. The Defendants even concede in their memorandum (ECF#67-1) that the aspects of their involvement related to the minor child were not for law enforcement purposes. As such the Defendants' attempt to assert probable cause as a defense related to their actions arising from a criminal investigation of unlawful conduct toward a child directly contradicts Defendants' averments that their involvement was *not* for law enforcement purposes. *See*, Def's. Memo (EFF#67-1) at pg. 16. Defendants should be judicially estopped from arguing probable cause for any uncharged crimes in light of the concession that their actions were not for law enforcement purposes.

## (B) Factual Relevancies Pertaining To Pervasive Patterns of Conduct In Support of Claims For Deliberate Indifference, Supervisor Liability, and *Monell*[5] Theories of Liability

During the month of September 2022, the Plaintiff filed a formal complaint with Defendant GCSO regarding the Deputy Defendants' conduct. Upon information and belief, Defendant GCSO took no action at all. The Plaintiff made multiple attempts to follow up on the status of such complaint, but received no response from the Defendants. The Plaintiff's final attempt to contact Defendant GCSO regarding the complaint was in July 2024. *See*, Exhibit C.

The Plaintiff has evidence that Defendant Owens has consistently been investigated for misconduct, constitutional violations, and even criminal conduct dating back to 2005. *See*, Exhibit M (Table of Misconduct / Internal Investigations). *See also*, Exhibit P (report of criminal investigation pertaining to Owens). Internal GCSO records and Defendant Owens's personnel

---

[5] **Monell v. Dept. of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).**

file is replete with documented incidents in which Defendant Owens has been in implicated internal investigations regarding his violation of citizens constitutional rights. The Plaintiff has evidence of at least three (3) sustained investigations in which the Supervisory Defendants found that Defendant Owens conduct such as his *"failure to supervise"* that resulted in the false arrest of an innocent person. *See*, Exhibit Q (Report of "Failure To Supervise" Incident). Defendant Owens also failed to supervise subordinate deputies regarding a "knock and talk" in which the subject's privacy was invaded and the OPS file indicates that Defendant Owens deliberately failed to respond despite agency policy requiring him to do so. Such evidence also contains findings that Defendant Owens's conduct was in contravention to a "recent Supreme Court ruling[6] concerning Knock and Talks" (sic). *See*, Exhibit Q ("Knock and Talk" OPS Report). Further, Defendant Owens illegally seized a citizen's vehicle in violation of the person's Fourth Amendment rights. Internal reports contain admissions by Defendants that Owens's conduct was in fact a constitutional violation and discussed their liability exposure. *See*, Exhibit N.

Furthermore, the Plaintiff has evidence that Defendant GCSO negligently rehired Defendant Glass after he knowingly and intentionally lied about his reason for resignation. While the Plaintiff was in Defendant Glass's custody, Defendant Glass attempted to establish a rapport with Plaintiff and in doing so, admitted to Plaintiff that prior to his first employment separation from GCSO, he was frequently either too intoxicated or incapacitated from ethanol withdrawal to perform his duties and thus had to resign before the agency could prove his unfitness. *See*, Exhibit C. By Defendant's own admission, being addicted to alcohol and / or drugs is a violation of General Order 108 and as such, he "would be unfit for service." *See*, Exhibit H (General Order

---

[6] **Upon information and belief it is likely Defendants are referring to** State v. Counts, **413 S.C. 153, 776 S.E.2d 59 (2015).**

108). *See also*, Exhibit G. Defendant Glass was terminated by the Sheriff's Office merely four (4) months after the incident in question subsequent to his arrest for DUI 1st offense pursuant to S.C. Code Ann. § 56-5-2930. *See*, Exhibit I. Defendant Glass ultimately pled guilty.

The Plaintiff has evidence that Defendants Owens and Bryson also have both been suspects of criminal investigations related to certain incidents that the Supervisory Defendants were notified of, in which there was reason to believe Defendants Owens and Bryson respectively committed criminal acts. *See*, Exhibit P, as well as Exhibit R. GCSO OPS investigators found that the Defendants did perpetrate criminal acts. However, the Supervisory Defendants failed to take action on these findings in order to protect the public from future harm.

## IV. <u>STANDARD OF REVIEW</u>

Rule 37(d)(1)(A), FRCP permits the district court to sanction a party who fails to appear for a properly noticed deposition or who fails to answer interrogatories or requests for inspection. To determine whether dismissal is warranted, courts must consider (1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions. Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs., Inc., 872 F.2d 88, 92 (4th Cir. 1989).

As to summary judgement, a court should grant summary judgement "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Rule 56(a), FRCP. In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be

drawn in his favor. *See,* <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed. 2d 202 (1986). The moving party bears the initial burden of demonstrating that summary judgement is appropriate; if the movant carries its burden, then the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial. *See,* <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986).

"Summary judgment is proper only when it is clear that there is no dispute concerning either the facts of the controversy or their inferences to be drawn from those facts." <u>Pullman Inv. Co. v. Cameo Props.</u>, 810 F.2d 1282, 1286, (4th Cir. 1987). The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury, or whether it is so one-sided, that one party must prevail as a matter of law." <u>Anderson</u>, 477 U.S. at 251-52.

## V. <u>DISCUSSION</u>

### 1) <u>Defendants' Motion To Dismiss Should Be Denied</u>

The Defendant's motion to dismiss should be denied as procedurally improper based on the fact that Defendants waived any right to seek sanctions by agreeing to reschedule the deposition. As set forth in the affidavit testimony of John E. Chambers, Jr., Esquire, (hereinafter: JEC) it was agreed by the parties that the deposition would be rescheduled. *See,* <u>Exhibit B</u>.

On good faith and credible information, the Plaintiff was at all times under the impression that the deposition set for 4th November, 2025 had been canceled and would be rescheduled. As such, the Defendants' motion to dismiss should not be before this Court for consideration.

In order to depose a party, the deponent must be served with a notice of deposition pursuant to <u>Rule 30(b), FRCP</u>. It is reasonable to infer that because an agreement to reschedule the deposition had been made, then the operative notice of deposition was implicitly withdrawn.

As such, the withdrawn NOD should be deemed to be invalid. The Defendants never attempted to reschedule the deposition and have not served the Plaintiff with any subsequent notice of deposition. Therefore, the Defendants waive any right to seek sanctions under Rule 37(d), FRCP in light of the agreement to reschedule the deposition because there was no longer a deposition to attend. Therefore Defendants' motion to dismiss should be denied as procedurally barred.

If *arguendo*, it is assumed that irrespective of the fact that opposing counsel agreed to reschedule the deposition— not appearing for the deposition in accordance with the Notice of Deposition constituted a failure to appear on behalf of the Plaintiff, then the Court must determine what, if any sanctions are warranted. *See*, Nat'l Hockey League v. Metro. Hockey Club, 427 U.S. 639, 643, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976). (purpose of sanctions is to penalize those whose conduct may be deemed to warrant them and deter those who might be tempted to such conduct in the absence of such a deterrent).

