

PLAINTIFF'S
EXHIBIT
B

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## GREENVILLE DIVISION

C/A No. 6:25-cv-01068-TMC-KFM

Nathan Chambers,
        Plaintiff,

Vs.

County of Greenville, Et al.
        Defendants.

**AFFIDAVIT OF
JOHN E. CHAMBERS, JR.**

---

**PERSONALLY APPEARED BEFORE ME THE AFFIANT, <u>JOHN E. CHAMBERS, JR.</u>, WHO AFTER BEING DULY SWORN, DEPOSES AND TESTIFIES AS FOLLOWS:**

1. My name is **John E. Chambers, Jr.**

2. I am an attorney (SC Bar No. 9027) and am competent to make this affidavit.

3. I make this affidavit based upon my personal knowledge of the matters stated herein.

4. If called as a witness, I could and would testify truthfully to the facts set forth in this affidavit.

5. This affidavit is submitted in connection with the issue raised by Defendants concerning the deposition of Plaintiff, Nathan Chambers, that had been scheduled for November 4, 2025.

6. I am not counsel of record for any party in this matter and I have no intention of making an appearance in this matter on behalf of the Plaintiff.

Page 1 of 4

7. At all times relevant hereto, I was acting in the capacity of Plaintiff's agent and not as counsel.

8. On or about November 2, 2025, I was asked by the Plaintiff, Nathan Chambers to check his mail and I was authorized to open any mail that appeared to pertain to any pending matters in which he was currently handling.

9. I observed an envelope that appeared to have a law firm's logo on it, therefore I opened such envelope in accordance with the instructions and authorization set forth above.

10. The envelope contained a notice of deposition regarding the instant case. I also observed a cover letter that appears to be from Charles F. Turner, Jr., Esquire dated October 23, 2025.

11. The NOD indicated that Defense counsel intended to take the Plaintiff's deposition on November 4, 2025.

12. Nathan Chambers gave me express authority to act as his agent for the limited purpose of making contact with the attorneys for the Defendants in order to apprise them of the fact that he was incarcerated and could not attend the scheduled deposition on the date set forth in the NOD.

13. On November 3, 2025, I called the law firm of Wilson Jones Carter & Baxley, P.A.

14. I made that call on behalf of Plaintiff concerning the deposition that had been scheduled for November 4, 2025.

15. During that call, I made contact with opposing counsel or a representative of opposing counsel regarding the scheduled deposition.

16. I advised that Plaintiff was incarcerated at that time.

17. I further advised that Plaintiff's incarceration would prevent him from appearing for the deposition scheduled for November 4, 2025.

18. The subject of canceling and rescheduling the deposition was discussed during the call.

19. It was agreed that the deposition scheduled for November 4, 2025 would be canceled because Plaintiff was incarcerated at the time the deposition was supposed to take place.

20. It was further agreed that opposing counsel would reschedule Plaintiff's deposition to a later date.

21. It was understood that the later deposition date would be determined once Plaintiff was released from the custody of the Oconee County Sheriff's Office.

22. Based on that communication and agreement, I understood that Plaintiff was not expected to appear for the deposition on November 4, 2025.

23. Based on that communication and agreement, I further understood that the deposition would be re-noticed or otherwise rescheduled after Plaintiff's release from custody.

24. I provide this affidavit to set forth my recollection of the communication that occurred on November 3, 2025 regarding the deposition scheduled for November 4, 2025.

25. I understand that Defendants have asserted that Plaintiff failed to appear for his deposition.

26. My recollection is that the deposition had been canceled by agreement because Plaintiff was incarcerated and that opposing counsel would reschedule the deposition after Plaintiff was released from custody.

27. Nothing in this affidavit is intended to address the merits of Plaintiff's substantive claims or Defendants' substantive defenses. This affidavit is limited to the deposition-scheduling issue described above.

28. I understand that deposition notices and sanctions concerning failure to appear for deposition are governed by the Federal Rules of Civil Procedure, including Rule 30, FRCP and Rule 37, FRCP.

29. I declare under penalty of perjury that the foregoing is true and correct based upon my personal knowledge.

THUS MORE YOUR AFFIANT SAYETH NOT.