When a party fails to appear for a deposition, it is within a court's discretion to sanction that party through a variety of means, including dismissal of the action. *See*, Rule 37(d), FRCP. In the Fourth Circuit, courts apply a four-factor test when considering dismissal of an action for failure to attend a deposition. *See*, Mut. Fed. Sav. and Loan Ass'n v. Richards & Assocs. Inc., 872 F.2d 88, 92 (4th Cir. 1989). The factors a court should consider in determining what sanctions to impose under Rule 37, FRCP are: "(1) whether the non-complying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions." Mut. Fed. Sav. and Loan Ass'n v. Richards & Assocs. Inc., *supra*.

The following is a discussion of the four (4) factors set forth above and the factual relevancies of the case at bar applied thereto: (1) bad faith: Plaintiff did not act in bad faith. In fact, the Plaintiff diligently attempted to contact opposing counsel while incarcerated but to not avail. When the NOD was made known to Plaintiff, he promptly directed his agent to contact opposing counsel to seek a solution, and Plaintiff contacted opposing counsel to reschedule immediately upon his release from custody. Opposing counsel refused to reschedule. (2) Amount of prejudice noncompliance caused adversary: the Defendants have not been prejudiced by the delay that occurred while Plaintiff was incarcerated. Since release, the Plaintiff has stood ready to be deposed but Defendants' refusal to reschedule the deposition is indicative of the lack of importance placed on the information they seek through such deposition despite their argument that the only meaningful discovery they believe they could obtain from Plaintiff is via deposing Plaintiff. *See*, <u>Def's. Memo</u> at pg. 9. (3) Deterrence effect: the need for deterrence of the particular noncompliance at issue herein is virtually nonexistent because the noncompliance was an isolated incident. The reason behind the failure to appear at the deposition was due to circumstances outside of Plaintiff's control, was not willful, was not due to a depraved scheme, and this was an isolated occurrence. (4) Effective less drastic sanctions: less drastic sanctions are would be more appropriate than dismissal. Dismissal is an extreme sanction that should be used only as a last resort. The alternatives to dismissal that the Court could order include, *inter alia*, admonishing the Plaintiff, ordering a conditional dismissal that declares the action would be dismissed if Plaintiff fails to attend a future deposition, or the Court could prohibit Plaintiff from introducing certain evidence rather than dismissing the entire case.

"Courts must be cognizant that dismissal is reserved for those flagrant cases in which a party has exercised bad faith and callous disregard for the district court's authority." Melvin v. Lady Foot Locker, Inc., 2008 U.S. Dist. LEXIS 136030, *3. It is the Plaintiff's position that the totality of the circumstances surrounding this matter do not indicate that sanctions are warranted. Accordingly, the Plaintiff respectfully requests that the Court decline to sanction the Plaintiff.

## 2) The Defendants Are Not Entitled To Summary Judgment

When addressing a summary judgment motion regarding whether there was a constitutional violation, the District Court asks whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?" Brosseau v. Haugen, 543 U.S. 194, 197 (2004). The evidence will show that Defendants' conduct in this case constitute multiple constitutional violations requiring redress under §1983.

### (A) Wrongful Arrest

First, the Defendants' contention that the Plaintiff was not arrested is a misapprehension of the law. When viewed in the light most favorable to the Plaintiff, summary judgment should be denied with respect to this issue because the Plaintiff's movement was restricted, he was not free to leave, was placed in handcuffs by Defendant Ortiz, and the actual or implied threat of force imposed on the Plaintiff by being under constant guard by Defendants for the entire duration of the incident constituted an arrest.

The Plaintiff was in custody for over four (4) hours. "An investigative detention can become an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force." Waters v. Madson, 921 F.3d 725, 736 (8th Cir. 2019). The excessive duration of time in which Plaintiff was in custody as well as the unreasonable force used by the Defendants' constitutes a de facto

arrest. *See*, <u>Exhibit D</u> at 14:46 —14:47 (Defendant Ortiz putting Plaintiff in handcuffs and detaining Plaintiff). Handcuffs, in particular, are "a hallmark of a formal arrest." <u>New York v. Quarles</u>, 467 U.S. 649, 655 (1984). Plaintiff remained handcuffed for over an hour before Defendant Owens orders that Plaintiff's handcuffs be removed. *See*, <u>Exhibit D</u> at 15:40:15. However, Plaintiff remained subject to the same custodial conditions and restrained freedom of movement for the entire duration of the Defendants' presence.

"[A]n action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary." <u>United States v. Raino</u>, 980 F.2d 1148, 1149 (8th Cir. 1992) (internal citation and quotation marks omitted). The nature of the detention in the case at bar can be construed to be both an investigative detention as well a custodial interrogation. Nevertheless, the Supreme Court emphasized in <u>Dunaway v. New York</u>, 442 U.S. 200 (1979) that "detention for custodial interrogation— regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest." <u>Dunaway</u>, 442 U.S. at 216. The *Dunaway* holding, in fact, merely reaffirmed this principle, which the Supreme Court had made clear ten years earlier in <u>Davis v. Mississippi</u>, 394 U.S. 721 (1969); namely, that an investigatory detention that, for all intents and purposes, is indistinguishable from custodial interrogation, requires no less probable cause than a traditional arrest. *See*, <u>Davis</u>, 394 U.S. at 726–27 ("Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusions upon the personal security of our citizenry, whether these intrusions be termed 'arrests' or 'investigatory detentions.'")

In the matter *sub judice*, the Defendants' actions of which consisted of both an investigatory detention and a custodial interrogation for an extended period clearly constitutes a

de facto arrest. First, the plaintiff was not free to leave and was interrogated after receiving Miranda warnings. Under <u>Dunaway v. New York</u>, 442 U.S. 200 (1979); as well as <u>Kaupp v. Texas</u>, 538 U.S. 626 (2003) custodial interrogation is precisely the kind of intrusion that courts treat as arrest-like for Fourth Amendment purposes. The fact that the Defendants Mirandized the plaintiff does not itself create the Fourth Amendment violation, but it strongly indicates they understood the encounter to have become custodial in the practical sense described in <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984).

Secondly, duration matters substantially. Four (4) hours far exceeds the brief and tightly limited detention contemplated by *Terry*. *See*, <u>Florida v. Royer</u>, 460 U.S. 491 (1983); <u>United States v. Sharpe</u>, 470 U.S. 675 (1985). Even though there is no rigid time rule, investigative stops must be temporary and last no longer than needed to verify or dispel suspicion, *See*, <u>Florida v. Royer</u>, 460 U.S. 491 (1983); <u>Rodriguez v. United States</u>, 575 U.S. 348 (2015); <u>United States v. Lopez-Moreno</u>, 420 F.3d 420 (5th Cir. 2005). Third, handcuffing is a serious restraint. The Fourth Circuit does not adopt a per se rule that handcuffs equal arrest. "Rather, an arrest is defined using an objective standard: whether the suspect's freedom of action is curtailed to a degree associated with formal arrest." <u>United States v. Elston</u>, 479 F.3d 314, 320 (4th Cir. 2007) (citing, <u>Park v. Shiflett</u>, 250 F.3d 843, 850 (4th Cir. 2001)). However, handcuffing is consistently treated as a hallmark of arrest-like restraint. *See*, <u>Pollreis v. Marzolf</u>, 9 F.4th 737 (8th Cir. 2021); <u>Donahue v. Wihongi</u>, 948 F.3d 1177 (10th Cir. 2020).