Executed on: 15 April, 2026
Location: Greenville, South Carolina

_____
**Signature of Affiant**

**SWORN TO & SUBSCRIBED BEFORE ME:**

This 15th day of April, 2026

_____
**Notary Public For South Carolina**
**My Commission Expires:** _____

Page 4 of 4

CONFIDENTIAL

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION



PLAINTIFF'S
EXHIBIT
C

| | |
|---|---|
| Nathan Chambers, <br><br> Plaintiff, <br><br> Vs. <br><br> County of Greenville, Et al. <br> Defendants. | C/A No. 6:25-cv-01068-TMC-KFM <br><br><br> **AFFIDAVIT OF** <br> **NATHAN L. CHAMBERS** |

**PERSONALLY APPEARED BEFORE ME THE AFFIANT, <u>NATHAN L. CHAMBERS</u>, WHO AFTER BEING DULY SWORN, DEPOSES AND TESTIFIES AS FOLLOWS:**

# I. Introduction & Background

1. My name is Nathan L. Chambers.

2. I am the Plaintiff in this action.

3. I am over eighteen years of age.

4. I have the legal and mental competency to provide the sworn testimony set forth in this affidavit herein and to testify in court.

5. The sworn testimony contained in this affidavit is based on my own personal knowledge, except as to matters therein stated to be alleged on information and belief; and to those matters I believe them to be true.

6. If called as a witness, I could and would testify truthfully to the matters set forth in this affidavit.

CONFIDENTIAL

7.    I submit this affidavit in opposition to Defendants' Motion to Dismiss Or In The Alternative For Summary Judgment (ECF#67).

8.    This affidavit addresses the principal factual disputes raised by Defendants, including but not limited to: the purpose and limited scope of my consent to enter my home; whether I objected to further searches and continued police presence; whether I acted erratically, interfered with medical care, made furtive movements, or posed a safety threat; whether the searches were consensual, justified by exigency, or justified by child-welfare concerns; whether I was detained, arrested, or otherwise seized; whether force was used against me; whether Defendants represented that they were obtaining or had obtained a search warrant; whether I consented to the later search; and facts relevant to supervisory and municipal liability, negligence, false imprisonment, and civil-conspiracy.

9.    The events described below occurred on or about June 28, 2022, at my residence located at 110 Perry Road, Greenville County, South Carolina.

## II.  The 911 Call And Limited Scope of Consent To Enter Premises

10.    On June 28, 2022, I contacted Greenville County emergency services because my fiancée, Rachel Parsons, appeared to be experiencing a suspected opioid overdose.

11.    I called 911 to obtain emergency medical assistance for Ms. Parsons. I did not call 911 to invite a general criminal investigation of my home, my family my personal belongings, my bedroom, my law-enforcement-related equipment, or for any other reason unrelated to the specific purpose of assisting with the resuscitation of Ms. Parsons.

CONFIDENTIAL

CONFIDENTIAL

12. Before Defendants arrived, I administered Narcan® and attempted to resuscitate Ms. Parsons. I was frightened, distressed, and focused on keeping her alive.

13. When deputies arrived, I allowed them into my home for the limited purpose of reaching Ms. Parsons and assisting with the medical emergency.

14. My permission for deputies to enter was *limited* to the emergency purpose for which I had called 911. Such purpose was *solely* to provide medical assistance to Ms. Parsons.

15. I did not give Defendants permission to conduct a general search of my residence.

16. I did not give Defendants permission to rummage through my personal property.

17. I did not give Defendants permission to inspect, manipulate, seize, or search my law-enforcement related equipment or other chattels.

18. I did not give Defendants permission to remain in my home for hours after the immediate medical emergency had dissipated.

19. After Ms. Parsons regained consciousness and EMS became involved, the circumstances no longer required the deputies to remain on scene.

## III. My Conduct During & Immediately After The Resuscitation of Parsons

20. Defendants characterize me as acting in an erratic fashion. I dispute that characterization.

21. Defendants further characterize my behavior as confrontational. I dispute that characterization

22. Defendants accuse me of interfering. I dispute that characterization.

CONFIDENTIAL
**Page 3 of 28**

CONFIDENTIAL

23. I was emotionally shaken because I just had to save my fiancée's life and I was worried about her and about my minor child.

24. Any distress I displayed was the natural result of witnessing and responding to a life-threatening overdose involving my fiancée.

25. I did not threaten any deputy, EMS provider, or other person.

26. I did not attempt to flee.

27. I did not attempt to destroy evidence.

28. I did not make furtive movements.

29. I did not interfere with EMS personnel rendering care to Ms. Parsons.

30. I complied with commands given to me, even when I believed those commands were unreasonable.

31. At one point, Ms. Parsons indicated that she was cold and asked for a blanket. I attempted to obtain a blanket for her. That was not a furtive movement and was not an attempt to interfere with EMS, hide evidence, or threaten anyone.