Furthermore, I will draw the Court's attention to the Defendants' misapprehension of the false arrest cause of action pleaded in this matter. *See*, <u>Amend. Comp. (ECF#46)</u> at pg.19. Wherein, Defendants erroneously attempt to characterize what was clearly pleaded as **false arrest** as

malicious prosecution instead. *See*, Def's. Memo (ECF# 67-1) at Pgs. 11-12. Quite obviously, these two causes of action are entirely different and distinct claims despite the cursorily appreciated similarities such as both torts requiring a lack of probable cause to prove the claim.

Consider the following explication of the significant differences that distinguish the tort of false arrest from that of malicious prosecution. "At common law, allegations that a warrantless arrest or imprisonment was not supported by probable cause advanced a claim of false arrest or imprisonment. . .However, allegations that an arrest made pursuant to a warrant was not supported by probable cause, or claims seeking damages for the period after legal process issued, are analogous to the common-law tort of malicious prosecution." Brooks v. City of Winston-Salem, 85 F.3d 178, 181 (4th Cir. 1996) *See also*, Porterfield v. Lott, 156 F.3d 563, 568 (4th Cir. 1998). *Accord*, Carter v. Bryant, 429 S.C. 298, 838 S.E.2d 523 (S.C. App. 2020)

Accordingly, Defendants' should be denied summary judgment based on the totality of the circumstances including, *inter alia*, the excessively prolonged custodial abridgment of Plaintiff's liberty, lack of probable cause, the unreasonableness of the actions pertinent to such detention; all of which culminated in a de facto arrest that was effectuated in bad faith and now, only after suit has a litany of *ex post facto* meritless justifications been advanced by the tortfeasors for such injurious and unconstitutional conduct. Additionally, the Defendants' malicious prosecution argument is premised on a misapprehension of the law and should be disregarded by the Court.

## (B) Unlawful Seizure

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable, searches and seizures." U.S. Const. amend IV. "Violation of the Fourth Amendment requires an intentional acquisition of physical control" over

the suspect. Brower v. County of Inyo, 489 U.S. 593, 596 (1989). In order to "seize" a person, a law enforcement officer must restrain that person's liberty. *See*, Adams v. Springmeyer, 17 F. Supp.3d 478, 503 (W.D.Pa. 2014) (quoting Terry v. Ohio, 392 U.S. 1, 19 (1968)). "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16 (1968). "From the time of the founding to the present, the Fourth Amendment's term "seizure" has meant "taking possession" of the criminal suspect. *See*, California v. Hodari D., 499 U.S. 621, 624 (1991) (internal citations omitted). A seizure of a person occurs when a reasonable person, considering the totality of the circumstances, would not believe that he or she is free to leave. Florida v. Royer, 460 U.S. 493 (1991). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

"Summary judgment in the unlawful search/arrest context often turns on whether the evidence is sufficient to support a finding that the searching/arresting officer had probable cause, a necessarily fact-intensive inquiry." Dempsey v. Bucknell Univ., 834 F.3d 457, 477 (3d Cir. 2016). *See also*, Dufort v. City of New York, 874 F.3d 338, 348 (2d Cir. 2017). "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Maryland v. Pringle, 540 U.S. 366, 371, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (emphasis supplied).

The Defendants claim the seizure of Plaintiff was reasonable because Defendant Freeman was tired of arguing with the Plaintiff, Plaintiff made supposed furtive movements, and questioned the professionals evaluating Parsons. *See*, Def.'s Memo (ECF#67-1) at pg. 21. The entirety of

these claims woefully misrepresent the facts and are contradicted by the evidence as discussed *supra.*

Crucially, Plaintiff only began questioning Freeman and Ortiz *after* they began conducting intrusive searches of Plaintiff's chattels without a warrant and totally unrelated to the overdose. *See,* Exhibit D at 14:46:47-14:47:17. The video speaks for itself. It appears that the Defendants were irritated by the fact that Plaintiff expressed his reasonable objection to the Defendants' intrusively searching areas and chattels unrelated to the overdose, without probable, and devoid of a search warrant. Defendant Ortiz's search was an audacious intrusion into the Plaintiff's privacy that was in wanton disregard for the rights provided by the U.S. Const. amend IV.

It is imperative to highlight the fact that none of the searches conducted by the Defendants had any reasonably cognizable nexus to the medical emergency that Defendants were on scene to address. It is axiomatic that when a law enforcement officer is given limited consent to enter a domicile for the sole purpose of assisting with a medical emergency any search must be limited to plain view observations and must be related to the ongoing medical emergency. Here, there is no doubt that Defendant Ortiz's invasive rummaging through Plaintiff's personal property without consent, without a warrant, and the medical emergency being without any logical relation to the items and area searched nor a valid articulable rationale for conducting such invasive search is an impermissible invasion of my privacy Plaintiff's privacy and constitutes a fourth amendment violation and is actionable under 42 U.S.C § 1983. Moreover, Defendant Ortiz's baseless capricious, and emotionally driven decision to abridge the Plaintiff's liberty casts a highly suspicious shadow over any *ex post facto* rationale the Defense offers as to the progeny of the detention that subsequently coalesced into a de facto arrest in light of the obvious pattern

of behavior of which cuts directly against the justification advanced by the Defense. Such issue is certainly ripe for a credibility determination. Such determination can only be made by a jury after Defendant Ortiz's conduct is scrutinized in the "crucible of cross examination" at trial. *See generally*, Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354 (2004).

Furthermore, the Plaintiff was not interfering with any investigation into the condition of the minor child. In fact, the Plaintiff cooperated with the Defendants. Therefore, once again the Defendants' basis for the seizure is without merit and unsupported by the evidence. The Defendants argue that they "found evidence of unlawful conduct towards a child, such that, had they arrested Plaintiff, the arrest *would* have been justified by probable cause." *See*, Def's. Memo (ECF#67-1) at pg. 18 (emphasis supplied). The Defendants' argument here wreaks of ex post facto justification for police conduct otherwise lacking in constitutional legitimacy.

The fact that the Defendants never criminally charged Plaintiff for such an offense indicates that they did not have probable cause. Quite simply put, if they had probable cause to arrest Plaintiff for such an offense and they were within their authority to do so, why did they not arrest the Plaintiff? The answer is clear, they did not have probable cause to charge Plaintiff with this offense. As such, the fact that they did not arrest the Plaintiff for this alleged offense flies in the face of their supposed probable cause argument. Relying on *speculative* probable cause—after the fact— when no charge was filed should be seen for what it is: utterly unmeritorious. Therefore, a genuine dispute of material fact exists as to whether or not the seizure and continued deprivation of Plaintiff's rights pursuant to U.S. Const. amend IV was objectively reasonable in light of these factual discrepancies advanced by the Defendants. It is the Plaintiff's position that it is not appropriate to make an *ex post facto* finding as to probable cause.