32. I was not arguing with Defendant Freeman while he was rendering medical aid. I did question Defendant Ortiz and object to inappropriate law enforcement conduct after deputies began intrusively searching areas and belongings unrelated to the overdose.

33. My objections were calm, lawful, and based on my understanding that the deputies had no warrant and no consent to search my private belongings.

CONFIDENTIAL

CONFIDENTIAL

34. At no time did I give Defendants any objective reason to believe that I posed an immediate danger to officer safety.

35. At no time did I give Defendants any objective reason to believe that I was being disorderly nor causing a disturbance.

36. At no time did I give Defendants any objective reason to believe that I was about to flee.

37. At no time did I give Defendants any objective reason to believe that I was about to destroy evidence.

38. The scene was secure, and I was compliant.

## IV. Initial Searches and My Objections

39. After Ms. Parsons regained consciousness, Defendant Ortiz began shining his flashlight around my bedroom in a manner I experienced as intrusive and unrelated to medical assistance.

40. Defendant Ortiz also used his flashlight to illuminate my person and my surroundings in a way that made me feel targeted and detained.

41. Defendant Ortiz later ordered me to sit in a chair with my hands in my lap.

42. I complied with that order.

43. I understood that I was no longer free to move about my own home.

44. Defendant Ortiz then began looking through or inspecting my personal belongings and chattels without a warrant and without my consent.

CONFIDENTIAL

CONFIDENTIAL

45. I objected to that search.

46. My objection was not an attempt to obstruct medical care. It was an objection to a warrantless search of private property.

47. After I objected, Defendant Ortiz became visibly angry and abruptly approached me.

48. Defendant Ortiz handcuffed me shortly after I objected to the search.

49. Defendant Ortiz's decision to handcuff me was not because I posed a threat, attempted to flee, interfered with EMS, or attempted to destroy evidence.

50. I believe I was handcuffed because I objected to unconstitutional searches and because Defendants wanted to control and silence me.

51. I saw Defendant Ortiz handle and inspect my tactical outer-carrier vest and equipment.

52. I saw deputies handle, manipulate, and inspect items in or around my vest and other personal belongings.

53. I did not consent to those inspections.

54. Such items were not being inspected to save Ms. Parsons's life.

55. Such items were not anywhere near the minor child's crib and had no relevance to any investigation regarding the minor child's well-being.

56. Such items were not searched because of any immediate threat to anyone's safety.

57. The searches of my personal property were unrelated to the purpose for which I had called 911.

CONFIDENTIAL

CONFIDENTIAL

## V. Detention, De Facto Arrest, Removal From The Home, Continued Abridgment of Liberty & Use of Force

58. Defendant Ortiz placed me in handcuffs inside my home.

59. I did not voluntarily submit to being handcuffed; I submitted because I was under the authority and control of armed deputies.

60. I was then removed from the bedroom and from the residence.

61. While Defendant Glass was escorting me out, I attempted to comfort my minor child, who was distressed.

62. I did not attempt to flee while being escorted out.

63. I did not attempt to strike, push, or harm Defendant Glass or anyone else.

64. My behavior was not combative nor threatening at any time during the entire duration of the event in question.

65. I never displayed behavior that could be construed to be passive resistance nor active resistance. In fact, I calmly obeyed every order given by the Deputy Defendants.

66. I did not resist arrest or detention.

67. Defendant Glass used force against me while I was restrained and compliant.

68. Defendant Glass slammed or drove my face and body into my child's crib.

69. The impact caused me pain and injury and caused distress to my minor child.

70. I believe the use of force was unnecessary, excessive, and punitive.

CONFIDENTIAL

71. After I was removed from the residence, I was required to remain outside, under guard, and was not free to leave.

72. I was made to remain outside during summer heat for an extended period.

73. For a significant portion of the incident I was handcuffed, restricted in movement, and under the control of deputies.

74. Even after handcuffs were removed, I did not believe I was free to leave.

75. Deputies remained with me and continued to control my movement.

76. I was not told that I was free to leave.

77. I was not free to enter my home to check on Ms. Parsons, my child, or my property.

78. I was not free to terminate the encounter.

79. I was detained for a significantly prolonged period of time. The entire period lasted over four hours; during which Defendants maintained control over me and my property.

80. I experienced the detention as a custodial arrest or de facto arrest, because my freedom of movement was restrained to a degree associated with formal arrest.