Additionally, there is no evidence that the Defendants were ever considering charging Plaintiff with unlawful conduct towards a child pursuant to S.C. Code Ann. § 63-5-70. Instead, it appears that the Defendants merely sought to have the child taken into emergency protective custody and deferred to SCDSS for the initiation of a Family Court removal action and not criminal prosecution. Furthermore, nothing in the *res gestae* contains even a scintilla of evidence to support the contention that the scope of the ***criminal*** investigation included the condition of the minor child. In fact, the evidence shows the investigation was almost exclusively focused on law enforcement equipment not the minor child—contrary to Defendants' assertion.

Moreover, in addition to the failed probable cause argument as it relates to unlawful conduct towards a child, the Defendants' likewise cannot establish that there was probable cause to arrest Plaintiff for any offense related to the law enforcement equipment located in Plaintiff's bedroom.

It is imperative to draw the Court's attention to the fact that the Defendants' conduct related to the searches in this case centered totally around the Plaintiff's bedroom, ***not*** where the child was located and the searches all appear to be motivated by Defendants' intent to intrusively search for law enforcement equipment. Such law enforcement equipment that they became aware of only after illegally conducting their initial search. Importantly, the Defendants were well aware that merely possessing law enforcement equipment without holding oneself out to the public as a law enforcement officer is not illegal and cannot constitute probable cause to arrest the Plaintiff for impersonating a law enforcement officer pursuant to S.C. Code Ann § 16-3-380. Defendants Owens, Ortiz, and Bryson make admissions on video conceding to this fact. *See*, Exhibit D (Ortiz BWC2) at 02:50-03:10. Because the Defendants make it clear that the reason for Plaintiff's continued detention (de facto arrest) stemmed from their unlawful search related to the

*legally* possessed law enforcement equipment, combined with the Defendants' own admissions captured on video in which they admit that there is nothing illegal about merely possessing the equipment in question, it is abundantly apparent that the Defendants did not have a lawful basis to seize Plaintiff. Accordingly, no officer would objectively conclude that the seizure of the Plaintiff was reasonable under the circumstances.

Therefore, based on the totality of the circumstances, there is a genuine dispute of material fact as to whether or not the Defendants' actions related to the seizure of Plaintiff was objectively reasonable and constitutes an issue for the jury.

## (C) Unlawful Search

The Defendants argue that the warrantless searches of Plaintiff's domicile fall under the exigent circumstances exception as well as the special needs exception. This argument fails with respect to both alleged exceptions because the facts of this case do not support the invocation of either exception and to varying extents, Defendants' arguments as to both exceptions appear to be red herrings.

### i) *Exigent Circumstances*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although it is now a "basic principle of Fourth Amendment law. . .that searches and seizures inside a home without a warrant are presumptively unreasonable," the rule is "subject to certain reasonable exceptions." Kentucky v. King, 563 U.S. 452, 459 (2011) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)). The instant case is not a clear cut exigency case. The factual pattern involved here cannot reconcile the Defense's exigency argument with temporality, scope,

and in light of the totality of the circumstances, each respective warrantless search in the series of searches was unreasonable. As to temporality, the searches were conducted with no temporal connection to the medical emergency; thus an exigency exception is not applicable as a matter of law and fails as a defense.

First, the Defendants' exigency defense is premised entirely upon the assumption that the warrantless intrusion was necessary because they could "not leave and allow Plaintiff to attempt to disguise the home's state before DSS arrived, thus destroying evidence both relevant and necessary for DSS to conduct a proper inspection." *See,* Def's. Memo (ECF#67-1) at pg. 15. The Defendants' baseless evidence destruction rationale is far too thin a reed to stand on to satisfy the the relevant factors required to establish the existence of exigent circumstances, specifically with respect to preventing an imminent destruction of evidence. *See* United States v. Turner, 650 F.2d 526 (4th Cir. 1981) (five (5) factor test established for determining if exigent circumstance exception is reasonable)).

As a threshold matter, the exigency exception is only applicable to situations concerning law enforcement officers conducting a warrantless search pursuant to a criminal investigation. CPS caseworkers are not law enforcement officers. They are civil administrative personnel employed by the SCDSS. Thus, a mere *inspection* of a home by SCDSS cannot be utilized as a reasonable basis for law enforcement officers to invoke the doctrine of exigency. If the Defendants' justification were to be accepted, the practical implications would produce absurd results directly repugnant to the well settled, long standing jurisprudence regarding exceptions to the warrant requirement.

Civilian CPS caseworkers do not possess the authority of a law enforcement officer to invoke the exigent circumstances doctrine. The emergency doctrine specifically permits "immediate entry as an incident to the service and protective functions of the police as opposed to, or as a complement to, their law enforcement functions." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992). Courts interpreting this exception have consistently framed it in terms of law enforcement officers responding to genuine emergencies— not civil agency workers conducting administrative investigations. The Defendants' exigency argument should be seen for what it is: an attempt to manufacture an exigency.

Application of this emergency doctrine is subject to another important limitation. Any search following warrantless entry for emergency reasons of the type here described must then be limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry. See, United States v. Presler, 610 F.2d 1206 (4th Cir.1979) (entry to aid unconscious occupant did not warrant unrelated search of apartment). See also, United States v. Brand, 556 F.2d 1312 (5th Cir.1977) (proper entry to aid drug overdose victim did not warrant unrelated search of adjacent room, but did make valid discovery of contraband in plain view in victim's room).

Furthermore, Defendants have failed to show that a genuine exigency existed. "The Supreme Court and this Circuit have held that more general emergencies, if enveloped by a sufficient level of urgency, may also constitute an exigency and justify a warrantless entry and search. See, United States v. Hill, 649 F.3d 258, 265 (4th Cir. 2011). "The person making entry must have had an objectively reasonable belief that an *emergency* existed that required immediate entry to render assistance or prevent harm to persons or property within." United States v. Moss, 963 F.2d

673, 678 (4th Cir. 1992) (emphasis supplied). But see, United States v. Yengel, (officer's warrantless entry to search for purported grenade in person's home was deemed unconstitutional when the scene was secure, the defendants had ample time to obtain a search warrant prior to entry, and there was no evidence that occupants were in imminent danger).

Contrary to Defendants' assertion, there is absolutely nothing in the record to suggest that the Plaintiff ever had an intention to destroy or obfuscate any evidence, nor do the Defendants identify a single specific fact in support of this claim. An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom. *See*, Mora v. City of Gaithersburg, 519 F.3d 216, 224 (4th Cir. 2008) (citing Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). The Defendants cannot contend that their nonconsensual invasive tarrying was objectively reasonable under this theory because such assertion is based on nothing more than mere speculation and they offer no specific articulable facts to support their claim.

The emergency aid exception does not give an officer free rein to search the home of a person under duress. Indeed, "[a]ny search following warrantless entry for emergency reasons. . .must then be limited by the type of emergency involved." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992). Once Ms. Parsons was no longer suffering from the effects of the overdose, there was no longer an emergency. As such, they Deputy Defendants cannot rely on the emergency aid exception. Accordingly, the Defendants cannot loophole their way into an exigency exception once the emergency dissipates. "Where. . .the objective facts decrease the likelihood, urgency, and magnitude of a threat, any uncertainty is like-wise tempered, and the exigency dissipates." United States v. Yengel, 711 F.3d 392, 400 (4th Cir. 2013).