81. I was Mirandized during the encounter.

82. Being Mirandized reinforced my understanding that Defendants considered me to be in custody.

83. I was questioned about law-enforcement-related equipment and alleged drug use while detained.

84. Contrary to what was asserted by the Defendants, I did not admit to consuming drugs.

85. The ambiguous, one-word response that I uttered to Defendant Ortiz regarding such subject matter was not an admission that I had consumed drugs on the date in question.

86. The drugs located on scene were procured solely by Ms. Parsons without my knowledge and she was the sole possessor of such illicit substances.

87. I never had possession, custody, or control of the illicit substances located on scene at any time.

88. I did not feel free to refuse questioning, leave, or reenter my home.

## VI. Revocation And Limitation of Consent

89. I told Defendant Glass, in substance, that the Deputy Defendants' permission to enter or remain in my home was limited to providing emergency medical assistance to Ms. Parsons.

90. I told Defendant Glass, in substance, that the deputies did not have my consent to continue searching or remaining in my home beyond that purpose and in light of the fact that the initial medical emergency had dissipated, I requested that they immediately depart.

91. Defendant Glass acknowledged my objection or revocation, but told me that any decision about whether deputies would leave or stop their activities would have to be made by a supervisor.

92. I understood from that response that my objection would not be honored.

93. Defendant Glass did not communicate my objection to the deputies who continued searching, to my knowledge.

CONFIDENTIAL

94. I continued objecting to the deputies' searches and presence as best I could while detained and under guard.

95. I did not knowingly, voluntarily, or freely consent to Defendants' continued warrantless searches after I was detained.

96. Any later interaction that Defendants characterize as consent occurred after I had already been detained, handcuffed, removed from my home, and placed under police control.

97. I was not in a position where I felt free to refuse the deputies' requests.

98. I was not in a position where I felt free to terminate the encounter.

99. I was not in a position where I felt free to insist that all deputies leave my property.

100. I did not sign any written consent-to-search form.

101. No deputy presented me with a written consent-to-search form.

102. No deputy advised me in writing that I had a right to refuse consent.

103. No deputy clearly advised me before the search that I could refuse consent and require a warrant.

104. To the extent any deputy stated that I could withdraw consent later, that statement did not cure the coercive circumstances because I was already detained and because Defendants prevented me from observing and controlling the scope of the search.

## VII. Search Warrant Representations and My Understanding

105. During the incident, Defendant Owens stated to me, in substance, that deputies were in the process of obtaining a search warrant and were waiting for it.

CONFIDENTIAL

106. I understood from Defendants' statements and conduct that a search warrant was being obtained or had been obtained.

107. I asked Defendant Glass about Defendant Bryson's role and purpose on scene.

108. Defendant Glass told me, in substance, that Defendant Bryson was an investigator and that he was on scene to conduct a search related to the search warrant that Defendant Owens had discussed.

109. Based on Defendants' representations, I believed the deputies were conducting or preparing to conduct a search pursuant to a lawful warrant.

110. I later learned that Defendants did not have a search warrant.

111. My understanding that Defendants had or were obtaining a warrant affected my perception of whether I had any practical choice.

112. I did not believe I had the right or practical ability to stop the search because I believed Defendants were acting under purported warrant authority.

113. When Defendant Owens later spoke to me about checking serial numbers and searching, I believed he was informing me about what deputies were going to do, not asking for free and voluntary consent.

114. I mistakenly interpreted Defendant Owens's statements about my ability to observe and object as a promise that I would be allowed to watch the search and object if deputies exceeded the stated scope.

115. Defendants did not honor that understanding.

CONFIDENTIAL

116. Defendants closed the door in my face and otherwise prevented me from meaningfully observing the search.

117. Because I could not observe the search, I could not meaningfully object to its scope or revoke any alleged consent.

118. I did object to Defendant Glass, but the search continued.

119. I did not voluntarily consent to a general search of my bedroom or belongings.

120. I did not voluntarily consent to a search for drugs, drug paraphernalia, law-enforcement equipment, serial numbers, documents, cards, or other personal items.

121. I did not freely, knowingly, and voluntarily consent to any search.

## VIII. Invasive Warrantless Searches of Chattels With Specific Focus On Law Enforcement Related Equipment

122. Defendants focused significant attention on law-enforcement-related equipment located in my bedroom or among my belongings.

123. I possessed certain law-enforcement-style equipment, but I did not hold myself out to the public as a law-enforcement officer.