In United States v. Turner, *supra*, the Court established a five factor test to determine whether an exigent circumstances exception is reasonable in a particular situation. The five factors are as follows: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband. United States v. Turner, 650 F.2d at 528. The facts of this case show that the Defendants cannot satisfy any of the *Turner* factors.

### ii) *Special Needs Exception*

The Defendants are not entitled to summary judgment because the search at issue was a warrantless criminal-investigatory search unsupported by probable cause and untethered to any valid exception. The Fourth Amendment's default rule is clear: searches conducted without a warrant are "per se unreasonable," subject only to "a few specifically established and well-delineated exceptions." United States v. Curry, 965 F.3d 313, 321 (4th Cir. 2020) (en banc) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); accord, United States v. Kolsuz, 890 F.3d 133, 137 (4th Cir. 2018); United States v. Davis, 690 F.3d 226, 252 (4th Cir. 2012). The Defendants bear the burden of proving that an exception applies. *See*, United States v. Davis, 657 F. Supp.2d 630, 645 (D. Md. 2009). They cannot carry that burden here. Their primary theory—the special-needs exception—fails as a matter of law because that doctrine applies only where a search serves "special governmental needs, beyond the normal need for law enforcement." United States v. Black, 707 F.3d 531, 540 (4th Cir. 2013). The Fourth Circuit has repeatedly emphasized that special-needs cases involve programmatic searches justified by non-

law-enforcement objectives and constrained by neutral safeguards, not ad hoc searches by officers in the field investigating suspected crime. *See*, United States v. Curry, 965 F.3d at 324–25 ("special needs cases all involve a critical feature not present here: programmatic safeguards designed to protect against a law enforcement officer's arbitrary use of unfettered discretion"). Here, the Defendants were not administering a neutral regulatory scheme or carrying out a predefined public-safety program. They were investigating whether Plaintiff had committed the criminal offense of impersonating a police officer and searching for evidence of that suspected crime. That is ordinary crime control, not a special need.

Defendants cannot evade that conclusion by relabeling their conduct. "The scope of a warrant exception should be defined by its justifications." United States v. Kolsuz, 890 F.3d at 144. And where "the governmental interest. . . cannot be characterized as anything other than an ordinary interest in law enforcement, the special needs doctrine does not apply." United States v. Davis, 657 F. Supp. 2d at 648. That is exactly this case. The purported "special need" is a post hoc litigation label pasted onto a run-of-the-mill criminal investigation. The Fourth Amendment does not permit such doctrinal laundering. Nor can defendants salvage the search by implying they had authority to investigate first and justify later. No arrest had been made when the search occurred, and a search "may not precede an arrest and serve as part of its justification." United States v. Currence, 446 F.3d 554, 557 (4th Cir. 2006) (quoting, Sibron v. New York, 392 U.S. 40, 63 (1968)). Likewise, observations made during an unlawful search cannot bootstrap probable cause that did not previously exist. United States v. Harvey, 901 F. Supp. 2d 681, 688–89 (N.D.W. Va. 2012). On Plaintiff's evidence, defendants lacked probable cause for impersonation

at the time of the search. The Constitution required them to get a warrant, not to rummage first and rationalize later.

Defendants have not shown entitlement to any exception as a matter of law. In the Fourth Circuit, officers must be able to identify "specific and articulable facts" supporting a detention or search, and exceptions to individualized suspicion exist only in "certain limited circumstances" involving "concerns other than crime detection." *See*, United States v. Black, 707 F.3d at 539–40. The special needs exception "is in no sense an open-ended grant of discretion that will justify a warrantless search whenever an officer can point to some interest unrelated to the detection of crime." Hunsberger v. Wood, 570 F.3d 546, 555 (4th Cir. 2009). Viewed in the light most favorable to Plaintiff, a reasonable jury could find that Defendants lacked probable cause, lacked any valid non-law-enforcement justification, and conducted a discretionary warrantless search for evidence of a criminal offense. That is not a special-needs search. It is the very kind of ordinary law-enforcement intrusion the Fourth Amendment presumptively forbids. Therefore, summary judgment should be denied.

## (D) Excessive Force

It is noteworthy that the Defendants do not not contend that striking, shoving, and slamming Plaintiff's head into his daughter's crib is not excessive force. *See*, Amd. Comp. (ECF#46) at ¶ 76-78. This conduct is most certainly excessive force and cannot be justified nor even mitigated with any reasonable explanation. Notwithstanding the fact that the handcuffing of Plaintiff constituted a significant Fourth Amendment seizure that requires strong justification.

"The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865,

(1989). Determining the reasonableness of an officer's actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. at 396.

The controlling authority in the Fourth Circuit is now clear: handcuffing without making a formal arrest when the person is not posing a threat nor is at risk of evading detection is unreasonable. *See,* E.W. v. Dolgos, 884 F.3d 172 (4th Cir. 2018). In light of the *Dolgos* holding, the Deputy Defendants also cannot hide behind qualified immunity for this unreasonable use of excessive force. *See,* E.W. v. Dolgos, 884 F.3d at 186 ("We emphasize, however, that our excessive force holding is clearly established for any future qualified immunity cases involving similar circumstances"). Summary judgement should be denied because the Defendants did not raise any issue with the primary factual basis of the Plaintiff's excessive force claim. Additionally, a reasonable jury could find that striking, shoving, forceful yanking of extremities, and slamming Plaintiff's head into a crib was an excessive use of force. As such, summary judgement must be denied.

### (E) **Qualified Immunity**

Qualified immunity protects government officials from claims of statutory or constitutional violations when they reasonably mistook the legality of their actions. *See,* Merchant v. Bauer, 677 F.3d 656, 661 (4th Cir. 2012). The Defendants argue that their actions are protected by the doctrine of qualified immunity. Qualified immunity, however, will not protect the conduct of the Defendants in this action.

To determine whether the Deputy Defendants are entitled to qualified immunity, we must answer two questions, with a split burden of proof. *See,* Stanton v. Elliot, 25 F.4th 227, 233 (4th

Cir. 2022). First, has the Plaintiff established that, when viewing the evidence most favorably to him, the officers violated his constitutional rights? *See*, Stanton, *supra*. If so, have the Defendants established that it was not "clear to a reasonable officer that the conduct in which [they] allegedly engaged was unlawful in the situation [they] confronted?" Figg v. Schroeder, 312 F.3d 625, 635 (4th Cir. 2002)). The evidence in this matter will show that the Defendants qualified immunity shield is shattered by the inescapable facts that bombard it, *ab initio* and throughout their illegal series of warrantless searches.

Once the emergency ends, continued searching for evidence without a warrant or another exception is unlawful, and qualified immunity should not protect officers who persist despite the absence of ongoing exigency. *See*, Bailey v. Kennedy, 349 F.3d 731 (4th Cir. 2003); United States v. Curry, 965 F.3d 313 (4th Cir. 2020).