124. I did not tell Defendants that I was a law-enforcement officer.

125. I did not display a badge, patch, or other item to Defendants in a way that represented that I was a law-enforcement officer.

126. I did not use any equipment to impersonate a law-enforcement officer during the incident.

127. I explained to Defendants that I did not hold myself out as law enforcement.

CONFIDENTIAL

CONFIDENTIAL

128. I heard Defendants acknowledge, in substance, that mere possession of law-enforcement equipment was not illegal.

129. I heard Defendant Owens state, in substance, that there was no evidence I was impersonating a cop.

130. Despite that acknowledgment, Defendants continued to search, inspect, and discuss my equipment and property.

131. Defendants' search activity appeared to be driven by curiosity or suspicion about the equipment, not by the medical emergency or by any immediate risk to my child.

132. My equipment was not contraband merely because I possessed it.

133. Defendants did not have probable cause to arrest me for impersonating a law-enforcement officer based on anything I said or did during the incident.

134. Defendants' continued detention of me and continued search of my belongings were not justified by any crime relating to the equipment.

135. Defendant Freeman entered my bedroom and retrieved or used my personal Miranda card or similar personal property.

136. I did not consent to Defendant Freeman searching for, removing, or using that item.

137. I understood the use of my own personal card to Mirandize me as mocking, humiliating, and unnecessary.

CONFIDENTIAL

138. The acquisition of the miranda card in particular was a calculated action that I understood to be possible only after the commission of the predicate act of invasively searching my property and manipulating such property in order to take possession[1] of the miranda card without consent and without the necessary search warrant   that The aforesaid action also shows the personal animus that Defendants felt for me.

139. Additionally, such unprofessional act evinced the Deputy Defendants' lack of humanity, compassion, or basic empathy; considering the fact that moments ago I nearly had my own spouse expire in front of me. My impression of such behavior was that the Deputy Defendants did not in fact take the gravity of the situation seriously.

140. The actions of the Deputy Defendants created the appearance that they felt as though they had free reign to act with impunity. I became fearful of the Defendant Deputies and their actions caused me to feel intimidated, under duress as well as in a state of immediate and continuous fear for my safety, health, and liberty throughout the prolonged duration in which I was forcefully subjected to the de facto arrest.

141. My impression was based on the totality of my experiences after encountering the Defendants comprehensively; to include the warrantless invasions of privacy, punitive and capricious custodial detention in handcuffs, wanton use of excessive force, lack of concern for a person who just experienced a life threatening medical event, and lack of concern for a person that was currently experiencing the acute effects of a chronic medical condition.

---

[1] **For all intents and purposes such action constituted a temporary seizure of the miranda card.**

CONFIDENTIAL

## IX. Child-Welfare Issues And SCDSS

142. My minor child was present in the home when deputies arrived.

143. I was concerned for my child's wellbeing throughout the incident.

144. Defendants prevented me from freely accessing, comforting, or checking on my child during the encounter.

145. I dispute Defendants' suggestion that I was indifferent to my child or that I posed an immediate danger to my child.

146. The deputies contacted the South Carolina Department of Social Services during the incident.

147. Based on what I observed, the deputies were acting as mandatory reporters or assisting a civil child-welfare response, rather than pursuing a criminal charge against me for unlawful conduct toward a child.

148. I was not arrested that day for unlawful conduct toward a child.

149. I was not prosecuted that day for unlawful conduct toward a child.

150. I do not recall any deputy telling me during the incident that I was being arrested or detained because there was probable cause to charge me with unlawful conduct toward a child.

CONFIDENTIAL

151. Defendants now contend that they had probable cause to arrest me for unlawful conduct toward a child, but that was not the reason I understood them to be detaining me at the time.

152. The searches I observed focused heavily on my bedroom, my personal belongings, and my law-enforcement-related equipment.

153. The searches I observed were not limited to checking whether my child had food, clothing, shelter, or immediate safety needs.

154. I did not attempt to hide the condition of my home from DSS.

155. I did not attempt to alter, destroy, or disguise anything before DSS arrived.

156. I did not threaten to do so.

157. Defendants never identified to me any specific fact showing that I was about to destroy evidence relevant to DSS.

158. Defendants had control of the scene and could have preserved any legitimate concern without conducting broad searches of my private property.

## X. Exigency & Emergency Circumstances

159. The emergency that caused me to call 911 was Ms. Parsons's suspected overdose.

160. Once Ms. Parsons regained consciousness and EMS personnel were involved, the immediate medical emergency had materially changed.