Warrantless searches and seizures inside the home are presumptively unconstitutional. *Yengel* describes this as "[t]he most basic principle of Fourth Amendment jurisprudence," United States v. Yengel, 711 F.3d 392, 396 (4th Cir. 2013). Officers begin from a constitutional default against warrantless home intrusion, not from a field of uncertainty. The home receives the highest Fourth Amendment protection, and any exception must be justified with precision. Such a justification cannot be made in this case, especially not considering the justifications advanced by the Defendants thus far; of which consist mostly of red herrings, and manufactured *ex post facto* exigencies.

The emergency / exigency doctrine is narrow and fact-dependent. "Reasonableness exceptions. . .must be narrow and well-delineated in order to retain their constitutional character." Yengel, 711 F.3d at 396. Warrantless entry requires "an objectively reasonable belief

that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within," Id. 711 F.3d at 397. Exigency turns on "specific articulable facts and reasonable inferences." United States v. Curry, 965 F.3d at 321 (quoting, United States v. Yengel, 711 F.3d 392 (4th Cir. 2013)). Emergencies justify only "limited searches or seizures." United States v. Curry, *supra*. In the case at bar the Defendants are quite obviously attempting to stretch an initial justification into a broader evidentiary search. In light of this fatal flaw, the Defendants cannot expect to be protected by qualified immunity.

Even when emergency entry is initially permissible, the scope of the search is strictly limited to the emergency that justified it. "Any search following warrantless entry for emergency reasons. . .must then be limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992).

The instant case presents overwhelming evidence that throughout the many hours that elapsed since the resolution of the emergency exceeded the limitation *Moss* articulates. The search was clearly a fishing expedition and was a patent constitutional violation that cannot be cured by an attempt to hide behind an exigency that had unequivocally dissipated and was temporally disconnected from the constitutionally violative searches.

It is axiomatic that where no actual exigency exists—or where officers no longer have reason to believe it exists— a constitutional violation is clearly established for qualified-immunity purposes. *See*, Bailey v. Kennedy, 349 F.3d 731 (4th Cir. 2003). In *Bailey*, the court rejected officers' claim that exigent circumstances justified warrantless entry, holding that "no exigent circumstances justified their warrantless entry into the Baileys' home," and further that

"it was clearly established that no exigent circumstances requiring immediate action to protect human life existed to justify the search. Moreover, a man of reasonable intelligence would not have believed that exigent circumstances existed in this situation." Baily v. Kennedy, 349 F.3d 731, 744–45 (4th Cir. 2003). The temporal factor pertaining to exigency is a substantial cruciality to the issue *sub judice*, *Yengel* and *Curry* sharpen the temporal dimension of exigency. The fact that the minor child was not in immediate danger, the overdose situation had resolved, the scene was secure, and there was absolutely no cognizable threat to officer safety, the holding in *Yengel* is on point with the issues in the case at bar; such as the "stable nature of the threat," its "immobile and inaccessible location," and the officers' own conduct indicating they did not truly regard the danger as requiring immediate action. *See*, Yengel, 711 F.3d at 398.

*Curry* provides a later Fourth Circuit reaffirmation that exigency cannot be generalized or extended beyond its factual predicate. The court stated that emergency-based intrusions depend on "specific articulable facts and reasonable inferences" and warned against approaches that would "completely cripple a fundamental Fourth Amendment protection." United States v. Curry, 965 F.3d 313, 321–22, 326 (4th Cir. 2020). The Fourth Circuit expressly held that a search justified by emergency entry "must then be limited by the type of emergency involved" and "cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992). That language is directly applicable to any scenario in which officers, having neutralized the emergency, continue probing drawers, rooms, containers, or other areas for evidence. It squarely rejects the idea that a lawful initial entry gives officers a roving commission to search further. Furthermore, warrantless home searches are presumptively unconstitutional and the emergency exception requires an

"objectively reasonable belief" in an emergency requiring "immediate entry." United States v. Yengel, 711 F.3d 392, 396–97 (4th Cir. 2013). The Fourth Circuit Court of Appeals in *Yengel* treated the lack of urgency as fatal. *See*, United States v. Yengel, 711 F.3d at 398. Thus, since the Deputy Defendants in the case at bar had time to obtain a warrant but chose instead to continue searching, the searches should be deemed unconstitutional.

On qualified immunity, Bailey v. Kennedy, 349 F.3d 731 (4th Cir. 2003) is the most important authority. The Fourth Circuit did not merely find a constitutional violation; it held that where the officers lacked a valid exigency, "it was clearly established" that immediate-action circumstances did not justify the search, and that "a man of reasonable intelligence would not have believed that exigent circumstances existed." Bailey v. Kennedy, 349 F.3d 731, 745 (4th Cir. 2003). In a case where officers continue searching after the emergency ends, authority arising from *Bailey* supports denial of qualified immunity because the facts show that a reasonable officer would have understood the exigency had dissipated.

Finally, the arrest / detention issue also cuts against the Defendants' ability to rely on qualified immunity and is a derivative of the search issue. The detention's justification collapses simultaneously with the search's justification. If no valid emergency requiring immediate action exists, officers cannot continue restraining liberty merely to facilitate an unconstitutional evidentiary investigation. The qualified immunity argument advanced by the Defendants is only further attenuated by the fact that during the entire escapade of illegality perpetrated by the Deputy Defendants, the Plaintiff was compliant, the premises secured, and there was no imminent danger. For these reasons, the Defendants' qualified immunity argument should fail as a matter of law and the motion for summary judgement should be denied.

## (F) Eleventh Amendment Immunity

The Defendants' Eleventh Amendment argument appears to contend that Defendant Greenville County is immune from suit pursuant to the Eleventh Amendment. Such argument is flawed. The Eleventh Amendment does not shield Greenville County from liability under 42 U.S.C. § 1983. Unlike a State or an arm of the State, a county does not enjoy Eleventh Amendment immunity from such claims. That principle is controlling here. In Scott v. Greenville County, 716 F.2d 1409, 1413–14 (4th Cir. 1983), the Fourth Circuit expressly rejected the argument that Greenville County derived Eleventh Amendment immunity from the State, holding that the district court erred in concluding otherwise and that the suit could proceed against Greenville County. That decision directly forecloses any argument that Greenville County is entitled to summary judgment on sovereign-immunity grounds. Nor is there any dispute that counties may be sued directly under § 1983 where the alleged injury was caused by official policy or custom. As the Fourth Circuit explained in Dotson v. Chester, 937 F.2d 920, 924 (4th Cir. 1991), counties, like other local government entities, may be sued for constitutional violations, provided the violation bears a sufficient relationship to county policy or custom. Accordingly, Greenville County cannot obtain summary judgment on the ground that the Eleventh Amendment bars Plaintiff's *Monell* claim.