CONFIDENTIAL

161. After that point, Defendants had time to seek a warrant if they believed a search was necessary.

162. Defendants discussed obtaining a warrant.

163. I did not create any urgent circumstance justifying the continued warrantless searches.

164. I did not make any movement toward drugs, needles, containers, equipment, or documents suggesting imminent destruction of evidence.

165. I did not attempt to move through the home to hide or remove items.

166. The home was under the control of multiple deputies.

167. Under those circumstances, there was no immediate emergency requiring Defendants to search my bedroom, equipment, chattels, or private property without a warrant.

168. The later searches were separated in time and purpose from the medical emergency.

169. The later searches were not necessary to render emergency aid to Ms. Parsons.

## XI. Injuries and Damages

170. As a result of Defendants' conduct, I suffered physical pain from being forcefully handled and slammed into or against my child's crib.

171. I suffered pain, discomfort, and distress from being handcuffed, restrained, removed from my home, and held outside under guard while experiencing a chronic medical condition.

172. I suffered emotional distress from being detained and searched in my own home after calling for emergency medical help.

CONFIDENTIAL

173. I suffered conscious pain and suffering, mental anguish, significant ordeal, emotional distress, and fear from being forced to remain in the extreme heat of the summer afternoon for many hours without water nor my necessary medications while experiencing a medical condition because I was was not free to move pursuant to the de facto arrest.

174. The Defendants conduct that caused me damage was perpetrated knowingly and with an intent to inflict emotional distress on me and Ms. Parsons.

175. I suffered emotional distress from being prevented from freely comforting my child and checking on Ms. Parsons.

176. I suffered humiliation and fear when deputies searched my belongings, used my personal property, questioned me while I was detained, and controlled my movement.

177. I suffered distress because the incident occurred in the presence of my minor child and affected my family.

178. I suffered injury to my privacy, possessory interests, liberty, and dignity.

179. I continue to experience emotional harm from the incident and from the consequences that followed.

## XII. Facts Relevant to Supervisory, Municipal, & Policy Claims

180. After the incident, I made a formal complaint to the Greenville County Sheriff's Office regarding the conduct of the Deputy Defendants.

181. I made that complaint in or around September 2022.

CONFIDENTIAL

182. I made multiple attempts to follow up on the status of that complaint.

183. I did not receive a meaningful response.

184. Upon information and belief, the Greenville County Sheriff's Office did not conduct a any investigation into my complaint.

185. I later obtained or reviewed materials that I understand to be internal records, personnel-related materials, Office of Professional Standards records, or investigation summaries concerning prior incidents involving certain deputies.

186. Based on those records, I understand that Defendant Owens had prior misconduct investigations, including matters involving alleged constitutional violations, false arrest, failure to supervise, unlawful seizure, and criminal conduct.

187. Based on those records, I understand that Defendant Bryson had prior misconduct and was the subject of a criminal investigation.

188. The business records provided by the Defendants contain evidence of a tacit authorization of Defendant Brysons's criminal conduct based on the following particulars: the Supervisory Defendants failed to file criminal charges, did not forward the matter to the Solicitor's Office for review despite being aware that he had committed a crime and having probable to arrest Defendant Bryson for said crime, and the Supervisory Defendants conducted an inchoate internal investigation in which the pertinent records concerning such investigation are incomplete or missing.

CONFIDENTIAL

189. The records in my possession that pertain to Defendant Bryson as well as Defendant Owens show a pattern and practice by the Supervisory Defendants of lenient and improper handling of criminal investigative matters involving agency personnel that are conclusively indicative of tacit authorization and deliberate indifference.

190. Based on *inter alia*, those records, other records within my possession, and my experience, I believe the the County of Greenville and the Greenville County Sheriff's Office had notice of repeated misconduct risks involving deputies and failed to take adequate corrective action.

191. Based on my interaction with Defendant Glass during the incident, Defendant Glass told me facts about prior alcohol-related issues and his employment history that, in my view, raised questions about his fitness and the adequacy of screening, retention, supervision, and discipline.

192. Based on substantial credible information, it appears that Defendant Glass was making certain self-disclosures in an attempt to establish a rapport with me.

193. It appeared that his intent was to elicit a statement against interest from me.

194. The admissions made by Defendant Glass were the following: (1) that Defendant Glass was addicted to alcohol. (2) that Defendant Glass was recently rehired by GCSO after he voluntarily resigned due to the fact that he felt he was in danger of supervisors / command staff becoming aware of his addiction, (3) his dependence on ethanol was so extreme that he was frequently too incapacitated from ethanol withdrawal syndrome or intoxication to report for his assigned tours of duty, (4) that he was happy that

CONFIDENTIAL

supervisory personnel did not become privy to his addiction during the vetting process as a rehire candidate.