## (G) *Monell* Claims

The Supervisor Defendants argue that the Plaintiff cannot show supervisory inaction by the Defendants and they should be entitled to summary judgement regarding the Plaintiff's *Monell* liability theory. Defendants further argue that discovery has not "borne out [any] evidence" of the

Plaintiff's claim. The evidence contradicts these assertions made by the Defendants and as such summary judgement should be denied. I will draw the Court's attention to the fact that these claims are not premised on a theory of vicarious liability. Ergo, we do not rely on *respondent superior* to prove such claims. Instead, the evidence will show that the Supervisory Defendants knew of a pervasive risk, responded with deliberate indifference or tacit authorization, and thereby set in motion or allowed the natural consequences that injured plaintiff. The Court should deny summary judgment because a genuine issue of material fact exists regarding the disputed issues of *inter alia*, notice, obviousness, adequacy of response, and causation.

When alleging supervisory inaction, a Plaintiff must show that "the supervisor's corrective inaction amounts to deliberate indifference or tacit authorization of the offensive practices." Orpiano v. Johnson, 632 F.2d 1096, 1101 (4th Cir. 1980). With respect to supervisor liability, the plaintiff must establish three (3) elements to prove such claim. *See,* Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994). Those elements are: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices," and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d at 799 (internal citations omitted). "[T]his issue is ordinarily one of fact, not law." Avery v. County of Burke, 660 F.2d 111, 114 (4th Cir. 1981).

As to the first element, "establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions

and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." Wilkins v. Montgomery, 751 F.3d 214, 228 (4th Cir. 2014) (citing, Shaw v. Stroud, *supra*). Thus, if the record contains repeated grievances, prior incidents, staff complaints, inspection findings, known shortages, chronic delays, or recurring failures by the same subordinates, that is enough to create a triable issue on supervisory knowledge.

With respect to the second element, a plaintiff "may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." Wilkins v. Montgomery, 751 F.3d 214, 228 (4th Cir. 2014).

The third element, causation, is established when the plaintiff demonstrates an "affirmative causal link" between the supervisor's inaction and the harm suffered by the plaintiff. Slakan v. Porter, 737 F.2d 368, 376 (4th Cir.1984). "This concept encompasses cause in fact and proximate cause." Shaw v. Stroud, *supra*. "Proof of causation may be direct. . .where the policy commands the injury of which the plaintiff complains. . .[or] may be supplied by [the] tort principle that holds a person liable for the natural consequences of his actions." Slakan v. Porter, *supra*.

In the instant case, as discussed *supra*, corrective inaction by the Supervisory Defendants occurred when Defendant GCSO was made aware of documented constitutionally violative behavior perpetrated by subordinate personnel in prior incidents but either did nothing to investigate such conduct, failed to implement adequate corrective measures, or knowingly allowed the conduct to continue without taking any action. The Defendants had prior notice of such conduct before the tortuous conduct occurred with respect to the instant case. Despite having notice of such conduct, the Supervisory Defendants failed to adequately take action or took no action at all to remedy the conditions giving rise to the liability forming conduct, such as

false arrest and illegal searches and seizures that occurred prior to the incident in the instant case. *See generally*, Exhibit M (Table of Misconduct / OPS Investigations). *See also,* Exhibit N, Exhibit O, Exhibit P, Exhibit Q and Exhibit R. Such inaction is tantamount to deliberate indifference and / or the tacit authorization of the offensive practice of violating citizens' constitutional rights.

Furthermore, also discussed above and via the affidavit testimony of the Plaintiff (Exhibit C) the Plaintiff made a formal complaint to GCSO's Office of Professional Standards regarding the incident that gave rise to the present litigation but it appears that Defendant GCSO did not investigate such complaint whatsoever in contravention to GCSO's well established policy. *See,* Exhibit K. This clearly shows supervisory inaction that was done with deliberate indifference to Plaintiff's rights because the conduct complained of would have put the Supervisory Defendants on notice of constitutional violations perpetrated by deputies had they actually conducted an investigation. Thusly, it is a reasonable inference that the Supervisory Defendants knew that such inaction clearly carries with it a pervasive and unreasonable risk of harm.

With respect to Defendant Owens in particular, Defendant GCSO's own records show that the conduct is widespread and pervasive, the supervisors clearly were aware of this conduct and failed to take adequate corrective action to prevent a continued unreasonable risk of harm of constitutional injury. *See,* Exhibit M. Such inaction or inadequate response by the Supervisory Defendants is indicative of deliberate indifference or tacit authorization of the misconduct.

It appears that Defendant Bryson undeniably committed a domestic assault on his stepson while the Defendant was in the process of assaulting or threatening his wife with the infliction of bodily harm. *See,* Exhibit R (Simpsonville PD Incident Report). There was certainly enough

probable cause to support an arrest for one (1) count of domestic violence 2rd degree pursuant to S.C. Code Ann. § 16-25-20(C)(4)(e)(ii). Defendant Bryson has been involved in multiple other incidents of misconduct yet he has never been properly disciplined. *See*, Exhibit M. By not criminally charging or properly taking action in response to Defendant Bryson's conduct, the Supervisory Defendants' conduct evinces a pattern and practice of deliberate indifference or tacit authorization of the misconduct.

But for the Supervisory Defendants continuously allowing criminal and constitutionally violative conduct to go unchecked, the chillingly abusive and constitutionally violative conduct in which the Deputy Defendants perpetrated during the illegal search and seizure of the Plaintiff and his chattels would not have occurred.

The evidence, when viewed in the light most favorable to the Plaintiff, shows that a genuine issue of material fact exists with respect to the Plaintiff's claims of deliberate indifference, supervisor liability, and municipal liability.

## (H) Negligence / Gross Negligence

Summary judgement must be denied because the record, viewed in the light most favorable to the Plaintiff, presents genuine disputes of material fact regarding the negligence and gross negligence causes of action. South Carolina law defines gross negligence as "the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." Clark v. S.C. Dep't of Pub. Safety, 362 S.C. 377, 385, 608 S.E.2d 573, 577 (2005). Gross negligence also means the "failure to exercise slight care" and is a relative term requiring consideration of "the absence of care that is necessary under the circumstances." Id. *See also*, Etheredge v. Richland Sch. Dist. One, 341 S.C. 307, 310, 534

S.E.2d 275, 277 (2000). Gross negligence is ordinarily a mixed question of law and fact. Faile v. S.C. Dep't. of Juvenile Justice, 350 S.C. 315, 345, 566 S.E.2d 536, 552 (2002). It becomes a question of law only when the evidence supports but one reasonable inference. *See*, Etheredge v. Richland Sch. Dist. One, *supra*. The record here permits multiple reasonable inferences from which a jury could find that the responding deputies and supervisory actors failed to exercise even slight care. Summary judgment is therefore improper.

The South Carolina Tort Claims Act ("SCTCA") provides the exclusive civil remedy for torts committed by governmental employees acting within the scope of official duty. *See*, S.C. Code Ann. § 15-78-70(a). Although the Act contains exceptions to the waiver of immunity, the exceptions do not defeat a claim where the statutory gross-negligence proviso applies and the record supports a jury finding of gross negligence. S.C. Code Ann. § 15-78-60(25) addresses losses resulting from governmental "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody" and preserves liability when that responsibility or duty "is exercised in a grossly negligent manner." *See*, S.C. Code Ann. § 15-78-60(25). South Carolina courts apply this provision by asking whether the governmental actor failed to exercise slight care under the circumstances. *See*, Rainey v. S.C. Dep't of Soc. Servs., 434 S.C. 342, 357–58, 863 S.E.2d 470, 478–79 (Ct. App. 2021).