195. Defendant Glass also disclosed to me that he strongly disfavors night shift (0700 hours-1900 hours) rotations in which GCSO requires him to work every six (6) weeks on a rotating basis.

196. During the Defendant's attempt to engage in the quid pro quo rapport building endeavor, a pattern and practice of unconstitutional conduct was admitted to; in that during monotonous periods of low call volume he commonly takes it upon himself to harass the motoring public for no legitimate purpose.

197. When the Defendant expounded on his rationale for this conduct it was disclosed to me that due to the fact that there are few calls for service to handle during the 0230-0500 hour period, he can achieve the benefit of keeping himself occupied and appearing proactive to his supervisors by arbitrarily selecting vehicles to follow in order to fabricate a pretext for subjecting the driver to a traffic stop.

198. Defendant Glass further disclosed that his favorite and most utilized fabricated pretext was: a subjective claim that the person he intends to stop is driving 'left or right of center.'

199. With respect to the statements made by Defendant Glass, these facts are admissible in evidence based on the party opponent exception to the hearsay rule, can be corroborated

CONFIDENTIAL

by other admissible evidence[2], such evidence is more probative than prejudicial, such evidence is not propensity evidence nor would it be offered merely for impeachment but instead it would be offered to prove a theory of liability central to the Plaintiff's case in chief.

200. I understand that Defendant Glass was later terminated after an arrest for DUI and that he ultimately pled guilty to the DUI offense in state court.

201. My claim is based on my understanding that supervisors and policymakers had notice of prior misconduct risks, failed to adequately train, supervise, investigate, discipline, or correct those risks, and thereby allowed the conduct that injured me.

202. I believe a jury should resolve whether the supervisory and municipal Defendants were deliberately indifferent to known risks of unconstitutional searches, seizures, arrests, excessive force, and misconduct.

## XIII. Facts Relevant to Negligence, Gross Negligence, False Imprisonment, And Civil Conspiracy

203. Defendants assumed control over me, my home, and the scene after I called 911 for medical assistance.

---

[2] Such corroborate evidence was produced by the Defendants in response to highly specific interrogatories and requests to produce— that, in and of themselves— would require the Plaintiff to be privy to certain facts in order to even know what to seek with respect to the information and materials sought via the aforesaid discovery requests. It is undeniable that the information used as a basis for such particularized discovery requests could not have been known by the Plaintiff but for the admissions made by Defendant Glass on scene.

CONFIDENTIAL

204. Once Defendants assumed that control, I believe they had a duty to exercise at least slight care in how they detained me, searched my property, interacted with my family, and handled the emergency scene.

205. Defendants failed to exercise slight care by escalating a medical call into a prolonged detention and series of warrantless searches.

206. Defendants failed to exercise slight care by handcuffing and detaining me without a lawful basis.

207. Defendants failed to exercise slight care by using force against me while I was compliant and restrained.

208. Defendants failed to exercise slight care by preventing me from comforting my child and checking on my fiancée while they continued searches unrelated to the emergency.

209. Defendants failed to exercise slight care by detaining me outside for an extended period while maintaining control over me and my property.

210. Defendants intentionally restrained my liberty.

211. I did not consent to being restrained.

212. I did not believe I was free to leave.

213. I did not believe I was free to terminate the encounter.

214. I did not believe I was free to reenter my home.

CONFIDENTIAL
Page 23 of 28

CONFIDENTIAL

215. Defendants lacked lawful justification to restrain me for the length, manner, and purpose of the detention.

216. I believe Defendants acted jointly and in coordination to continue the search and detention after they knew or should have known they lacked a warrant and lacked voluntary consent.

217. I believe Defendants acted jointly and in coordination to create the impression that a warrant existed or was forthcoming. Then, used that impression to attempt to coerce acquiescence to searches in bad faith.

218. I believe Defendants acted jointly and in coordination to continue searching even after I objected.

219. The Deputy Defendants' coordination harmed me by depriving me of my liberty, privacy, property rights, and family integrity during and after the incident.