The evidence here falls squarely within S.C. Code Ann. § 15-78-60(25). The Deputy Defendants assumed control over Plaintiff inside his own residence, ordered him to remain seated, restricted his movement, handcuffed him, removed him from the home, held him under guard for hours in summer heat, and prevented him from checking on his fiancée and child. Those facts implicate control, confinement, custody, protection, and supervision. A reasonable

**Page 42 of 45**

jury could find that those duties were not exercised with at least slight care. *See*, <u>Clark v. S.C.</u> <u>Dep't of Pub. Safety</u>, *supra.*

A jury could find that the Defendants failed to exercise slight care when they converted a medical rescue call into an aggressive detention and search without probable cause. Defendants knew that Plaintiff was seeking emergency medical aid, yet Defendants escalated the encounter, restricted Plaintiff's movement, effectuated a de facto arrest, and conducted myriad warrantless searches rather than limiting their conduct to legitimate functions.

The evidence shows that, while handcuffed and compliant, Plaintiff was assaulted and had his head slammed into his child's crib merely for attempting to comfort his daughter. *See*, <u>Amd.</u> <u>Comp</u>. (ECF#46) at ¶ 76-78. *See also*, <u>Exhibit C</u>. South Carolina law recognizes that an unlawful arrest may support liability for physical contact associated with the arrest. <u>Horton v. City of</u> <u>Columbia</u>, 408 S.C. 27, 44–45, 757 S.E.2d 537, 546–47 (Ct. App. 2014). A jury could find that using such force on a restrained, non-violent person reflected conscious indifference to Plaintiff's safety and constituted the absence of slight care. Furthermore, Plaintiff was held in handcuffs for an extended period of time, and was forced to remain against his will in the summer heat for over four (4) hours without adequate access to water or relief, while suffering from cyclic vomiting, and recent medical incapacitation. Such facts permit a jury to conclude that the Defendants knowingly disregarded an obvious risk to Plaintiff's health while exercising custody.

The Defendants cannot avoid trial by recasting the deputies' operational misconduct as protected discretion under <u>S.C. Code Ann. § 15-78-60(5)</u>. The governmental entity bears the burden of establishing an exception to the SCTCA's waiver of immunity. *See*, <u>Faile</u>, 350 S.C. at 331. To establish discretionary immunity, the governmental entity must show more than the mere

existence of choices; it must prove that the employee actually weighed competing considerations and made a conscious choice using accepted professional standards. *See*, Clark, 362 S.C. at 387. In *Faile*, the South Carolina Supreme Court held summary judgment was improper where the governmental entity fails to establish the conduct resulted from a protected discretionary decision rather than an administrative or operational failure. Faile, 350 S.C. at 333–36.

Moreover, S.C. Code Ann. § 15-78-60(5) does not immunize conduct that a jury could find grossly negligent under S.C. Code Ann. § 15-78-60(25). *See*, Faile, 350 S.C. at 337–38.

## (I) Civil Conspiracy

It appears that the Defendants presume they cannot be subjected to liability for civil conspiracy due to the intracorporate conspiracy doctrine. However, the Defendants' acts fall within a certain narrow exception to the doctrine.

The intracorporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own. *See*, ePlus Tech., Inc. v. Aboud, 313 F.3d 166, 179 (4th Cir. 2002) ("under the intracorporate immunity doctrine, acts of corporate agents are acts of the corporation itself, and corporate employees cannot conspire with each other or with the corporation"). There are two (2) important exceptions to this doctrine. First, the intracorporate immunity doctrine is generally inapplicable "where a co-conspirator possesses a personal stake independent of his relationship to the corporation." ePlus Tech., 313 F.3d at 179. Secondly, a plaintiff may state a conspiracy claim where the agent's acts were not authorized by the corporation. *See*, Buschi v. Kirven, 775 F.2d 1240 1252–53 (4th Cir. 1985). In the instant case, the Deputy Defendants combined, coordinated, and conspired to deceive Plaintiff into believing that the various warrantless searches conducted on the date in question were pursuant

**Page 44 of 45**

to a valid warrant, when in fact no warrant was ever acquired. *See*, <u>Amd. Comp. (ECF#46)</u> at pg. 34. The aforementioned conduct constitutes a conspiracy outside their official roles due to such acts not being authorized by the principal entity.

### (J) <u>Common Law False Imprisonment</u>

Defendants are not entitled to summary judgment on Plaintiff's state law claim for false imprisonment because the record creates multiple genuine disputes of material fact as to whether Plaintiff was intentionally restrained without lawful justification as discussed *supra*. Under South Carolina law, false imprisonment consists of the deprivation of one's liberty without lawful justification. *See*, <u>Carter v. Bryant</u>, 429 S.C. 298, 838 S.E.2d 523 (Ct. App. 2020). The issues turn on disputed facts and competing inferences; therefore summary judgment should be denied.

## VI. <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons the Defendants' Motion To Dismiss or In The Alternative Motion For Summary Judgement should be denied *in toto*.

Respectfully submitted,

By: *Nathan L. Chambers*

Nathan L. Chambers
Fed. Bar No: N/A
162 Steve Nix Road Suite 2B
Seneca, South Carolina 29678
(864) 561-3838
<u>nchambers@celeriuslimited.com</u>
FOR THE PLAINTIFF

30th May, 2026
Seneca, South Carolina

**ATTACHMENT A**

## CERTIFICATION OF DESIGNATION
## OF INFORMATION AS CONFIDENTIAL

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Nathan L. Chambers, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 6:25-cv-01068-TMC-KFM |
| v. | ) | |
| | ) | |
| Greenville County, Greenville County | ) | |
| Sheriff's Office, John Hobart Lewis, Louis | ) | **CERTIFICATION OF** |
| Ortiz, James Michael Glass, Hannah | ) | **DESIGNATION OF INFORMATION** |
| Stouffer, Jason Owens, Ryan Freeman, | ) | **AS CONFIDENTIAL** |
| and Walter Bryson, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Documents produced herewith **[whose bates numbers are listed below (or) which are listed on the attached index]** have been marked as CONFIDENTIAL subject to the Confidentiality Order entered in this action which Order is dated 18th July, 2025.

By signing below, I am certifying that I have personally reviewed the marked documents and believe, based on that review, that they are properly subject to protection under the terms of Paragraph 3 of the Confidentiality Order.

Check and complete one of the options below.

☒      I am a *pro se* party to this action.

❏      I am a member of the Bar of the United States District Court for the District of South Carolina. My District Court Bar number is [District Court Bar #].

❏      I am not a member of the Bar of the United States District Court for the District of South Carolina but am admitted to the bar of one or more states. The state in which I conduct the majority of my practice is [state in which I practice most] where my Bar number is [that state's Bar #]. I understand that by completing this certification I am submitting to the jurisdiction of the United States District Court for the District of South Carolina as to any matter relating to this certification.

Date:  30th May, 2026

Nathan L. Chambers
FOR THE PLAINTIFF