## XIV. Summary of Material Facts I Dispute

220. I dispute Defendants' assertion that I gave unlimited consent to enter, remain in, or search my home.

221. I dispute Defendants' assertion that I never objected to their presence or searches.

222. I dispute Defendants' assertion that I freely and voluntarily consented to the later search.

223. I dispute Defendants' assertion that I was not seized, detained, or arrested in a practical sense.

CONFIDENTIAL

224. I dispute Defendants' assertion that I was not subjected to excessive force.

225. I dispute Defendants' assertion that the only force used against me was handcuffing.

226. I dispute Defendants' assertion that I was acting erratically in a way that justified detention.

227. I dispute Defendants' assertion that I interfered with medical care.

228. I dispute Defendants' assertion that I made furtive movements.

229. I dispute Defendants' assertion that I posed an immediate threat to officer safety.

230. I dispute Defendants' assertion that I attempted to destroy or hide evidence.

231. I dispute Defendants' assertion that all searches were limited to child welfare or medical needs.

232. I dispute Defendants' assertion that exigent circumstances justified the searches after the medical emergency had dissipated.

233. I dispute Defendants' assertion that special needs justified broad warrantless searches by law-enforcement officers.

234. I dispute Defendants' assertion that they had probable cause to arrest or detain me for impersonating a law enforcement officer.

235. I dispute Defendants' assertion that they had probable cause to arrest or detain me for unlawful conduct toward a child.

CONFIDENTIAL

236. I dispute Defendants' assertion that I consumed illicit substances on the day of the incident.

237. I dispute Defendants' assertion that their actions were not knowingly intended to inflict emotional distress on me and Ms. Parsons.

238. I dispute Defendants' assertion that their actions were not wanton, egregious, and shocking to the conscience of a reasonable person.

239. I dispute Defendants' assertion that no reasonable person should have to endure the same or similar conduct.

240. I dispute Defendants' assertion that there is no evidence supporting supervisory, municipal, negligence, gross negligence, false imprisonment, or conspiracy claims.

241. The disputed facts described herein are not an exhaustive list of facts in which I dispute, however, such facts are those of which have direct pertinence to the Court's case decision on the issue of summary judgement. Other facts relevant to a disputation of certain matters currently viewed to be presumptively immaterial to the issue of summary judgment or the resolution of the claims of this action have been omitted from his affidavit. To the extent it is determined that said facts are applicable and material to the issue before the Court, such facts will be addressed at the hearing on the Defendants' motion for summary judgment. I reserve the right to raise such facts, if necessary, at such appropriate time subsequent to the filing of this affidavit hereof should the need arise.

CONFIDENTIAL

CONFIDENTIAL

242. The disputed facts described in this affidavit are material to the claims and defenses raised in Defendants' motion and should be resolved by a jury.

## XV. The Deposition Issue

243. I did not intentionally disregard the notice of deposition.

244. I did not act in bad faith.

245. I was not attempting to avoid deposition testimony nor subvert the process of discovery.

246. I understood, based on communications involving John E. Chambers, Jr., Esquire (who was temporarily acting as my agent) and Defendants' counsel, that the deposition scheduled for November 4, 2025, would be rescheduled.

247. I believed the operative deposition date would not go forward as originally noticed but instead— per the purported agreement— would be rescheduled to a date certain subsequent to my release from the custody of the Oconee County Detention Center.

248. I have stood ready and willing to sit for a deposition time since being released from OCDC.

249. Per my understanding of the agreement I made contact with Defense counsel and attempted and have the deposition rescheduled immediately upon my release from OCDC. However, opposing counsel declined; providing the basis of such declination as a preference to await the Court's ruling on the pending motion prior to rescheduling.

250. The nonappearance was the result of misunderstanding, circumstances outside my control, and a belief that the deposition would be rescheduled.

CONFIDENTIAL

CONFIDENTIAL

251. I respectfully request that the Court deny the motion to dismiss.

## XVI. Declaration and Verification

252. I declare under penalty of perjury that the foregoing is true and correct based on my personal knowledge, except as to matters expressly stated to be based on records, discovery materials, body-worn-camera footage, or information available to me, and as to those matters I believe them to be true.

253. I understand that affidavits or declarations used to oppose summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated, consistent with Rule, 56(c)(4), FRCP and 28 U.S.C § 1746.

THUS MORE YOUR AFFIANT SAYETH NOT.

Executed on: 18 April, 2026
Location: Seneca, South Carolina

_____
**Signature of Affiant**

**SWORN TO & SUBSCRIBED BEFORE ME:**

This 18th day of April, 2026

_____
**Notary Public For South Carolina**
**My Commission Expires:** 2032