Chambers Vs. County of Greenville, Et al.
C/A No. 6:25-cv-01068-TMC-KFM



# INDEX OF EXHIBITS

| EXHIBIT | DESCRIPTION OF EXHIBIT |
|---------|------------------------|
| A | Index of Exhibits |
| B | Affidavit of John E. Chambers, Jr. |
| C | Affidavit of Nathan L. Chambers |
| D | Ortiz BWC Video Footage |
| E | Freeman BWC Video Footage |
| F | CAD Report |
| G | Excerpt From Def. Glass's Responses To Plaintiff's Interrogatories |
| H | GCSO General Order 108: Alcohol and Controlled Substance Use |
| I | Record of Termination of Defendant Glass For Criminal Misconduct |
| J | Exhibit J: General Order 219 Search / Seizure |
| K | Exhibit K: General Order 111 (Office of Professional Standards |
| L | Excerpt From Code 5 Report |
| M | Table of Misconduct / Internal Investigations |
| N | Internal Records / Memo. Re: 4th Amendment Violation By Def. Owens |
| O | Report of "Failure To Supervise" Incident |
| P | Reports Re: Criminal Investigation of Defendant Owens |
| Q | "Knock and Talk" OPS Report |
| R | Simpsonville PD Incident Report Re: Defendant Bryson Domestic Violence |

Page 1 of 1

<u>Chambers Vs. County of Greenville, Et al.</u>
C/A No. 6:25-cv-01068-TMC-KFM



EXHIBIT

B

# EXHIBIT B

*Affidavit of John E. Chambers, Jr.*
(Filed Under Seal)

Chambers Vs. County of Greenville, Et al.
C/A No. 6:25-cv-01068-TMC-KFM



EXHIBIT

C

# EXHIBIT C

## *Affidavit of Nathan L. Chambers*
## (Filed Under Seal)

Chambers Vs. County of Greenville, Et al.
C/A No. 6:25-cv-01068-TMC-KFM



EXHIBIT

D

# EXHIBIT D

## *Ortiz BWC Video Footage*
## (Filed Under Seal)

Chambers Vs. County of Greenville, Et al.
C/A No. 6:25-cv-01068-TMC-KFM



EXHIBIT

E

# EXHIBIT E

## *Freeman BWC Video Footage*
## (Filed Under Seal)

1/28/25, 1:19 PM

Inform Browser : 21.102.75.2 : 21.102.75.2 : 21.102.75.2 - Reports



EXHIBIT
F

# Incident Detail Report

Data Source: Data Warehouse
Incident Status: Closed
Incident number: SO220628-103747
Case Numbers:
Incident Date: 6/28/2022 14:30:29
Report Generated: 1/28/2025 13:19:28

## Incident Information

| | | | |
|---|---|---|---|
| Incident Type: | 1 DEPUTY | Alarm Level: | |
| Priority: | Immediate | Problem: | 80B_Abuse Neglect Child Elder |
| Determinant: | | Agency: | SHERIFF |
| Base Response#: | | Jurisdiction: | SHERIFF |
| Confirmation#: | 06282022-0099681 | Division: | SOW |
| Taken By: | Stewart, Kaitlyn 316 | Battalion: | SOW9 |
| Response Area: | SO9C | Response Plan: | 1D-09 |
| Disposition: | 05_Incident Report Taken | Command Ch: | |
| Cancel Reason: | | Primary TAC: | |
| Incident Status: | Closed | Secondary TAC: | |
| Certification: | | Delay Reason (if any): | |
| Longitude: | 82414923 | Latitude: | 34882507 |

## Incident Location

| | | | |
|---|---|---|---|
| Location Name: | | County: | GREENVILLE |
| Address: | 110 Perry Rd | Location Type: | |
| Apartment: | | Cross Street: | YOUNG ST/VINE ST |
| Building: | | Map Reference: | |
| City, State, Zip: | (C) GREENVILLE SC 29609 | | |

## Call Receipt

| | | | |
|---|---|---|---|
| Caller Name: | T-Mobile USA | | |
| Method Received: | | Call Back Phone: | 864-557-6636 |
| Caller Type: | | Caller Location: | |
| Caller Address: | | Caller Location Phone: | |
| Caller Building: | | Caller Apartment: | |
| Caller City, State, Zip: | | Caller County: | |

## Time Stamps

| Description | Date | Time | User | Description | Time |
|---|---|---|---|---|---|
| Phone Pickup | 6/28/2022 | 14:30:29 | | | |
| 1st Key Stroke | 6/28/2022 | 14:30:29 | | Received to In Queue | 00:00:40 |
| In Waiting Queue | 6/28/2022 | 23:21:32 | | Call Taking | 00:10:59 |
| Call Taking Complete | 6/28/2022 | 14:41:28 | Stewart, Kaitlyn 316 | In Queue to 1st Assign | 00:00:40.6 |
| 1st Unit Assigned | 6/28/2022 | 14:31:49 | | Call Received to 1st Assign | 00:01:20.6 |
| 1st Unit Enroute | 6/28/2022 | 14:31:49 | | Assigned to 1st Enroute | 00:00:00.0 |
| 1st Unit Arrived | 6/28/2022 | 14:33:23 | | Enroute to 1st Arrived | 00:01:33.9 |
| Closed | 6/28/2022 | 23:22:52 | Bingel, Julie 374 | Incident Duration | 08:52:23 |

## Resources Assigned

| Unit | Primary Flag | Assigned | Disposition | Enroute | Staged | Arrived | Delay At Patient Avail | Complete | Odm. Enroute | Odm. Arrived | Cancel Reason |
|---|---|---|---|---|---|---|---|---|---|---|---|
| E29SO | N | 14:31:49 | | 14:31:49 | | | | 14:32:08 | | | |
| M12SO | N | 14:31:54 | | 14:31:54 | | 14:33:28 | | 14:59:59 | | | REA_Reassigned |
| B39SO | N | 14:32:06 | 05_Incident Report Taken | 14:32:06 | | 14:33:23 | | 18:03:18 | | | |
| B03SO | N | 14:33:18 | 03_Handled by Deputy No Report | 14:33:18 | | 14:39:47 | | 16:19:11 | | | |
| 762SO | N | 14:34:02 | | 14:34:02 | | 14:34:03 | | 16:23:26 | | | |
| B60SO | N | 14:37:36 | 05_Incident Report Taken | 14:37:36 | | 15:24:20 | | 18:03:18 | | | |
| M12SO | N | 15:00:31 | | 15:00:31 | | 15:00:31 | | 16:30:08 | | | |
| M12SO | N | 16:35:05 | | 16:35:05 | | 16:35:05 | | 18:03:18 | | | |
| B39SO | Y | 23:22:45 | | 23:22:45 | | 23:22:45 | | 23:22:52 | | | |

## Personnel Assigned

| Unit | Name |
|---|---|
| E29SO | Norris, Neal Philip_INACTIVE (SO1718) |
| M12SO | Freeman, Ryan Adam M10 (SO1638) |
| B39SO | Ortiz, Louis D19 (SO2026) |
| B03SO | Owens, Jason Michael 400 (SO881) |
| 762SO | Stouffer, Hannah 750 (SO2070) |
| B60SO | Bryson, Walter Dodson 623 (SO1569) |
| M12SO | Freeman, Ryan Adam M10 (SO1638); Freeman, Ryan Adam M10 (SO1638) |
| B39SO | Ortiz, Louis D19 (SO2026) |

## Caution Notes

No Caution Notes found

https://cadbrowser.greenvillecounty.org/VisiNetBrowser/Search/IncidentReport.aspx?id=13235756&ds=a

CONFIDENTIAL

DEF PROD 001



**EXHIBIT**

**G**

## INTERROGATORY NO. 21:

Has Defendant Glass ever undergone treatment for alcohol or drug abuse?

a) Did Defendant Glass take steps to obfuscate his addiction from his employer?

**ANSWER: Defendants object to Interrogatory 21, pursuant to the *Federal Rules of Civil Procedure Rule 26(b)*, because the information requested is irrelevant to issues in this action and is not likely to lead to the discovery of admissible or relevant evidence.**

## INTERROGATORY NO. 22:

What is the GCSO's policy for dealing with employees or officers who are addicted to alcohol or

drugs?

a) Provide a statement as to if the GCSO believes that an officer who is addicted to alcohol or

drugs is or is not unfit for service.

**ANSWER: General Order 108 (Alcohol and Controlled Substance Use) outlines GCSO's policy on alcohol and controlled substances. Under this General Order, employees at GCSO are NOT permitted to use any illegal substances. Possession and use of controlled substances is only permitted with a prescription from a licensed medical physician. No GCSO employee is allowed to use or be under the influence of alcoholic beverages or any intoxicating substances while in an on-duty status. The only exception for this is when in the performance of law enforcement duty and only with specific consent of a supervisor, but never in uniform. No employee is exempt from random drug/alcohol testing. Refusal to submit to drug testing will result in termination and perspective employees will be denied employment. If there is a positive test result, that employee may result in termination, possibility of criminal prosecution, and perspective employees will be denied employment. As to prescription/ non-prescription medication, if this medication impairs an employee's ability to work he/she is required to inform his/her immediate supervisor.**

a) **Anyone "addicted" to alcohol and/or drugs would be in violation of GCSO General Order 108 and as such, would be unfit for service.**

[Signature on following page]



**GREENVILLE COUNTY SHERIFF'S OFFICE**

**GENERAL ORDERS**

**EXHIBIT H**

**GO - 108**

**ALCOHOL AND CONTROLLED SUBSTANCE USE**

**PURPOSE:** This policy is to safeguard the safety and security of the citizens of Greenville County, to provide the highest quality of law enforcement services possible and to certify that a safe and healthy workplace will be provided for County employees to work. Standards concerning the use of alcohol and drugs, and the use of alcohol and drug-screening tests **apply to all Sheriff's Office personnel.**

**DEFINITIONS:** **ALCOHOLIC BEVERAGES** – Refer to all liquors, beer and wine.

**PRESCRIPTION AND NON-PRESCRIPTION MEDICATION** – Includes any medication given under the direction of a licensed physician or any "over the counter" medication that could hinder an employee's ability to safely complete all assigned job tasks.

**ILLEGAL DRUG OR SUBSTANCE** – Includes all illegal drugs or substances that could result in criminal prosecution for possession or use. This includes anabolic steroids.

**POLICY:** No employee of the Sheriff's Office is allowed to use any illegal drugs or substances as defined in the South Carolina Code of Laws under **Controlled Substances** or other related provisions. Possession and use of prescribed, controlled substances is permitted only with a prescription from a licensed medical physician.

No member of the Sheriff's Office is allowed to use or be under the influence of **alcoholic beverages or any intoxicating substances** while in an on-duty status. The only exception to this is when in the performance of law enforcement duty, and then, only with specific consent of a supervisor and never in uniform.

**PROCEDURE:** **Prescription or Nonprescription Medication** – If taking medication, that could impair an employee's ability to perform assigned job tasks, the employee is required to inform his/her immediate supervisor.

**Failure to Inform Supervisor** - Constitutes a violation of this policy and subjects the employee to punitive action.

**Reasonable Suspicion Testing** – Employees are compelled to comply if requested to submit urine or blood screening as part of an administrative investigation. Reasonable suspicion testing is initiated at the direction of a Division Commander when:

---

**DEF PROD 0038**

**GO-108**                    ALCOHOL AND CONTROLLED SUBSTANCE USE

- Involvement in an accident, or when conditions exist, that indicates drug or alcohol intoxication.
- Suspicion of alcohol or narcotic intoxication while working.

**Screening Tests** – Performed only in a medical office, hospital or licensed laboratory under the direction of qualified medical and/or trained laboratory personnel.

**Test Results** – Disclosed only as part of an official internal investigation or during subsequent disciplinary proceedings.

**Random Drug and Alcohol Testing** – At the discretion of the Sheriff, random drug and alcohol testing will be performed quarterly in conjunction with the County's Alcohol and Drug Testing Policy for all County employees classified as "safety sensitive positions".

**Pre-Employment Drug Screening** – A testing of prospective employees during the testing phase of the hiring process and before a final hiring decision is made. Prospective employees will be required to sign the County's *Alcohol/Drug Testing Consent and Waiver of Liability Form.*

**Refusal to Submit to Drug Testing** – Termination. Perspective employees will be denied the opportunity for employment.

**Positive Test Results** – Confirmed positive test results for alcohol, controlled substances, or any other unauthorized substance may result in termination, including the possibility of criminal prosecution. Perspective employees will be denied employment.

Hobart Lewis, Sheriff

DEF PROD 0039





**Sheriff**



Hobart Lewis
Greenville County Sheriff's Office

November 1, 2022

James Carson Glass

Dear Mr. Glass:

The reason for your dismissal from the Greenville County Sheriff's Office was due to *violation of Rules and Regulations 90.01 (Conduct Unbecoming) and 20.12 (Obedience to Laws)*. The effective date of the separation is October 29, 2022.

You have sixty (60) days in which to notify the Greenville County Human Resources Department if you wish to continue medical insurance coverage. Any contributions that have been made from your salary to your South Carolina Police Officers Retirement System account can be refunded to you after a ninety (90) day waiting period. Please contact Human Resources at ██████ for further details.

You will not be eligible for accrued annual leave or sick leave.

Your employment record will reflect the above stated reason for separation.

Sincerely,



JJ:ch

cc: ██████ Administrative Coordinator



An Accredited Law Enforcement Agency
4 McGee Street, Greenville, SC 29601 / (864) 467-5280 / Fax (864) 467-5299
GET THE SHERIFF'S OFFICE APP BY TEXTING: GCSO TO 95577

CONFIDENTIAL

**DEF PROD 00413**

Form 108
Personnel Dept.

# DISCIPLINARY ACTION

James Carson Glass

**Name**

10/20/22

**Date**

Deputy Sheriff

**Position Title**

Uniform Patrol

**Department**

## S U S P E N S I O N

_____ is suspended from his/her job for

_____ for the following reasons:

## D I S M I S S A L

James Carson Glass

_____ is discharged from county

employment for the following reasons:
Rules and Regulations 90.1 Conduct Unbecoming
Rules and Regulations 20.12 Obedience to Laws

**Department Head**

**Date** 10/31/22

**Employee**

**Date** 10-29-22

**Personnel Director**

**Date**

CONFIDENTIAL

**DEF PROD 00412**

| | PERSONNEL ORDER | DATE OF ISSUE | EFFECTIVE DATE | NO. |
|---|---|---|---|---|
| | | 10/31/2022 | 10/29/2022 | **S22-483** |
| SUBJECT | | | DISTRIBUTION | AMENDS |
| **TERMINATION** | | | J,K | |
| REFERENCE | | | RESCINDS | STAR NO. |
| | | | | 1889 |

James Glass, star #1889 is hereby terminated from the Greenville County Sheriff's Office for violation of rules and regulations 90.01 and 20.12.

Hobart Lewis, Sheriff

CONFIDENTIAL

**DEF PROD 00414**



PLAINTIFF'S
EXHIBIT

J



GREENVILLE COUNTY
SHERIFF'S OFFICE

| GENERAL ORDERS | GO - 219 |
| --- | --- |
| | SEARCH AND SEIZURE |

**PURPOSE:** This directive provides guidelines for the execution of a search warrant, and limited exceptions to a search warrant.

**POLICY:** It is policy of the Greenville County Sheriff's Office to:
1. Provide techniques to accomplish a thorough and legal search.
2. Observe the constitutional rights of the persons the warrant is being served upon.
3. Minimize the level of intrusion experienced by those who are having their premises searched.
4. Provide for the highest degree of safety for all persons concerned.
5. Establish a record of the entire execution process.

**Search and seizure with a search warrant is preferred unless limited exceptions apply.** The key to the successful, legal discovery of evidence or contraband is reasonableness coupled with a deputy's ability to articulate the necessity of search and seizure with or without a warrant.

**DEFINITIONS:** **SEARCH SITE** - The premises or persons to be searched, as explicitly described in the search warrant.

**SEARCH PERSONNEL** - Sheriff's deputies and support personnel taking part in the execution of a search warrant.

**EVIDENCE COLLECTOR** - Member of the search team responsible for the possession, packaging, sealing, and marking of all items seized.

**SUPERVISING OFFICER** - Search team member most knowledgeable about the case and/or responsible for the investigation.

**UNIFORMED PERSONNEL AND EQUIPMENT REQUIREMENTS:** A search team will include at least one uniformed deputy. All non-uniformed deputies are to be <u>clearly identified</u> as law enforcement deputies by wearing a Sheriff's Office badge, a distinctive jacket, armband, or some other highly visible indicator of office.

**All members of the search team are to be equipped with body armor.**

ISSUED 090192     REVISION 05202020     PAGE 1 OF 10

DEF PROD 0049

GO-219                                             SEARCH AND SEIZURE

---

**TIME LIMITATIONS ON
SEARCH WARRANT
EXECUTION:**

**A search warrant is to be executed as soon as practical within conditions permitted by State law.** Circumstances that may necessitate a delay in executing a search warrant include, but are not limited to:

- The need to execute more than one search at the same time requiring coordination and mobilization of law enforcement resources.
- Seizeable items have not arrived at the search site.
- Probability is high that substantial resistance will be encountered.
- A particular person(s) is absent from the search site, and the supervisory deputy feels the search would best be conducted if that person were present.
- A need to protect an informant's identity.

Searches are to be conducted within reasonable hours as may be dictated by the circumstances surrounding the investigation and pursuant to State law.

**PREPARATION FOR
EXECUTION OF
SEARCH WARRANT:**

**PRE-ENTRY BRIEFING** - Prior to entering the premises, the supervisory deputy is to conduct a pre-entry briefing of the execution process with all search team personnel. Search personnel are to view a simulation of the conditions of the search site (using maps, charts and diagrams, when appropriate) and tactics to be used in the event of forced entry. The on-duty uniform patrol Lieutenant or their designee is to be notified.

The supervisory deputy is to attempt to determine if any circumstances have changed making execution of the search warrant undesirable at that time. Surveillance teams are to be used whenever possible to ensure intelligence on the target is kept fresh up to the time of execution.

The supervisory deputy is to ensure the entire search warrant execution process is documented from beginning to end. Documentation continues until the search team leaves the premises. If practical, a written record is to be supported with photographs and a video recording of the entire search site from start to finish.

**ENTRY PROCEDURES:**     Approach to the scene is to be without sirens. If a pre-execution surveillance team is on the scene, radio contact is to be made to ensure it is an appropriate time to serve the search warrant.

---

2                                             SEPTEMBER 1, 1992

**DEF PROD 0050**

GO-219                                                  SEARCH AND SEIZURE

The supervisory deputy is to make certain the search warrant is valid and the property about to be searched is the property described on the warrant.

**Search personnel are to position themselves in the following manner:**
1. Exits from the premises are covered.
2. Uniformed deputies are the most visible members of the search team, and should conduct the entry.
3. Non-uniformed deputies are the last personnel to enter the search site.

**NOTIFICATION OF INTENDED SEARCH:**

In a voice loud enough to be heard inside the premises, the supervisory deputy or a uniformed deputy is to notify persons inside the search site:
1. That they are from the Sheriff's Office.
2. They are in possession of a warrant to search the premises.
3. They are demanding immediate entry into the premises.

No-knock entries are conducted in accordance with State law.

**ACTIVITIES:**

The supervisory deputy is to ensure the search team conducts a security sweep of the search site. After the search site is secured, search personnel are to develop a prioritized strategy detailing probable locations of the items to be seized and a systematic operation for conducting the search. The evidence collector is responsible for collecting, preserving, and documenting all items seized until possession is transferred to Property and Evidence.

If damage occurs during an entry to premises and the structure is to be left vacant, making it vulnerable to security problems, arrangements are to be made to guard the premises until it can be secured. If damage occurs, actions causing the damage and a detailed description of the nature and extent of the damage are to be documented. Efforts are to be taken to minimize damage and disruption from searches.

**SEARCH AND SEIZURE WITHOUT A WARRANT:**

**SEARCH BY CONSENT** - A search made following voluntary consent from one authorized to give consent is a lawful exception to the warrant requirement. The critical issue is whether consent is voluntary and not coerced. Factors that may be considered in determining voluntary consent include the following:

1. The number of deputies present at the time consent is requested. Is the consenter legally qualified to give consent for search of the premises?

3                                                      SEPTEMBER 1, 1992

DEF PROD 0051

**GO-219**                                                SEARCH AND SEIZURE

2. Time of day.
3. Manner of request.
4. Display of weapons by search team.
5. Whether consenter is in custody.

Consent to search must be obtained in writing by using an approved Consent to Search form. This form advises the individual they have the right to withhold consent and is the only warning required. The consenter controls the conditions, scope, and time of the search, and may revoke consent.

**EXCEPTION TO WRITTEN CONSENT:** Consent to search on vehicles must be captured with the use of a body camera with audio and/or in-car video with audio. In cases where the ability to video and audio record such consent is not available, then written consent must be obtained.

**STOP AND FRISK** - When a deputy has articulable reasons to fear for their safety, they may conduct a limited search for weapons using a pat down of the outer clothing. Objects felt and believed to be weapons may be retrieved and subsequently used as grounds for arrest if the object's possession is unlawful.

**SEARCH OF A VEHICLE** - A vehicle found on the open road or other public place may be searched without a warrant, consent, or arrest when the deputy initiating the search has probable cause to believe the vehicle contains contraband or evidence of a crime and it is impractical to obtain a search warrant. This exception to the warrant requirement is based on the Carroll Doctrine due to a vehicle's mobility.

The scope of this type of search is the same as with a warrant and may therefore extend to any part of the vehicle where evidence sought could be located. The search may extend into any container found within the vehicle wherein the evidence could be secreted.

**EXIGENT CIRCUMSTANCES** - The law recognizes that under certain emergency circumstances, the requirement of a search warrant is waived and a deputy may properly make warrantless entry. **Immediate warrantless entry is justified:**
1. To protect life and property.
2. To arrest a fugitive in hot pursuit.
3. To preserve evidence from being destroyed or removed.

Deputies effecting warrantless entry should be prepared to justify their action with facts supporting a reasonable belief an emergency existed.

4                                                        SEPTEMBER 1, 1992

**DEF PROD 0052**

GO-219                                                        SEARCH AND SEIZURE

CRIME SCENE SEARCHES - A crime scene may present exigent circumstances permitting a warrantless search of the entire premises or area for protection of life and property. A deputy may respond to an emergency and seize evidence in plain view. Any extended search directed against a person possessing Fourth Amendment protection in a premise is to be done with a search warrant or consent.

SEARCH INCIDENT TO ARREST - The authority to search following a full custody arrest is an exception to the warrant requirement and allows a full, complete search for weapons, implements of escape, or evidence of the arrestee's crime. The search is to be made at the time and place of arrest or as soon thereafter as practical.

Search incident to arrest includes:
1. The person of the arrestee.
2. Portable personal property in the possession,
3. The immediate surrounding area from which the arrestee could seize a weapon or destroy evidence.

Reasonable force may be used to overcome resistance to accomplish a search incident to full custody arrest.

PROTECTIVE SWEEP - When an arrest is made, a protective sweep of a residence or building may be conducted if a deputy has reasonable suspicion that accomplices or others are present and they could jeopardize the safety of deputies or an arrestee. A protective sweep is limited to a brief inspection of only those places where a person could be concealed. Evidence or contraband discovered in a protective sweep may be seized or the observation used to obtain a search warrant.

**Anytime a deputy is in a place that they have the lawful right to be and observes evidence or contraband in plain view, they may seize it.**

**STRIP AND BODY CAVITY SEARCHES:**

Because they are the most pervasive invasions of the right to privacy, strip and body cavity searches may be justified only under extraordinary circumstances and must be done by the least intrusive means possible. A strip search without a warrant will be deemed unreasonable unless there is an exigent circumstance and there is a clear indication that evidence will be found under the clothing. The deputy must be able to articulate exactly why they think the search is necessary. Such intrusive searches without a warrant may not be conducted on the mere chance the desired evidence might be obtained.

5                                                           SEPTEMBER 1, 1992

DEF PROD 0053

GO-219                                                  SEARCH AND SEIZURE

A body cavity search is only to be attempted under the most exigent of circumstances and even then only with a search warrant. When seeking a search warrant, the deputy must be able to clearly articulate why they believe the search is necessary. Even if the warrant is obtained, but is not clear as to the justification, the search will be considered unreasonable.

In the event that the suspect is a juvenile, when procuring the warrant, specific consideration should be given to the age and mental capacity of the suspect, as well as the psychological impact that the search would have upon the suspect.

As a matter of policy, reasonable suspicion justifying a *"Terry"* pat down does not justify a strip or body cavity search. A deputy is not to conduct a strip or body cavity search on the basis of consent. Consent to pat down or a search of pockets does not constitute consent for strip or body cavity search.

**STRIP SEARCHES** - A strip-search **must be approved** by a supervisor. A strip search in the field is conducted only under exigent circumstances where the life of a deputy or others is at risk. When authorized, a strip search is to be conducted in a room that will afford privacy from all but those authorized to conduct the search. The search is to be performed by the least number of personnel possible.

Strip searches are to be performed by deputies of the same sex as the detainee. Deputies are to respect the self-identified gender identity of the detainee when determining which gender personnel should conduct the strip search. The gender of those conducting the search should match the gender identity of the detainee as closely as is feasible.

These procedures apply uniformly to juveniles and adults and should be conducted in the least intrusive manner possible.

**BODY CAVITY SEARCHES -** *A body cavity search is not to be conducted without a court order or search warrant.* Body cavity searches, excluding the mouth, are conducted only when there is probable cause to believe a particular person may be concealing contraband within a body cavity or otherwise on the suspect's person.

A body cavity search is to be performed only by a licensed physician or other medically trained person as directed by the physician. The process of conducting the body cavity search is to involve the same safeguards for privacy and hygiene as for strip searches.

6                                                  SEPTEMBER 1, 1992

**DEF PROD 0054**

**GO-219**                                                    SEARCH AND SEIZURE

**Search procedure:**

1. The deputy is to inform the detainee of his intent to conduct a body cavity search thus giving the detainee the opportunity to voluntarily surrender the suspected contraband.

2. The detainee is to remove all articles of clothing, including wigs and dentures, and present them to the deputy for inspection.

3. If the detainee resists the cavity search and becomes violent, additional deputies of the same sex or gender identity as the detainee, as are feasible, should restrain the detainee and assist in stripping. Only reasonable force, necessary under the circumstances, is to be applied to complete the search. If force is used to conduct the search, deputies involved must complete a RTA report.

4. If the detainee resists a cavity search and an insufficient number of deputies are available to restrain the detainee, deputies of the opposite sex or a different gender identity may assist in subduing the detainee before he/she is stripped. The detainee is to be subdued with necessary restraints (handcuffs/shackles) before the assisting deputies leave the room.

**NOTE – All strip and body cavity searches are to be thoroughly documented.**

**INVENTORY OF VEHICLES/PROPERTY:** The concept of inventory is based on the idea that deputies frequently come into possession of property belonging to other people.

**Inventory is based on three primary interests:**

1. Protecting the owner's property.
2. Protecting a deputy against claims of theft or damage.
3. Protecting a deputy and the public against dangerous instruments.

A deputy must have lawful custody of the vehicle or property to conduct an inventory. All vehicles and property taken into custody are to be inventoried to insure safety of the public and their interests. A written report (tow, evidence, incident, supplemental, etc.) is to be completed on all inventoried property.

**DRUG RELATED SEIZURES:**

**BURDEN OF PROOF** – Before seizing money related to drug/narcotic activity, the seizing deputy must be prepared to document and later testify to the articulable facts that identify the money as proceeds from a drug or narcotic offense. If the seizing deputy is not capable of articulating the facts pertinent to proving the money was generated from drug or narcotic sales, the money must not be seized and is to be booked into detention as part of the arrestee's personal affects.

**DEF PROD 0055**

**GO-219**                                           SEARCH AND SEIZURE

The civil process to pursue proceeds from a drug or narcotic offense is separate from the criminal aspect of the case. Mere possession of drugs and money does not constitute grounds for seizure of the money. If the seizing deputy cannot effectively and thoroughly describe the totality of the circumstances that led them to seize the money, the Seizure Coordinator will return the money to its owner.

**SEIZURE VALUES** – As a general guideline, the following indicates values that determine whether seizure of property applies to a particular drug related incident:
1. Money - $1,000.
2. Vehicles - $2,000.

**NOTE** – If an amount is less than $1,000 and there exists articulable facts to prove the money was tied to drug sales, the money can be seized.

**CONSENT FORFEITURE** – Occasionally, suspects will consent to forfeiture of their seized money. Once again, consent forfeiture must be coupled with articulable facts, as previously described, with the consent form properly filled-out and sent to the Seizure Coordinator. The original Consent Forfeiture form must be sent to the Seizure Coordinator.

A suspect may consent to forfeiture any amount of money, however, there are fees incurred into the Sheriff's Office retaining the money. The Solicitor's Office receives 20% of all seized money and court fees are attached to the overall process. If it is determined that it will not be cost effective to pursue retention of specific amounts less than $1,000, it may be necessary to return the money.

**Drug/Narcotic Related Money Seizure Documentation** – The following documents are to be sent to the Seizure Coordinator by the end of shift:
1. Incident Report.
2. Original Consent Forfeiture form.
3. Notification of Currency form.

**VEHICLES** – Before a vehicle is seized for drug/narcotic activity, the seizure must be approved by the Vice & Narcotics Sergeant and/or the Seizure Coordinator.

**DEF PROD 0056**

**GO-219**                                              SEARCH AND SEIZURE

**Drug/Narcotic Related Seizure Documentation** – The following documents are to be sent to the Seizure Coordinator by the end of shift:
1. Incident Report citing the name of the vehicle driver, the name of the registered owner, and lien information.
2. Yellow copy of Vehicle Tow and Inventory Record.

In addition to the previously listed documents, the vehicle ignition and trunk keys are to be included with the incident report and tow sheet. Do not send house keys, office keys, etc., to the Seizure Coordinator.

**NOTE** - Vehicles seized for drug/narcotic related activities are to be towed by the Duty Wrecker to the Greenville County Vehicle Service Center.

**REAL ESTATE SEIZURE** – Seizures of real estate will be coordinated through the Asset/Forfeiture Unit of the Greenville County Solicitor's Office.

**ASSET FORFEITURE** – All property acquired through asset forfeiture is to be accounted for in agency records and disposed of pursuant to legal authority.

**TRAFFIC RELATED VEHICLE SEIZURES:**

**South Carolina Code of Laws 56-5-6240** mandates the seizure of a vehicle operated by the registered owner or by a member of the registered owner's household when the operator is charged with:
1. DUI-3rd and above within 10-years of cause date.
2. DUS 4th and above within 5-years of cause date.

**Traffic Related Seizure Documentation** - The following documents are to be sent to the Seizure Coordinator by no later than the end of each shift:
1. Incident Report (Code-5).
2. Completed DUI/DUS Seizure Form.
3. Yellow copy of Vehicle Tow and Inventory Record.
4. Copy of ticket citing charge for seizure.
5. Defendant's driving record.
6. Copy of seized vehicle registration.

In addition to the previously listed documents, the vehicle ignition and trunk keys are to be included with the required documentation. Do not send house keys, office keys, etc., to the Seizure Coordinator.

**DEF PROD 0057**

GO-219                                                              SEARCH AND SEIZURE

**LARCENY RELATED**
**VEHICLE SEIZURE:**

NOTE - Vehicles seized for DUI/DUS are to be towed by the Duty Wrecker to the Greenville County Vehicle Service Center.

South Carolina Code of Laws 16-13-175 – The motor vehicle used in the commission of a larceny may be seized if the offender is the registered owner of the motor vehicle and the offender used the vehicle during the commission of a larceny. The statute allows officer discretion in seizing vehicles for larceny offenses. Before a vehicle is seized for larceny activity, the seizure must be approved by the Property Crimes Sergeant or Lieutenant.

**SEIZURE VALUE** – $2,000 is the general guideline for seizing a vehicle for a larceny offense.

**Larceny Related Seizure Documentation** - The following documents are to be sent to the Seizure Coordinator by no later than the end of each shift:
1. Incident Report.
2. Yellow copy of Vehicle Tow and Inventory Record.
3. Copy of warrant or ticket citing charge for seizure.
4. Copy of seized vehicle registration.
5. Original Consent Forfeiture form (if applicable).

In addition to the previously listed documents, the vehicle ignition and trunk keys are to be included with the required documentation. Do not send house keys, office keys, etc., to the respective unit Sergeant.

NOTE - Vehicles seized for larceny are to be towed by the Duty Wrecker to the Greenville County Vehicle Service Center.

_____
Hobart Lewis, Sheriff

10                                                              SEPTEMBER 1, 1992

**DEF PROD 0058**



| | | |
|---|---|---|
| **GREENVILLE COUNTY SHERIFF'S OFFICE** | **GENERAL ORDERS** | **GO - 111** |
| | | **OFFICE OF PROFESSIONAL STANDARDS (INSPECTIONS, INTERNAL AFFAIRS)** |

**PURPOSE:** Professional Standards is responsible for inspections and internal investigations.

**INSPECTIONS:** **STAFF INSPECTIONS** – Inspections of procedures, facilities, property, equipment, personnel, and administrative/operational activities. Conducted outside normal supervisory procedures and chain of command. Personnel assigned to Staff Inspections have no command authority over line components. They operate through direct authority of the Sheriff. Staff inspections provide for improvement of the Sheriff's Office. These inspections are not tools for lodging disciplinary action. Having no direct supervisor authority over the personnel or unit inspected, a staff inspector normally only reports findings to the Sheriff, unless the inspector observes activities that could jeopardize the reputation of the agency or gross violations of procedure. In this instance, the inspector takes steps necessary to ensure a change in behavior or action. During the course of an inspection, efforts will be made to provide a supervisor from the Unit or special team to assist OPS personnel.

**UNIT READINESS INSPECTIONS** –Every four years OPS will conduct an inspection of specialized response teams and operational readiness to include Field Force, SWAT, Dive Team, Canine Services, Hazardous Device Team, Medical Support team, and Air Support.

**STAFF / UNIT READINESS INSPECTION FUNCTION:** Goal - Increase effectiveness and improve standards of service.

**Objectives:**

1. Determine performance. Are policies, regulations, systems, and procedures complied with? Has the operation developed as planned?
2. Determine achievement. Did the operation accomplish what was expected of it?
3. Determine the use of resources.
4. Determine the existence of need.

**GO-111**                                    OFFICE OF PROFESSIONAL STANDARDS

**PROFESSIONAL
STANDARDS
COMMANDER:**                    **Duties and responsibilities:**
- Ensures staff inspections of all divisions, sections, and units within the agency.
- Ensures inspections are conducted in an impartial and objective manner, and findings are documented in unbiased reports.
- Reviews and evaluates all inspection reports before they are forwarded to the Chief Deputy.
- Makes recommendations for improvement or remedial action to correct deficiencies.
- Maintains files to ensure follow-up inspections.
- Ensures compliance with CALEA standards during the inspection process.

**PROCEDURE:**                   **To attain the objectives of Staff Inspections** - Everything within the agency is subject to inspection. The Sheriff can order Professional Standards to conduct inspections of any organizational element, procedure or condition.

**PRE-INSPECTION NOTIFICATION** – Divisions, units or sections receive a minimum of two full days' notice prior to inspection. Unit readiness inspections of specialized teams are conducted unannounced.

**PRE-INSPECTION BRIEFING** – Personnel assigned to conduct an inspection are briefed on general objectives and specific areas to be covered.

**INSPECTION REPORT** - Inspection reports are forwarded to the Chief Deputy, Division Majors and Division Commanders. They include recommendations for improvement, and credit for a job well done when praise would apply. When it is within their authority to effect change, recommendations for improvement are made directly to unit/section supervisors.

**FOLLOW-UP INSPECTION** - At prescribed time intervals, inspectors report on implementation progress of recommended changes for improvement.

2                                                                    JUNE 1, 1984

**GO-111**                                    OFFICE OF PROFESSIONAL STANDARDS

---

**SPOT-CHECK INSPECTION** - Spot-check inspections identify problem areas which might lead to weaknesses or deficiencies in personnel or materials. These inspections are conducted continuously and on an unscheduled basis. If a spot-check inspection reveals the need for a more comprehensive inspection, then pre-inspection notification is made to the affected Division Commander.

**INSPECTION FREQUENCY** – Staff Inspections of all organizational components occur every four years.

**STAFF INSPECTION EXAMPLES –**

**Personnel:**
- Conduct
- Appearance
- Discipline
- Job performance
- Job knowledge
- Integrity
- Morale
- Knowledge of agency policy/procedures/ rules and regulations

**Operations:**
- Condition/maintenance of facilities and equipment
- Citizen interviews
- Communications discipline
- Incident response time
- Quality of calls-for-service
- Report preparation and records
- Roll calls
- Supervision and command
- Court appearance and presentations
- Selectivity of enforcement
- Work schedules in relation to manpower need
- Conformity with established policy and procedures

**Administration:**
- Cooperation, other elements and agencies
- Manpower utilization
- Control of overtime

---

3                                                         JUNE 1, 1984

**GO-111**                         OFFICE OF PROFESSIONAL STANDARDS

---

**INTERNAL AFFAIRS:**

**Background** - It is the policy of this agency to accept and investigate **all complaints**, including anonymous complaints, of alleged misconduct against its employees: and, based upon investigative findings, to make fair, prompt, and impartial disposition of all charges.

**PURPOSE OF INTERNAL AFFAIRS –**
- Protect the public.
- Maintain integrity of the agency.
- Assure the rights and fair treatment of individual deputies.
- Achieve an effective disciplinary system.

**FUNCTION OF INTERNAL AFFAIRS –**
- Review complaints.
- Conduct impartial investigation of complaints.
- Testify before Conduct and Procedures Board reviews.
- Provide direction to the public about how to file complaints against employees. This is accomplished through community relations programs and the annual report.
- Registering letters of appreciation and commendation on employees.

**COMPLAINTS:**

**COMPLAINT DEFINED** - An allegation an employee has violated an agency or county rule/regulation, county ordinance, or state/federal statue.

**Complaints generally originate from the following sources:**
- Reported to supervisors by members of the agency.
- Reported by supervisors or command personnel.
- Reported by private citizens or citizen groups.
- Referred to the agency by any person or agency.

**COMPLAINT INVESTIGATIVE CONCLUSIONS** - At conclusion of the investigative process, complaints are classified in one of the following five categories:

**UNFOUNDED** – Investigation revealed complaint was not based on facts or the incident did not occur.

**EXONERATED** - Action reported did occur, but investigation disclosed actions were reasonable, lawful and proper.

**NOT SUSTAINED** - Insufficient evidence available to prove or disprove allegations in the complaint.

---

4                                                     JUNE 1, 1984

**GO-111**                          OFFICE OF PROFESSIONAL STANDARDS

---

**SUSTAINED** - Investigation disclosed sufficient evidence to support allegations in the complaint.

**ADMINISTRATIVELY CLOSED** – Investigation is closed due to the uncooperative behavior of the complainant and/or victim.

**SUPERVISORS AND THE INTERNAL AFFAIRS PROCESS -** Immediate supervisors may investigate minor allegations (service related inquiries that do not rise to the level of an Internal Affairs investigation). Professional Standards investigates all major allegations. In addition, Professional Standards maintains staff control and coordination over all ongoing investigations. Division Commanders notify Professional Standards of employee misconduct investigated by supervisors. Professional Standards maintains records of allegations investigated by supervisors.

**Complaints investigated by line supervisors or as directed by respective Division Commanders include, but are not limited to, the following:**
- Differences of opinion between citizen and deputy relative to enforcement
- Lateness
- Uniform and equipment violations
- Personal appearance infractions
- Minor omissions in assigned duties
- Minor infractions of departmental regulations concerned with efficiency or safety
- Complaints of discourteous or minor misconduct
- Minor disciplinary problems of a supervisory nature
- Cases referred by Professional Standards

**Complaints investigated by Professional Standards include, but are not limited to, the following:**
- Commission of a crime
- Immorality
- Use of narcotic drugs
- Intoxication
- Acceptance of bribe or gratuity
- Malfeasance in office
- Injury to detainee
- Dishonesty
- Unauthorized release of confidential information
- Excessive use of force
- Other acts of a serious nature

---

JUNE 1, 1984

**GO-111**                                    OFFICE OF PROFESSIONAL STANDARDS

## PROFESSIONAL STANDARDS RESPONSIBILITIES UPON RECEIPT OF A COMPLAINT –

Step One:     Evaluate the complaint. Assign a control number. Determine investigative action.

Step Two:     Enter complaint in Internal Affairs Control Log.

Step Three:   Notify affected Division Commander unless notification would impede or jeopardize the investigation. Refer major allegations to the Sheriff. The Sheriff determines the assignment, scope, and depth of the internal investigation.

## SUPERVISOR RESPONSIBILITIES WHEN PROFESSIONAL STANDARDS REFERS COMPLAINTS –

Step One:     Make all necessary investigative field contacts. In all cases, personal contact is desired over telephone contact.

Step Two:     Document all information and compile written reports.

Step Three:   Take appropriate disciplinary action if the complaint or infraction is within scope of supervisor's authority.

Step Four:    Submit written report, findings, and, if applicable, disciplinary action taken, to Professional Standards within ten days of complaint assignment.

**COMPLAINT FORMS:**

**Notification of Formal Complaint –** All complaints agency wide are documented on Allegation of Employee Misconduct report forms.

**AFFIRMATION FORMS -** Forms signed by complainants to emphasize the seriousness of complaints, to discourage frivolous charges, and to document receipt of complaints.

**GO-111**                                    OFFICE OF PROFESSIONAL STANDARDS

**PROFESSIONAL STANDARDS ROLE IN COMPLAINT PROCESS -**

- Serve as the central repository for all internal complaint investigations.
- Serves as the primary investigating unit in matters of criminal conduct by employees. This does not preclude the temporary assignment of personnel from another division to augment Professional Standards personnel, depending on the nature or complexity of the investigation.
- Maintains liaison with the Solicitor's Office in all investigations involving alleged criminal conduct.
- Conducts a joint review with the Solicitor's Office prior to the dismissal of any criminal allegations against employees.
- Complete internal investigations within thirty days. Exceptions to the thirty day time limit granted only by the Sheriff when extenuating circumstances exist.
- Submit weekly status reports to the Sheriff on lengthy investigations.

**ROLE OF THE PROFESSIONAL STANDARDS COMMANDER IN THE COMPLAINT PROCESS –**
Serves as the Internal Affairs Officer and reports results of internal investigations directly to the Sheriff.

**ROLE OF INVESTIGATING SUPERVISORS IN THE COMPLAINT PROCESS –**
1. Responds to complainants by letter, in person, or by telephone.
2. Limits response to the specific charge, the agency's response to the charge, and disposition of the investigation, if final disposition is determined.

**NOTE -** If a complaint has resulted in an Internal Affairs investigation, the Office of Professional Standards responds in writing to the complainant.

**EMPLOYEE NOTIFICATION OF COMPLAINT INVESTIGATIONS -** To ensure employee morale, employees under complaint investigation are informed of complaints, unless doing so could jeopardize the investigation. In all cases employees are informed of the results of investigations. Employees receive a written statement of the allegations, their rights and their responsibilities relative to the investigation as soon as practical.

**GO-111**                                   OFFICE OF PROFESSIONAL STANDARDS

**EMPLOYEE / COMPLAINANT INTERVIEWS**– To ensure the accuracy of the complaint investigation process, employee and complainant interviews may be videotaped.

**RELIEF FROM DUTY** – Any employee involved in a response to aggression or collision, while operating a county vehicle, that results in serious injury or death will be removed from a line of duty assignment pending administrative review by the Sheriff.

Additionally, if it is in the best interest of the agency and the public, employees can be relieved from duty pending the outcome of an investigation involving allegations of serious misconduct or criminal conduct. Relief from duty is also used in cases where the officer's physical or psychological fitness is impaired. Relief from duty involves transfer from field duties to administrative duties, placement on leave, or suspension without pay.

**INSTRUMENTS FOR THE DETECTION OF DECEPTION** - Deception testing of employees may be required during internal affairs investigations. Before proceeding further with complaints where there is no supporting evidence and the investigation hinges solely on the statement of the complainant, the complainant is requested to take deception tests.

**EVIDENCE GATHERING** - Employees can be required to submit to additional evidence gathering tests when the examinations are specifically directed and materially related to a particular type of internal affairs investigation, such as an allegation of drug use or a witnessed act of misconduct or criminal activity:
- Employee medical or laboratory examinations conducted at Sheriff's Office expense.
- Employee file photographs or current photographs. Employee financial disclosure statements.
- Employee participation in a line-up.

**INTERNAL AFFAIRS RECORDS** – Professional Standards maintains permanent files of all records pertaining to internal affairs investigations. Digital records are kept secured in the OPS folder on network servers with authorized access only. Hard copies are kept in a locked filing cabinet within the OPS office which has controlled access.

8                                             JUNE 1, 1984

**GO-111**                                        OFFICE OF PROFESSIONAL STANDARDS

**ACADEMY MISCONDUCT REPORT FORM -** When a sworn employee is the subject of an investigation for misconduct and the allegation is determined to be valid, a Misconduct Report Form is completed by Personnel and sent to the South Carolina Criminal Justice Academy.

**COMPLAINANT NOTIFICATION OF DISPOSITION:**

A complainant who files a formal complaint on an employee will be notified of receipt of the complaint within fourteen days. At the conclusion of the investigation, usually within thirty days, the complainant will be notified of the results.

**REQUIRED REPORTING:**

**Incidents of questionable employee behavior are to be immediately reported to the Office of Professional Standards.** Questionable behavior would be any activity that could reflect unfavorably on the Sheriff's Office, or that could impair the operation or efficiency of this agency or the employee. This includes criminal allegations or situations of imminent arrest.

Additionally, employees are required to immediately report any criminal allegations or the imminent arrest of an employee to the Office of Professional Standards. Employees are to report any contact with law enforcement outside of their job function (i.e. traffic violations, etc) and/or other non arrest able offenses to their immediate supervisor upon returning to work for their next assigned shift.

If an employee is sued as a result of job function, they are required to report the lawsuit to a supervisor and the Office of Professional Standards.

**See also General Order 238 Employee Domestic Misconduct and the use of No Contact Orders.**

_____
Hobart Lewis, Sheriff

PLAINTIFF'S EXHIBIT L

**GREENVILLE COUNTY SHERIFF'S OFFICE**

Agency I.D. SC0230000   EC5 07/06/2022-09:44:33   Supplemental Report   Ent: agreene 07/11 02:09:01

Incident Type S420 - Emergency Protective Custody

| | |
|---|---|
| ☐ Original Report | ☐ Status Change  ☐ Additional Victims  ☐ Additional Stolen Property |
| ☒ Supplemental Report | ☐ Other Report  ☒ Additional Defendants  ☐ Additional Recovered Property |

Patrol District 09C     Page 1 of 4 Pages

**I.D. OVERFLOW**

☐ Complainant  ☐ Victim  ☒ Subject #2  ☐ Runaway  ☐ Wanted  ☐ Arrest  ☐ Missing  ☐ Jail  ☐ Other

Subject's Name (Last, first, Middle): Chambers, Nathan Lee

Victim Relationship To Subject | Ethnicity N | Resident J | Race W | Sex M | Age 28 | Date of Birth 10/22/1993

Address: 110 PERRY Rd     City GREENVILLE     State SC     Zip Code 29609     Patrol District 09C     Day Phone     Evening Phone

Height 510 | Weight 150 | Hair Bro | Eyes | Facial Hair, Scars, Tattoos, Glasses, Clothing, Physical, Peculiarities, Etc. BUILD:Thin / Slender

☐ Victim No. ____     Visible Injury ☐ Yes ☐ No     Complaint of any Non-Visible Injuries ☐ Yes ☐ No
Explain:

Victim Using Alcohol ☐ No ☐ Yes ☐ Unk
Drugs ☐ No ☐ Yes  Type:

Subject No. 2     Using Alcohol ☐ No ☐ Yes ☒ Unk
Using Drugs ☐ No ☒ Yes ☐ Unk   Type: P

Two-Man Veh ☐  One Man Veh ☐  ALONE ☐
Detective ☐  Other ☐ ASSISTED ☐

☐ Arrested on Current Offense
☐ Cleared By Arrest on Prior Offense

Arrestee Armed ☐ Yes ☐ No   Weapon Type     ☐ On View Arrest  ☐ Summoned  ☐ Custody

Juvenile Disposition ☐ Handled Released  ☐ Referred To Other Authority

Arrest Location

**NARRATIVE**

Overflow:
Show of Force: NO
Terrorist Affiliation: Not Terrorist related
Hate Group Affiliation: Not Hate Group related
Latitude: 34.882507 Longitude: -82.414923
------------------------------------------
Parsons, Rachel Nicole:Subject 1
Subject Types: Suspect

Mobile: (864)557-6636 ,
DL STATE/NUMBER: SC/0102616992 DOB: 12/23/1995
------------------------------------------
Chambers, Nathan Lee:Subject 2
Subject Types: Suspect
SSN: 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,
Mobile: (864)561-3838
DL STATE/NUMBER: SC/0102507864 DOB: 10/22/1993
------------------------------------------
Rodgers, Haley:Complainant 2

RACE: White, SEX: Female, Mobile: (864)467-7700,
352 Halton  Rd Greenville  29607

------------------------------------------
Chambers, Scarlett:Victim 1

DOB: 04/04/2019
Victim Form Given: NO

Narrative:
ASSIGNMENT:
On 6-28-2022 at 1431 hours, I was working uniformed patrol for the County of Greenville. I was wearing a standard Sheriff's Deputy uniform while driving a marked patrol car. I was dispatched to 110 Perry Rd. in the County of Greenville in reference to an overdose. The complainant (Nathan Chambers) advised dispatch that his girlfriend (Rachel Parsons) was not awake and barely breathing. Nathan stated he had given Rachel two doses of Narcan in an

**PROPERTY**

| Status | Property Type | Quantity | Property Make | Color | Description | Serial # / OAN | Value |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**ADMIN**

| Subject Identified | Subject Located | ☒ Active ☐ Unfounded | ☐ Admin Closed | ☐ Arrested Under 18 | ☐ Ex-Cleared Under 18 |
|---|---|---|---|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No | | | ☐ Arrested 18 and Over | ☐ Ex-Cleared 18 and Over |

Reason For Exceptional Clearance   ☐ Offender Death  ☐ No Prosecution  ☐ Victim Declines Cooperation  ☐ Extradition Denied  ☐ Juvenile No Arrest

| Reporting Officer(s) | Date | Unit#/Star# | Approving Officer | Date | Unit#/Star# |
|---|---|---|---|---|---|
| ORTIZ, LOUIS | 06/28/2022 | B39 / 02026 | SKINNER, AARON | 07/01/2022 | B19 / 01625 |
| GLASS, JAMES | 06/28/2022 | B39A / 01889 | Follow Up ☒ Yes ☐ No   SID - Crimes Again Investigation | 06/28/2022 | / 00000 |

| Agency I.D.<br>SC0230000  EC5 07/06/2022-09:44:33 | **GREENVILLE COUNTY SHERIFF'S OFFICE**<br>**Supplemental Report** Ent: agreene 07/11/2022<br>02:09:01 | Case Number<br>22000103747 |
|---|---|---|

| ☐ Original Report | ☐ Status Change | ☐ Additional Victims | ☐ Additional Stolen Property | Incident Type  S420 - Emergency Protective Custody |
|---|---|---|---|---|
| ☒ Supplemental Report | ☐ Other Report | ☐ Additional Defendants | ☐ Additonal Recovered Property | Patrol District  09C        Page  2  of  4  Pages |

**I.D. OVERFLOW**

☐ Complainant
☐ Victim
☐ Subject
☐ Runaway
☐ Wanted
☐ Arrest
☐ Missing
☐ Jail
☐ Other

| Subject's Name (Last, first, Middle) | | Victim Relationship To Subject | Ethnicity | Resident | Race | Sex | Age | Date of Birth |
|---|---|---|---|---|---|---|---|---|
| Address | City | State | Zip Code | Patrol District | Day Phone | | Evening Phone | |
| Height | Weight | Hair | Eyes | Facial Hair, Scars, Tattoos, Glasses, Clothing, Physical, Peculiarities, Etc. | | | | |

| ☐ Victim No. ____<br>Explain: | Visible Injury ☐ Yes ☐ No | Complaint of any Non-Visible Injuries ☐ Yes ☐ No | Victim Using Alcohol ☐ No ☐ Yes ☐ Unk<br>Drugs ☐ No ☐ Yes Type: | Two-Man Veh☐ One Man Veh☐  ALONE☐<br>Detective ☐      Other☐ ASSISTED☐ |
|---|---|---|---|---|

| Subject No. ____ | Using Alcohol ☐ No ☐ Yes  ☐ Unk<br>Using Drugs ☐ No ☐ Yes  ☐ Unk  Type: | ☐ Arrested on Current Offense<br>☐ Cleared By Arrest on Prior Offense |
|---|---|---|

| Arrestee Armed | ☐ Yes ☐ No   Weapon Type | ☐ On View Arrest  ☐ Summoned ☐ Custody |
|---|---|---|
| Juvenile Disposition | ☐ Handled Released  ☐ Referred To Other Authority | |
| Arrest Location | | |

**NARRATIVE**

attempt to wake her up.

I drove to the incident location signal one (lights and sirens) which was authorized by Sgt. Rivera (E03).

DETAIL'S:
Deputy Freeman (M12) and myself arrived on scene within a couple minutes of being dispatched. We were greeted at the door by Nathan who allowed us entry into the residence. While going through the living room, I observed a little girl (Scarlett Chambers 4-4-2019) laying in her crib. Nathan brought us back to the bedroom where we found Rachel passed out on the floor. We observed Rachel's shallow breathing for a few moments while we assessed her condition. After a couple seconds she awoke and became concious. She was fully alert and it was apparent the narcan administered took effect. Greenville County EMS then came into the residence and rendered aid to Rachel. Rachel ultimately denied to be transported by EMS to the hospital.

PLAIN VIEW OBSERVATIONS:
While inside the bedroom, I observed a loaded needle with 25ml of fluid on the bed side table. On the table beside the desk at the foot of the bed, there was a white powdery substance that Nathan said was fentanyl. Both of these items were seized and turned over to Deputy Freeman (M12) which he later placed into Property and Evidence. There were also two SHARPS containers located in the bedroom which were nearly full of used syringes. Based on these observations I formed the opinion there was current and an extensive history of narcotic use at the location. I also observed Nathan had several "Track marks" on the interior of his arms which he admitted was from using narcotics.

Nathan had a wall full of Police shoulder patches. On a chair beside the door, Nathan had an outer carrier vest with a Greenville County Sheriff's office printed badge and a patch that said "Deputy Sheriff." Nathan also had a TASER, radio, and several pouches attached to the vest. On the desk in the bedroom, Nathan had two MDT's as well as a charging station for the radio.

STATEMENT OF THE SUBJECTS (Nathan Chambers and Rachel Parsons)
Nathan was placed into handcuff's due to acting in an erratic manner and being very argumentative when EMS was rendering aid to Rachel. Because of this, Nathan was then brought onto the front porch of the residence.

**PROPERTY**

| Status | Property Type | Quantity | Property Make | Color | Description | Serial # / OAN | Value |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**ADMIN**

| Subject Identified | Subject Located | ☒ Active  ☐ Admin Closed | ☐ Arrested Under 18 | ☐ Ex-Cleared Under 18 |
|---|---|---|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No | ☐ Unfounded | ☐ Arrested 18 and Over | ☐ Ex-Cleared 18 and Over |

| Reason For Exceptional Clearance | ☐ Offender Death ☐ No Prosecution ☐ Victim Declines Cooperation ☐ Extradition Denied ☐ Juvenile No Arrest |
|---|---|

| Reporting Officer(s) | Date | Unit#/Star# | Approving Officer | Date | Unit#/Star# |
|---|---|---|---|---|---|
| ORTIZ, LOUIS | 06/28/2022 | B39 / 02026 | SKINNER, AARON | 07/01/2022 | B19 / 01625 |
| GLASS, JAMES | 06/28/2022 | B39A / 01889 | Follow Up ☒ Yes ☐ No  SID - Crimes Again<br>Investigation | 06/28/2022 | / 00000 |



EXHIBIT

M

## Table of Misconduct & Internal Investigations

| No. | DEFENDANT | NATURE OF COMPLAINT / CONDUCT | DATE | OPS CASE No. | OUTCOME | SANCTIONS IMPOSED (IF ANY) | ADDITIONAL DETAILS |
|---|---|---|---|---|---|---|---|
| 1 | Jason Owens | Officer Involved Shooting | 4/5/2005 | 1-5-60 | Exonerated | None | Involved in an OIS incident in which Owens and 3 other deputies engaged a suspect in a shootout. Suspect fired 6 rounds at deputies. Owens fired 9 rounds at suspect striking and killing suspect (other deputies fired 22 additional rounds at suspect). |
| 2 | Jason Owens | Insubordination; Failure To Perform Duties | 3/14/2007 | CR-07-012 | Sustained | Suspended - 3 days | Failed to provide evidence to Solicitor, failed to respond to inquires by Solicitor and supervisor, lied to supervisor regarding delivery of evidence. |
| 3 | Jason Owens | Failure To Perform Duties | 8/8/2007 | CR-07-060 | Sustained | Written Reprimand | Failed to conduct proper investigations; multiple pending cases with incomplete investigations. |
| 4 | Jason Owens | Conduct Unbecoming of a Deputy; Assault / Battery (Criminal) | 11/19/2010 | IA-10-029 | Sustained | Suspended - 2 days | Defendant Owens and other deputies were involved in an assault / battery at a bar while intoxicated. The victim sustained serious injuries to the head. Owens fled the scene, attempted to cover up his involvement, and was found to have violated agency policies regarding reporting involvement in potential criminal conduct. Victim sought to press criminal charges, however, despite GCSO finding that Owens, et al. were culpable for the assault, no charges were filed. |
| 5 | Jason Owens | Failure To Qualify | 11/17/2011 | CR-11-109 | Sustained | Counseled / Remedial Training | Failed to qualify re: firearms marksmanship. |
| 6 | Jason Owens | Unexcused Tardiness; Deceit Incident | 2/28/2012 | CR-12-027 | Sustained | None | Failed to report for duty on time. When questioned as to reason for tardiness via phone Owens advised that he was in traffic. When Owens finally arrived he was observed to be carrying a Hardees bag. Owens admitted to actual reason for being late was "getting some breakfast." |
| 7 | Jason Owens | Conduct Unbecoming / Unprofessional Conduct | 7/25/2012 | CR-12-132 | Sustained | Oral Reprimand | Multiple instances where Owens was verbally combative with other persons Reported to have "cussed out" others during various operations. Advised by superior that Owens cannot allow his emotions to dictate his decisions and his poor / disrespectful conduct negatively reflects on him and GCSO. |
| 8 | Jason Owens | Unauthorized Use of County Vehicle / Misuse of County Property | 4/7/2015 | CR-15-028 | Sustained | Suspended - 1 day | Allowed a civilian to operate and / or be transported in his county issued vehicle on a personal trip to Charleston, SC without notifying or obtaining approval from command staff. |
| 9 | Jason Owens | County Vehicle Involved MVC with Fixed Object | 6/25/2015 | CR-15-056 | Sustained | Written Reprimand | Collided with fixed object while operating his county issued vehicle in reverse. Written reprimand issued counseling Owens on proper operation of a motor vehicle while vehicle is in reverse. |
| 10 | Jason Owens | Insubordination | 11/3/2015 | CR-15-076 | Sustained | Written Reprimand | Deliberate indifference to violation of citizen's privacy regarding "knock and talk" incident. |
| 11 | Jason Owens | Failure To Appear | 7/27/2016 | CR-16-059 | Sustained | Written Reprimand | Failed to appear for hearing in General Sessions court in which Owens was commanded to appear pursuant to subpoena. Circuit Solicitor reported the unlawful conduct to Chief Deputy. FTA resulted in presiding Judge dismissing the criminal case. |
| 12 | Jason Owens | Failure To Supervise | 10/27/2021 | CR-21-131 | Sustained | None | Defendant Owens (rank: Sargent) and a trainee falsely arrested an innocent citizen. |

| No. | DEFENDANT | NATURE OF COMPLAINT / CONDUCT | DATE | OPS CASE No. | OUTCOME | SANCTIONS IMPOSED (IF ANY) | ADDITIONAL DETAILS |
|---|---|---|---|---|---|---|---|
| 13 | Jason Owens | Failure To Supervise; Failure To Perform Duties | 8/16/2023 | CR-23-074 | Sustained | None | Defendant Owens (rank: Sargent) failed to properly review a use of force / RTA (Response To Aggression) incident involving one of his subordinate deputies. Defendant Owens failed to document the incident and failed to discipline the deputy involved. |
| 14 | Jason Owens | Excessive Use of Force | 3/6/2012 | IA-12-007 | Exonerated | None | Complainant alleged Defendant Owens used excessive force when arresting him during an undercover narcotics operation. Also alleged his rights were violated because Def. Owens stripped searched subject in public. |
| 15 | Jason Owens | Excessive Use of Force | 7/19/2012 | IA-12-023 | Exonerated | None | Defendant Owens and others struck and tased a subject during an undercover prostitution sting operation. Subject was transported to the hospital with shoulder injuries and other injuries as a result of the use of force. |
| 16 | Jason Owens | Conduct Unbecoming / Unprofessional Conduct | 6/21/2022 | IA-22-012 | Unfounded | None | Complainant alleged Defendant Owens made derogatory and disrespectful comments during his complainant's arrest. |
| 17 | Jason Owens | Failure To Supervise | 6/21/2022 | IA-22-012 | Sustained | None | Defendant Owens illegally seized citizen's vehicle from his own property without a warrant and in violation of subject's 4th amendment rights. |
| 18 | Jason Owens | Misc. Constitutional Violation | 7/11/2012 | SP-12-012 | Exonerated | None | A GCSO investigation notebook / file was left in a homicide suspect's residence by Def. Owens. |
| 19 | Jason Owens | Unlawful Search / Seizure | Unknown | LS-12-004 | Unknown | N/A | Defendant Owens searched a building on a property without a search warrant during the execution of a search warrant that pertained to a different building. |
| 20 | James Glass | Use of Force | 1/18/2023 | 23-09886 | Exonerated | None | Deputies struck subject in face and deployed Taser® on subject who fled on foot. Defendant Glass failed to activate his BWC. |
| 21 | James Glass | Use of Force | 1/29/2023 | 23-015410 | Exonerated | None | Defendant Glass and other deputies were involved in an affray while visiting a taco stand. |
| 22 | James Glass | Conduct Unbecoming | 7/21/2022 | SR-22-030 | Unfounded | None | Received complaint that Defendant Glass was disrespectful to citizen. |
| 23 | James Glass | Arrested For DUI 1st Offense | 10/29/2022 | Unknown | Sustained | Terminated | Defendant Glass was terminated subsequent to his arrest for DUI 1st offense. |
| 24 | Louis Ortiz | County Vehicle Involved MVC | | CR-22-069 | Sustained | Written Reprimand | Defendant Ortiz was involved in an MVC while responding signal one (lights and sirens activated). It was determined that Def. Was operating his vehicle unsafely. |
| 25 | Louis Ortiz | Officer Involved Shooting | 12/27/2023 | FD-23-017 | Exonerated | None | Defendant Ortiz and 3 other deputies engaged in a gunfight with a suspect who discharged a weapon at them. Def. Ortiz and another deputy fatally wounded the subject. |
| 26 | Louis Ortiz | Officer Involved Shooting | 11/5/2024 | FD-24-015 | Exonerated | None | Defendant Ortiz and a sniper from the SWAT team fired a total of 6 rounds (Ortiz: 5 / sniper: 1) at a subject who brandished a shotgun in the presence of deputies. |
| 27 | Lois Ortiz | Conduct Unbecoming / Unprofessional Conduct | 5/11/2022 | OT-22-009 | Unfounded | None | Suspect accused Defendant Ortiz of using racial slurs and making offensive comments to the suspect. OPS found the offensive comments were not cause for discipline because they were "all based on facts." |
| 28 | Louis Ortiz | Conduct Unbecoming / Unprofessional Conduct | 7/21/2022 | SR-22-30 | Unfounded | None | Complainant alleged Defendant Ortiz made derogatory and disrespectful comments. |
| 29 | Ryan Freeman | Failure To Perform Duties | 10/15/2019 | CR-19-174 | Sustained | Written Reprimand | Failed to complete mandatory training. |

2

| No. | DEFENDANT | NATURE OF COMPLAINT / CONDUCT | DATE | OPS CASE No. | OUTCOME | SANCTIONS IMPOSED (IF ANY) | ADDITIONAL DETAILS |
|-----|-----------|-------------------------------|------|--------------|---------|----------------------------|--------------------|
| 30 | Hannah Stouffer | Failure To Follow Policy / State Laws | 5/13/2025 | CR-26-044 | Sustained | Written Reprimand | While working as an SRO, Defendant Stouffer returned a gun to a student on school property after weapon was temporarily seized during the search of student's vehicle on school property. Failed to determine if student was a prohibited possessor and did not comply with state law regarding prohibition of firearms on school property. |
| 31 | Hannah Stouffer | Unsafe Operation of County Vehicle | 6/4/2025 | SR-25-049 | Unfounded | None | Citizen reported that he observed Defendant Stouffer operating her county issued vehicle at excessive speeds. |
| 32 | Walter Bryson | Failure To Perform Duties | 8/30/2017 | CR-17-071 | Sustained | Written Reprimand | Failed to complete mandatory training. |
| 33 | Walter Bryson | Failure To Perform Duties | 3/23/2021 | CR-21-042 | Sustained | Written Reprimand | Failed to report for training. |
| 34 | Walter Bryson | Insubordination | 7/23/2021 | CR-21-091 | Sustained | Written Reprimand | Failed to follow policy directive re: dress code. |
| 35 | Walter Bryson | Conduct Unbecoming of a Deputy; Domestic Violence (Criminal) | 9/16/2024 | OT-24-004 | Unknown | None | Defendant Bryson committed the crime of Domestic Violence 2nd degree when he assaulted his stepson and used force to impede his ability to call 911 subsequent to a Defendant Bryson making threats and verbally abusing his wife. It appears that GCSO took no action. The disposition merely indicates: "documented to file." |

3



**EXHIBIT**

**N**



| | **Greenville County Sheriff's Office**<br>Office of Professional Standards<br><br>**Internal Affairs Investigation** | **IA-22-012** |
|---|---|---|

**Employee(s) Involved:**

**Deputy** ▮▮▮▮▮▮▮▮▮▮▮ **\*2014 / B-27**

**Sgt. Jason Owens \*881 / B-3**

---

**Complainant(s):**

▮▮▮▮▮▮▮▮▮▮

---

**Incident Location/ Date:**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

**Allegations and Findings:**

**Deputy Carmichael:** Violation of RR 70.08 (Conduct Towards the Public):
         **UNFOUNDED**

         Violation of GO-227 (Vehicle Tow):
         **SUSTAINED**

------------------------------------------------------------

**Sgt. Owens:** Violation of RR 20.17 (Failure to Supervise):
         **SUSTAINED**

---

**Evidence on File:**

Video ☒   Audio ☒   Photographs ☒   Other ☒   Documents ☒

Attorney/Client Privileged

CONFIDENTIAL           **DEF PROD 002838**



# Greenville County Sheriff's Office
## *Office of Professional Standards*

### Case Disposition IA-22-012

*Date:* **June 21st, 2022**

*Employee: Deputy* ▮▮▮▮▮▮▮▮▮▮ *2014 / #B-27*

*Allegations: GO-227 – Vehicle Tow*

☐ **EXONERATED**
Investigation discloses that an incident
occurred but was lawful and proper.

☒ **SUSTAINED**
Investigation disclosed sufficient evidence
to support the allegations in the complaint.

☐ **UNFOUNDED**
Investigation indicates the acts complained
of did not occur or were not committed by
members of the Greenville County Sheriff's Office.

☐ **NOT SUSTAINED**
Investigation discloses insufficient evidence to clearly
prove or disprove the allegations made by the complainant.
*Comments:*

**Sheriff Lewis**



# Greenville County Sheriff's Office
### Office of Professional Standards

### Case Disposition IA-22-012

*Date: June 21ˢᵗ, 2022*

*Employee: Sgt. Jason Owens \*881 / #B-3*

*Allegations: RR 10.17 – Failure to Supervise*

☐ **EXONERATED**
Investigation discloses that an incident
occurred but was lawful and proper.

☒ **SUSTAINED**
Investigation disclosed sufficient evidence
to support the allegations in the complaint.

☐ **UNFOUNDED**
Investigation indicates the acts complained
of did not occur or were not committed by
members of the Greenville County Sheriff's Office.

☐ **NOT SUSTAINED**
Investigation discloses insufficient evidence to clearly
prove or disprove the allegations made by the complainant.
*Comments:*

**Sheriff Lewis**

CONFIDENTIAL

**DEF PROD 002837**

## Conclusion:

Based upon the information obtained and the interviews conducted during the course of this investigation, it is the finding of this Office that the allegations made by Mr. ████████████ of inappropriate **Conduct Towards the Public** against Deputy ████████ are **UNFOUNDED.** There is no evidence to indicate that the allegations made by Mr. ████ both in writing and in-person, have any merit. In fact, BWC footage shows that Deputy ████████ conducted himself in a professional manner even as Mr. ████ continued to vociferate throughout his arrest process.

Furthermore, the investigation did reveal that the towing of Mr. ████ vehicle from his residence after his arrest was not in compliance with **General Order 227** regarding **Vehicle Towing** and that violation is therefore **SUSTAINED** against Deputy ████████ Mr. ████ vehicle had no evidentiary value and was not in need of safe-keeping as it was parked in the driveway of his residence. Mr. ████ address is listed on his driver's license and his vehicle registration as well. His wallet and other personal items were turned over to his sister at the scene by Deputy ████████

Lastly, the investigation further revealed that Sgt. Owens was on scene for a large portion of the incident and allowed Mr. ████ vehicle to be towed from his residence without the existence of probable cause. Sgt. Owens conceded during his OPS interview that the vehicle had no evidentiary value but indicated that he did not want to set a precedent of encouraging violators to avoid paying a tow bill by failing to stop for blue lights. Additionally, Sgt. Owens rejected the notion that the towing of an individual's vehicle by the Sheriff's Office without probable cause constituted a "seizure" as defined by the 4th Amendment and GCSO General Orders. The finding of **Failure to Supervise** by Sgt. Owens is therefore **SUSTAINED.**

End of Conclusion.



## Sheriff

**Hobart Lewis**
Greenville County Sheriff's Office

June 22nd, 2022



Mr. Hunt,

The complaint you filed on June 9th, 2022 involving Deputy ███████ with the Greenville County Sheriff's Office has been investigated by the Office of Professional Standards. The investigation is now complete and the allegation against Deputy ███████ concerning the towing of your vehicle after your arrest has been sustained. Your vehicle was released from the tow company on Friday June 10th at no charge to you.

Additionally, the findings were forwarded to Sheriff Hobart Lewis. If you have additional questions, please contact this Office.

Respectfully,



Greenville County Sheriff's Office
Office of Professional Standards
4 McGee St.
Greenville, SC 29601



An Accredited Law Enforcement Agency
4 McGee Street, Greenville, SC 29601 / (864) 467-5280 / Fax (864) 467-5299

CR-21-131




**EXHIBIT**

# GREENVILLE COUNTY SHERIFF'S OFFICE
# WRITTEN REPRIMAND REPORT

To: Sgt. Jason Owens      B3      881

        NAME        Unit #        Star #

From: Lt. ▮▮▮▮▮▮      A1      452

        NAME        Unit #        Star #

Reference: Failure to Supervise R&R 10.17      Date / Time: 10/27/21 @ 1800

## Issue / Incident Summary:

On 08/11/21 you read and approved a supplemental report from Dep. ▮▮▮▮ 2004/A42 in reference to a Breach of Trust Over $10,000 incident where Dep. ▮▮ had obtained an arrest warrant for a subject in reference to this incident (Case #21-122194). Dep ▮▮▮ at the time was still in a probationary period through 07/2022 where he was suppose to brief a Sergeant before obtaining a Felony Arrest Warrant. Dep. ▮▮ did not document in the supplemental report that he had briefed a Sergeant prior to obtaining the arrest warrant. On 09/30/21 it was deteremined that Dep. ▮▮ had obtained the arrest warrant from this incident on the wrong individual and that he had not conduct a complete investigation. An OPS investigation was completed concerning this incident.

## Summary of Discussion

Sgt. Owens advised that due to Dep. ▮▮▮ multiple years of experience in Charleston City along with his belief at the time that Dep. ▮▮ was beyond his probationary period for briefing Sergeants, that he did not question Dep. ▮▮ about briefing a Sergeant prior to obtaining the arrest warrant. Sgt. Owens also advised that he was reading a supplemental report and did not look at the entire investigation and was unaware of the advice that had previously been given to Dep. ▮▮▮▮▮▮▮▮▮▮ Sgt. Owens believed that the supplemental report he read provided adequate probable cause for obtaining the arrest warrant. Sgt. Owens also advised that Dep. ▮▮ is primarily a ▮▮▮▮ Deputy and that he rarely reads Dep. ▮▮ reports or is involved in Dep. ▮▮ investigations and that he only read this supplemental because it was a ▮▮▮ incident.

## Recommendation to Employee:

Know the probationary period of all Deputies assigned to your supervision and platoon to ensure that they have properly notified someone when necesssary. Carefully read any reports or supplemental reports to ensure a complete investigation has taken place and if necessary look at previous supplemental reports to ensure all steps of the investigation have been completed.

Pursuant to General Order 112, the employee must sign punitive disciplinary action with the understanding that his/her signature indicates receipt of the document and does not necessarily indicate his/her agreement with the contents. Failure to sign will result in the employee immediately being placed on administrative leave without pay. If an employee fails to sign this document by the end of the second full workday, he/she is considered to have resigned without notice. Employees who wish to grieve the disciplinary action should follow the procedures in General Order 113.

Employee's Signature / Unit # / Star #　　　　　　　　Supervisor's Signature / Unit # / Star #

Lieutenant's Initials _____　　　　　　　　　　　　Captain's Initials _____

▮▮▮▮▮▮▮▮▮    Copy-Platoon    Copy-Division Commander    Copy-Sheriff    Rev. 07/01/2020

CONFIDENTIAL

**DEF PROD 002236**

EXHIBIT

P



# Greenville County Sheriff's Office

### Internal Affairs Investigation

## IA 10-29

**Employee(s) Involved:**

████████████████████████

Investigator Jason Owens (*881 / Unit 430)

████████████████████████

**Complainant(s):**

███████████████

**Incident Location:**

█████████████████████████

**Allegations and Recommendations:**
Deputy ████████████ – Conduct Unbecoming a Sheriff's Deputy – SUSTAINED

Investigator ████████████████████████ Investigator Jason Owens,
Sergeant ████████████████ – General Order 111: Required Reporting of an
Incident Involving an Employee - SUSTAINED

Evidence on File:

Video ☒ Audio ☒ Photographs ☒ Other ☐

**Confidential**

CONFIDENTIAL

**DEF PROD 002507**



# Greenville County Sheriff's Office
## Stephen D. Loftis, Sheriff

AN ACCREDITED LAW ENFORCEMENT AGENCY

**To:**     **Sheriff Stephen D. Loftis**
            **County Attorney** █████████
**From :**  **Office of Professional Standards**
**Date:**   **November 19, 2010**
**Re:**     **IA 10-29 / Conduct Unbecoming a Sheriff's Deputy**

On August 16th 2010 this office received information from Captain █████████ Commander of the Greenville County Sheriff's Office Selective Enforcement Division, in regards to an incident that occurred involving several Greenville County Sheriff's Deputies. Captain █████████ stated that he was informed by Lieutenant █████████ that on the evening of August 14th 2010 members of the Vice/Narcotics Unit and members of the Uniform Patrol Division were involved in an altercation at █████████ a bar located █████████ while in an off-duty capacity. Captain █████████ was informed that several Sheriff's Deputies were at this bar when an unknown individual initiated a physical altercation with them. During this altercation, the unknown individual was struck by Deputy █████████ and was taken to the hospital. It was relayed to this office that Sheriff Loftis ordered a review of this incident. Captain █████████ stated that the following Deputies were present during the incident in question: Investigator █████████(*803 / Unit 441), Investigator █████████ (*574 / Unit 436), Investigator Jason Owens (*881 / Unit 430), Deputy █████████ (*1108 / C-16 / Recently transferred to the Directed Patrol Unit), and Sergeant █████████ (*760 / B-3). Captain █████████ further informed this office that Sergeant █████████ with the █████████ did respond to the scene as result of the altercation, but did not write a report.

I contacted Greenville County Emergency Medical Services Records Division clerk █████████ in an attempt to obtain further information in regards to the incident in question. █████████ informed me that I would have to produce a court order to view the report submitted by medics on the scene in question.

**Confidential**

She also informed me that she could not provide me with the name of the individual that was transported from the scene.

I then responded to the ███████████████ and spoke with Sergeant ████████ in regards to the incident in question. He confirmed that responding officers, Sergeant █████ and another unknown responding officer, did not complete an incident report. I requested to speak with Sergeant █████ at which time I was advised that he was on night shift. I provided my office and mobile number, requesting a return telephone call. Sergeant █████ then escorted me to the Greer Police Department Communications Center, at which time I spoke with Communications Supervisor ████████████████ ████████ provided me with a CAD report of the incident in question and emailed me the incoming 911 calls. The CAD report indicates that the incident occurred at ███████████████████████████████████████ The incident occurred on August 14th 2010 at 2327HRS. Greer Police Officers cleared the scene at 2340HRS. Sergeant █████ also escorted me to the Greer Fire Department, stating that they had also responded to the scene. I spoke with the Fire Chief, who provided me with a copy of their report. I noted no information on the report other than an unknown male was transported by Emergency Medical Services.

After leaving the Greer Police Department I responded to the incident location only to note that it was closed. I left a business card requesting a return telephone call.

As I was returning to my office I received a telephone call from Sergeant ██████ Since I was driving, I was unable to record the telephone conversation. Sergeant █████ advised me that on the date in question he and another officer responded to the incident location in reference to a fight in progress. Upon his arrival he observed an individual who appeared to be injured lying on the ground. He then spoke with an unknown individual inside the business who identified himself as a ████████████████████ who told him about the fight that had just occurred. He informed Sergeant █████ that the individual who was lying on the ground started the fight. Another member of the band informed Sergeant █████ that the unknown individual lying on the ground received the injuries from tripping out the door. Sergeant █████ also indicated that the unknown male attempted to assault his officer while conducting the investigation. He observed the unknown individual to be extremely intoxicated. He followed the unknown individual to the hospital, at which time the unknown individual stated that he did not wish for the incident

2

to be investigated. He further stated that one of the individuals involved in the altercation identified themselves as a Greenville County Sheriff's Deputy. I advised Sergeant ▮▮▮▮▮ that I may need to contact him at a later date to obtain further information.

I conducted a review of the incoming 911 call given to me by Greer Police Department Communications. An unknown female called 911 and requested an ambulance. There was no mention of an altercation.

On August 20th 2010 I met with ▮▮▮▮▮▮ the owner of ▮▮▮▮▮▮ in regards to the investigation. We initially began by discussing the establishment's surveillance system. The system was designed for internal theft purposes, and not security. A review of the video recorded during the incident in question was not very clear. I was able to distinguish that some type of disturbance occurred near the front door of the business. I was also able to observe an unknown individual, wearing a light colored button up shirt, leave the bar through the rear door immediately after the altercation. I requested that he provide me with a copy. He agreed and I informed him that I would contact him at a later date to retrieve the video.

I then began to discuss the incident in question, during which I noted that much of what he was discussing seemed to be third hand information. ▮▮▮▮ ▮▮▮▮ stated that he was told by several other individuals that the person who was hit, whom ▮▮▮▮▮ identified as ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ was sitting at the same table as the Deputies in question. The Deputies were there for someone's birthday party. At some point, ▮▮▮▮▮▮ slammed his hand down on the table and knocked someone's beer over. Witnesses indicated that ▮▮▮▮▮ was extremely intoxicated. One of the Deputies told him to calm down. ▮▮▮▮▮ told them that he was going to "fuck you up". The Deputies then indicated that they wanted to "finish this outside". At this point three Deputies and Ted ▮▮▮▮▮ walked to front door and went outside. ▮▮▮▮▮▮ stated that he was not sure who started but did know that ▮▮▮▮▮ was hit. He further stated that his head hit the side of the building and then the ground. According to the witnesses, they believed that all of the individuals were planning to fight when they got outside. Later during my conversation with ▮▮▮▮▮ I noted that he changed his version of events. He indicated that ▮▮▮▮▮ had paid his tab so he was thought to be leaving. He further indicated that witnesses thought ▮▮▮▮▮ was "just being mouthy" but was on the way out of the bar when he was hit. ▮▮▮▮▮ also stated that some witnesses

3

DEF PROD 002510

indicated that the Deputy that struck ███████ ran out the back of the business before the Greer Police Department arrived on scene. I asked ████ ██████ for witnesses to the incident. ███████████provided me with the following names: ████████████████████████████████████and his mother ████████████ ██████████ (From the band ████████ and the ████████████████████ and ███████████ (Drummer for the band and believed to be a ████████████████████████████████████ ██████████further stated that it was his opinion that █████████started the verbal altercation but that he should not have gotten "popped".

I then walked outside and performed a visual search of the area. I noted a large area of what appeared to be congealed blood in front of the business. This was confirmed by █████████ I requested that Master Deputy ███████ ██████ respond to the scene to take photographs. Master Deputy █████did respond and take photographs, which he later provided to me in digital format. After the photographs were taken, I left the area.

I then attempted to contact the additional witnesses to the incident in question. On September 1st 2010 I was able to speak with █████████ via landline. █████████████indicated that he was the drummer for the band, and also a police officer for █████████ He stated that he was coming off the stage after a set when he observed an "old guy trying to get out the door". He then observed a young blonde individual, that he was told was a Highway Patrolman, try to pull the older man, later identified as █████████ towards him. █████████ attempted to get between the two individuals but was unsuccessful. He then observed the younger individual shove █████████into a wall, after which he bumped his head and fell to the ground. ██████████ later was told that the owner of the business told the individual who started the altercation to run out the back of the business. █████████was also told that the altercation began over someone taking █████████chair, after which the younger individual told him "not anymore mother fucker". █████████ ██████████ further stated that █████████was not capable of defending himself. Due to the information he provided, I requested to meet with him to speak about his version of events in further detail. I scheduled a meeting with him at █████████ at 1500HRS.

I then contacted █████████ in regards to his version of events. He stated that he was in the back and did not see anyone "scuffling" or "walk out the back". Once he saw something happening he told everyone to get back inside. He said that he could tell me the rumors that he heard. I asked him what the

4

rumors were and he stated that "it was a cop that did it" and that "he went out the back door". He stated that he just heard it from random people in the bar and that I might meet resistance from people during this investigation. I did not pursue a written statement from ████████.

On the afternoon of September 1st 2010 I met with █████████ at the ██████████████████████ parking lot to discuss this case. █████ ██████ stated that on the date and time in question he was performing as the drummer for the band playing at ███████████████████████was leaving the stage when he observed a verbal altercation between two individuals; later identified as Jason Owens and ██████████ A third individual, later identified at ███████████appeared to step in between the two in an attempt to intervene. During this altercation, Jason Owens appeared to grab███████████████████████ The fight then moved to the doorway. ███████raised his hands asking what was going on. As the fight was moving towards the doorway,████████████observed ██████████ be forcibly pushed out the door, striking his head against the side of the building and then against the ground. The owner of the bar, known as████ then told the "Deputy to leave because the police were coming". ██████████was later informed by his wife, ███████████ that the altercation began over someone taking████████ seat at the table, which eventually led to ███ ███████being physically assaulted.██████████described the "Deputy" in question as having "lost control". ██████████ provided me with his wife's contact information and his brother's contact information, who was outside the business at the time of the altercation. He also provided me with the contact information for ██████████the lead singer for the band who was also a witness to the incident in question. ██████████ sent me an email containing his version of events. Multiple attempts were made to contact ███████████with no success. As of the date of this report, I have been unable to reach her.

On the morning of September 2nd 2010 I spoke with██████████ via landline in reference to this case. I asked ██████████ if he observed the incident in question. ██████████stated that all he saw was "that fella getting knocked out". I asked him to explain further. ██████████stated that while he was on stage he observed several individuals, including an "older man", later identified as██████████ arguing at the front door of the business. An unknown individual, later identified at██████████who was not involved in the argument, swung at██████████ and knocked him out. ██████████was standing behind the original individual, later identified as██████████ that he

5

**DEF PROD 002512**

was arguing with. ▊▊▊▊▊ went and got the owner and told him that a fight had just occurred. ▊▊▊▊▊ was later informed that the individual who struck ▊▊▊▊ was a Greenville County Sheriff's Deputy. He was also told that after the altercation ▊▊▊▊▊ was told to leave out the back door by the bar owner. ▊▊▊▊▊stated that he did not hear this. Officers from the Greer Police Department Greer arrived on scene and spoke with an individual in a yellow shirt, later identified as ▊▊▊▊▊▊▊ stated that was not the individual that struck the ▊▊▊▊ I asked ▊▊▊ ▊▊▊▊▊▊▊▊▊ had attempted to assault any one. ▊▊▊▊▊ insisted that did not happen, unless if occurred before the argument started. He stated that at the time he was struck, ▊▊▊▊▊ was walking backwards out the front door. I arraigned a meeting with ▊▊▊▊▊ at his place of business ▊▊▊▊▊▊▊▊▊▊

On the afternoon of September 2nd 2010 I spoke with ▊▊▊▊▊▊▊via landline regarding this case. ▊▊▊▊ stated he was standing at door way when the altercation occurred. ▊▊▊▊▊▊ stated that a man wearing a blue and white striped, beige shorts, with dark crew cut hair, shoved the victim in question into him. The victim fell on▊▊▊▊▊▊ after which his head hit the wall and then hit the ground. ▊▊▊▊▊▊ noted that the victim's head was "busted wide open". The assailant then stated "I told you to get out of here". ▊▊▊▊▊▊▊ stated that he was told that the assailant ran out the back of the business before the police arrived. ▊▊▊▊ ▊▊▊▊▊ stated that he would be able to identify the individual in question if he observed a photograph. I advised him that I would contact him at a later date to obtain a written statement.

On the afternoon of September 2nd 2010 I responded to ▊▊▊▊▊in order to speak with ▊▊▊▊▊▊▊reiterated his version of events, after which he provided me a written statement as to his version of events.

On the morning of September 3rd 2010 I spoke with▊▊▊▊▊via landline in regards to this investigation. ▊▊▊▊▊ stated that he was at ▊▊▊▊ ▊▊▊▊▊when the incident occurred, but that his information was third hand. He stated that he had heard that the individual that was hit, ▊▊ ▊▊▊▊ had said something to someone inside the bar which caused him to be hit. The only thing that ▊▊▊▊▊ saw was ▊▊▊▊▊lying on the ground outside the bar. ▊▊▊▊▊ also stated that he heard that the individual that hit ▊▊▊▊ ran from the scene. ▊▊▊▊▊ further

6

indicated that his mother was with him, but that she has not indicated to him that she observed the alteration in question.

On the afternoon of September 3rd 2010 I received a telephone call from one ███████████████ who stated that he was told by███████████to contact me. I returned███████████████ telephone call and left a message. Shortly after I received a telephone call from ███████████████ I asked████████ ████████ to describe the incident in question.███████████████ stated that he did observe the altercation and that the individual that struck the victim struck him from behind another individual without provocation and ran out the back of the business. He further stated that he heard multiple individuals begin to yell out the name ██████ and began to yell "get him out of here the police are coming". He further stated that when he arrived at the bar, he noted that the individual later identified at███████████and the individual later identified at██████████were sitting at the same table nearby with a large group of women and men. He assumed they were there together.████████████ ████████stated that his girlfriend told him that ██████ had taken a swing at ████████at which point█████████began to walk outside. That was when████████was struck. I asked███████████████ about meeting with him and his girlfriend. ███████████████ stated that he was no longer on speaking terms with her. I then made arraignments to speak with him and obtain a written statement at a later date.

On September 14th 2010 ███████████████ interviewed███████████ in regards to this investigation. █████████ stated that he believes that he is the victim of an assault. He also stated that he attempted to speak with Greer Police Department about the incident, but that one Officer████████told him that witnesses on the scene told her that he fell out the door of the business, which is what caused his injuries. Lieutenant████████asked███████████ to relay his version of events. █████████stated that he and his girlfriend, ███████████████went to dinner that night. While out, two friends named███████████████called them and told them that they were going to to hear a band. ███████████████████████ then met ███████████████around 9 PM on the evening in question. They sat at a table near the front of the building, close to the band. At some point,███████████████████ got up to dance. While they were dancing, another group came and sat in their chairs. █████asked them to move and they did. However, one younger male kept looking at them the entire evening making "gestures". At around 11 PM████████████████ ████████that he wanted to leave. ███████████████ stated that t ey

CONFIDENTIAL                    **DEF PROD 002514**

were going to stay. ████████ walked to the bar and paid the tab while ████████ went to the restroom. ████████ admitted to having several drinks. As he was leaving, one of the younger individuals said something to him. ████████ stated that if one of the younger individual said something smart to him, he probably said something smart back to him. He then began to walk out the door. At this point he stated that someone "turned my lights out". He stated that he remembered someone telling him to lie still, he remembers being in an ambulance, and does not fully remember until he wakes up in the emergency room restrained. Later, ████████ spoke with Officer ████████ with the ████████ She indicated to him that he was "very uncooperative" at the emergency room. ████████ told her that he does not remember. ████████ further stated that his son, ████████ spoke with friend of his from a restaurant and bar called ████████ who told him that several off-duty police officers were at that establishment for a party and that one of them was the one that hit him. ████████ showed Lieutenant ████████ a series of photographs of the incident location and injuries. Lieutenant ████████ provided ████████ with an email address so that we may have copies of the photographs in question. ████████ stated again that he probably smarted off to those individuals if they did smart off to him, but that he is 52 years old and was not looking for a fight. ████████ provided this office with ████████ and ████████ contact information. ████████ then provided this office with a written statement as to his version of events.

On the afternoon of September 21ˢᵗ 2010 I responded to ████████ ████████ and spoke with ████████ in regards to his version of events. ████████ stated that he was standing outside near the door when he heard the door "fly open" and a guy fall out. He further stated that the victim was hit by a younger white male wearing a white and blue striped shirt. The white male had dark, short hair. After this individual pushed the victim out of the door, he said "I told you to get the fuck out of here". ████████ further stated that there was another "big guy" beside him that may have helped him push the victim out of the door. When the victim fell to the ground he stated that he heard his head hit the ground and it sounded like a "melon". ████████ stated that he looked directly at person who hit the victim. ████████ was further told that the individual ran out the back of the business with a female. ████████ observed a photograph of ████████ and said the person he thought to be the suspect was "close". I confirmed that ████████ saw the victim pushed. ████████ also stated that he heard that the victim was hit

8

CONFIDENTIAL     **DEF PROD 002515**

before came out door. ██████████████ provided me with a written statement as to his version of events.

I then responded to the ████ in downtown Spartanburg, SC, and spoke with ██████████████ in regards to his version of events. ██████████████ stated that when the altercation occurred he was outside standing with a group of individuals. He had gone out there to smoke with several friends when he heard the door open and then heard a friend of his named ██████████ say "Oh shit". ██████████████ then saw several guys running out door, at which point one guy swung over another guy, hitting the first in face, knocking him out. The individual fell onto an ashtray and then onto the ground. ██████████████ then heard several unknown individuals yell the name ████████ and they began to tell him "go to back". ██████████████ noted that no one seemed worried about the individual on the ground. ████████ ████████ stated that the individual who hit the other was a "stout" guy, with short dirty blonde hair, slight hair, wearing a button up shirt and khaki pants. He also stated that he was "clean cut" and "walking around like a punk looking for trouble". He also thought the victim was sitting at the same table with the suspect. ██████████████ also provided the name of his girlfriend, ██████████████ and her contact information. ██████████████ provided this office with a written statement as to his version of events.

While at ██████ I contacted ██████████████ via cell phone in order to speak with her about this case. She stated that she was willing to meet me in the parking lot of the ██████ in order to provide her version of events. ██████████████ stated that when the altercation occurred she was sitting along the wall of the business. The group of "young guys" were sitting at a table in the center. The "older guy" walked up to the "young guys" and said something, at which time one of the younger guys "punched him". Someone then told him to run to the back of the business. The individual who started the physical altercation was a while male wearing a white shirt and a hat. He was also clean cut with a little facial hair. ██████████████ looked at a picture of ██████████ and stated "that looks like him". She further indicated that while the older man did seem to say something to the group of younger guys, the younger male did start the physical altercation. ██████████████ provided me with a written statement as to her version of events. ██████████████ ██████████ also provided me with the contact information for one ████ a friend who may have observed the incident in question.

9

**DEF PROD 002516**

On the morning of September 22nd 2010 I spoke with ▓▓▓▓▓▓▓ in regards to her version of events. She stated that she did not see the events, nor did she see anyone "get hit". She did see the "victim" on the ground after the incident, but she insisted that she did not see anything.

On September 22nd 2010 I spoke with Sergeant ▓▓▓▓▓▓ supervisor for the Vice / Narcotics Unit, in regards to his version of events. Sergeant ▓▓▓ stated that he was notified of the incident in question the following Sunday morning at 1000HRS by Investigator ▓▓▓▓▓▓▓▓▓▓▓▓▓ told him that they were at ▓▓▓▓▓▓▓▓ when they encountered an extremely intoxicated individual. They noted that the individual was being somewhat "rough" with his wife. At some point the individual slammed his hands down on the table because of the music that was being played, knocking over some drinks. Jason Owens told the individual to "calm down". ▓▓▓▓▓▓▓▓ took Jason Owens outside to calm down. After a few minutes outside they came back in. Everyone sat back down with the exception of Jason Owens, who stood on a nearby wall. The individual in question was on way out, when he initiated a verbal altercation with Jason Owens. ▓▓▓▓▓▓▓ stepped in between the two, at which time ▓▓▓▓▓▓ said was hit in the back of the head by this individual. At this point, ▓▓▓▓▓▓ hit the individual. ▓▓▓▓▓▓▓ indicated that he thought ▓▓▓▓▓▓ "knocked him out", but later he discovered that they individual hit his head on the ground. Shortly after ▓▓▓▓▓▓▓ called, Jason Owens called Sergeant ▓▓▓ and relayed the same version of events. Since the date of the incident, Sergeant ▓▓▓ has spoken with each of the individuals at the said location, all of whom provided him with similar versions of events. The only difference noted was that ▓▓▓▓▓▓ indicated that the individual was trying to hit him. Later Sergeant ▓▓▓ was also informed that Sergeant ▓▓▓▓▓▓▓▓ was present during the incident in question. Sergeant ▓▓▓ emailed me a written statement as to his version of events.

On September 22nd 2010 Sergeant ▓▓▓▓▓▓ with the ▓▓▓▓▓▓▓ Department responded to the Law Enforcement Center in regards to this investigation. Sergeant ▓▓▓ stated that the call for service came into the police department as a fight in progress. ▓▓▓▓▓▓▓▓▓▓▓ was the primary officer. He and ▓▓▓▓▓▓▓▓▓▓▓▓ a so responded. Officer ▓▓▓ arrived first on scene, with Sergeant ▓▓▓▓ and Officer ▓▓▓ arriving shortly behind. When Sergeant ▓▓▓ arrived, he noted the victim lying on the pavement bleeding from his head. An unknown individual was holding a rag to his head. Sergeant ▓▓▓ also noted about 30

10

**DEF PROD 002517**

people surrounding the individual. Greer Police Officers began to move people away from the victim until Emergency Medical Services arrived on scene. The officers then attempted to figure out what happened, but were faced with multiple versions of events. One version received was that the victim was being confrontational with someone and was hit. Another version was that the victim fell out the door as the crowd was pushing through. One patron pointed out an individual that was believed to be involved, who was identified as ██████ ██████ When called on by Sergeant ████ he identified himself as a Sheriff's Deputy. ████████ told Sergeant ████ that his involvement consisted of trying to calm the victim down during an altercation. Sergeant ████ stated that he may have told him that the victim tripped out the door, but he is not certain. Sergeant ████ noted that ████████ appeared to be sober. ████████ did not indicate how the victim was injured got hurt. Sergeant ████ did indicate that he and his officers did not receive a lot of cooperation from the patrons of the business. Sergeant ████ sent Officer ████ to the hospital to obtain the victim's version of events. Officer ████ called him back shortly after stating that the victim was very uncooperative and did not want the incident investigated. Officer ████ also stated that the victim was being so combative that the off duty security police officer was requested to stay in room with him. Officer ████ also stated that the victim may have swung at her while lying on the ground. She also stated that it was possible that he was trying to get her flashlight out of his face. During his time on the scene, Sergeant ████ noted that the victim was obviously intoxicated. Since the victim did not want to cooperative with the investigation, he decided to end it. While on the scene, no one else identified themselves as a Sheriff's Deputy. No one told Sergeant ████ that the other individual involved left the scene. Greer Police were never able to identify the potential assailant. Greer Police did not complete a written report. Sergeant ████ provided this office with a written statement as to his version of events.

On September 23rd 2010 I met ████████████████ at the Greer Police Department. Officer ████ first told me that ████████ did come to the Greer Police Department four days after the incident requesting an investigation. ████████ told her that he was hit in back of head. He told her that the individual that hit him was wearing a blue and white striped shirt. She questioned him about how he could describe the individual if he was hit in the back of the head. She also asked him about how much he had to drink that night. He told her "two beers". The case was cleared as administratively closed due to a lack of evidence. Officer ████ further stated that on the night in question, when she arrived on the scene, Officer ████ was with the

11

DEF PROD 002518

victim. She observed the victim swing at Officer ▮▮▮▮ flashlight. The victim also did no want to go to the hospital, but wanted to go home. She noted that the victim appeared extremely intoxicated. After Emergency Medical Services transported the victim, Officer ▮▮▮▮ began her investigation. As she began to conduct her investigation, she did not receive much cooperation from the patrons. No one volunteered any information. During that time, she was present when Sergeant ▮▮▮▮ spoke with ▮▮▮▮▮▮▮▮ indicated that he was trying to calm the victim down as the crowd exited out the front door. ▮▮▮▮▮▮ did not indicate that he was hit; nor did he say how the victim was injured. To Officer ▮▮▮▮▮▮ seemed very "level headed". While on the scene, some unknown individuals did indicate that that an individual in a blue and white striped shirt hit the victim. During her time there, an individual matching that description was not located. It is her belief that the victim fell and hit head.

I then met Officer ▮▮▮▮▮ at ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ since she was attending a law enforcement school and was only available for interview during lunch. Officer ▮▮▮▮ stated that she was the first Officer on the scene. When she arrived she observed the victim lying on the ground in front of the business, bleeding from the back of the head. She noted that he appeared extremely intoxicated. She began to clear the way for Emergency Medical Services. As this was occurring she began to investigate the incident. One unknown individual and the victim's girlfriend told her that the victim was hit by a male in a blue and white striped shirt. The victim also relayed this to her. Later, the officers determined that the girlfriend was not present when the incident occurred. Another unknown individual told her that a large crowd had pushed him out the door and he fell and hit his head. Officer ▮▮▮▮ was also privy to a portion of the conversation between ▮▮▮▮▮▮ and Sergeant ▮▮▮▮▮▮▮ stated that the victim had been initiating altercations all evening. As the victim was walking out a arge crowd followed and caused him to fall. The officers did not locate anyone who observed anyone struck inside the business. They also were unable to locate an individual wearing a blue and white striped shirt. Officer ▮▮▮▮ provided me with a written statement as to her version of events.

On the afternoon of September 23rd 2010 I spoke with ▮▮▮▮▮▮ in regards to her version of events. ▮▮▮▮▮▮ began by stating that there were a lot of people who saw what happened, but when the police arrived to investigate, no one said anything. She further indicated that "a bunch of cops" that were friends of hers were involved and that she knew "that a cop was involved". I

12

DEF PROD 002519

asked her how she knew the individuals involved and she stated that she knew them from ███████████ She further stated that she knew others had seen the incident, that the individuals involved were undercover Sheriff's Deputies, and thought that one of them was a █████████████████ ████████████ On the date and time in question ██████████ met with ███ ███████████████████ and friends of hers, at the bar in question. They sat at a table near the front of the business, near the band. At that time, ████████ did not appear to be intoxicated. When the incident occurred, she was outside the business smoking with her roommate, ████████ They had been there for about an hour. While outside she observed the "Highway Patrolman" and another "cop friend" in a yellow shirt drag the victim outside. The victim appeared to be extremely intoxicated at that point. They pushed him out, then the "Highway Patrolman hauled off and knocked the crap out of him". She initially stated that she did not observe the victim get hit, but seemed to be concerned about becoming involved because she was familiar with all of the parties involved. She also confirmed that ██████████ did not attempt to strike either one of the individuals involved and that the strike delivered by the "Highway Patrolman" was unprovoked. I asked her if she would be willing to look at several photographs of potential participants. Initially she asked if she could be left out of the investigation but later was willing to cooperate. She also indicated that when the police arrived on the scene, the "Highway Patro man" walked out the back of the business. She told me that she had a big problem with how the individuals in question handled the situation and no longer trusted any of them. She also stated that the owner of the bar was "a major dick" about it, wanting to ensure that the incident was kept as quiet as possible. ██████████████ told me that her roommate would be wiling to speak with me regarding her version of events. I then scheduled a time to meet with her and her roommate the following day at ████████████████████ ███████████

On September 24th 2010 Investigator ████████████ and I met with ███ █████████████████████, behind the ████████████ ████████████████████████ in regards to this investigation. I first spoke with ████████████ regarding her version of events. ████████████ stated that at the date and time in question, she was outside with ████████████ when she heard what she thought to be someone striking someone, at which point she observed ████████████ "flying" out the front door. An individual came out the front afterwards and "popped up" his collar, appearing to be very proud of himself. Afterwards, he went back inside. Initially, she thought that he was the one who had struck ████████████ She was later told that another individual had struck

13

      DEF PROD 002520

██████████ and that the individual she observed had been attempting to escort the victim out the front door. Others who had also observed the incident pointed the individual who struck the victim out to ████████████████ indicates that she never observed the "punch", but observed the results afterwards. She did observe the victim's head hit the concrete ground. Once the police arrived on scene, ████████████ stated that she observed the individual that she was told who punched ████████ exit out the back of the business. Ten minutes later, she observed the individual that she was told hit the victim back inside the business. ████████████ also indicated that she was acquainted with the individuals involved by spending time at ██████████████ and knew them as undercover police officers. I showed several pictures to ████████████ She indicated that ████████████ was the individual that she was told hit the victim and left out the back of the business. She also identified ████████████ as the individual that helped "drag" the victim out of the business. ████████████ and ████████████ provided this us written statements as to their version of events.

I made arraignments to speak with all of the employees involved in the incident in question on September 28ᵗʰ 2010. I first spoke with Sergeant ████████ ████████████ Sergeant ████████████ was issued a Garrity Advisement, which he indicated that he understood and signed a Garrity Advisement form. I then spoke with him about the incident in question. He advised that the group of them were together for a birthday party for ████████████wife. The party began at a place called ████████ which is a pizza restaurant. He and his fiancé ████████ got there at around 2030HRS. The group left there and went to ████████████ Sergeant ████████████stated that he had only two drinks that night. He did not consider any of the other Deputies as being intoxicated during the evening. At one point during the evening, he was sitting at a table near the band with ████████Jason Owens, ████████████ and his wife, when the band stopped playing. The bar then turned on the "house music", which Sergeant ████████████ recognized as ████████████ An individual, determined to be████████████ slammed his hands on the table due to the music. This knocked over a drink and Jason Owens made a comment to ████████████ In Sergeant ████████████ opinion, ████████████ was very intoxicated. ████████████ stood up and a female who appeared to be with him told him to sit down. At this point,████████████was attempting to stare Jason Owens down. Sergeant ████████████told Jason Owens to ignore him. During the evening, several words were exchanged between the two. Towards the end of the evening,████████████stands up, walks around the table and points at Jason Owens and said something. Sergeant ████████████stated that

14

CONFIDENTIAL     **DEF PROD 002521**

the music was loud and he could not hear it. Jason Owens is then walked outside by either ████████████████████████ or both, he is not sure. █████ ████████ then begins to walk towards the door. When everyone got outside, something happened. Sergeant ████████████ was unable to see, but due to the commotion he knew something had happened. Sergeant ██████████████ then walked outside and saw ██████████ lying on the ground. Several "EMS" guys who were with them began to tend to ██████████ Sergeant ███████████████ walked in and out several times until Emergency Medical Services and Greer Police arrived on scene, at which point he sat down inside the business. Sergeant ██████████████ was aware that ████████████ left the scene. He observed ██████████ and who he thought to be the owner of the bar talk outside for several minutes. Afterwards the conversation he left and did not return. He is not sure if ████████████ left with his girlfriend or not. Two weeks after the incident ██████████ called Sergeant ██████████████ and apologized to him for "putting him in that position". Sergeant ██████████████ did not observe a physical altercation occur at the table. I asked Sergeant ██████████████ who told him that ██████████ attempted to hit ████████████ Sergeant ██████████ stated that one of the Deputies involved told him, but he could not remember who. Sergeant ██████████████ did not provide an explanation as to why an on duty supervisor was not called that night. Sergeant ██████████████ provided this office with a written statement as to his version of events.

I then spoke with Investigator ██████████████ in regards to his version of events. Investigator ████████ was provided a Garrity Advisement, which he signed and received a copy of. I then asked him about his version of events. The group went out that night for his wife's birthday. They started by eating at ██████████████ which is a short distance from ████████████████ After eating they walked to ██████████████ During they night they socialized, walking in an out of the bar to smoke. At some point, they ended up at the same table as ██████████████████████ Before the initial incident, ██████████████████████ wife was speaking with ████████████████████ during which time ██████████ was flirting with the women sitting at the table. The first incident that occurred involving ████████████was when the band stopped playing and the bar turned on a ████████ song. When the song came on, ██████████ slammed his fist on the table. This knocked a drink on the table over. When this happened, ████████████ was sitting at the table with ██████████████████████ Jason Owens, possibly Sergeant ██████████████████████████████ wife. Jason Owens told ████████████to calm down. ██████████ began to grumble. ██████████████ then told Jason

15

Owens to go outside, which he did; and it is believed that he went outside with ███████████████████ then spoke to ████████ and confirmed that "everything was alright". ███████████ stated that he considered ████ to be very intoxicated. Close to midnight, either ████████ or ████████ paid their check. ███████████ watched them, since he was walking behind them. Jason Owens made eye contact with ████████ at which time ████████ began to point at Jason Owens, yelling something at him and began to walk towards him. Jason Owens and ████████ began to exchange words, at which time ████████ told Jason Owens something to the effect of "I'll kick your ass". Jason Owens was telling ████████ to shut up. ████████ then attempted to intervene by taking Jason Owens and pushing him back. A crowd began to gather and the incident began to move towards the door of the business. ████████ noted that his wife began to walk towards the door and he told her to "stay". She returned to the table. The incident seemed to have moved outside. ████████ stepped to the door at which point he observed ████████ outside, but no one else. When he returned inside, he observed Jason Owens. ████████ told him to stand at the back of the bar. He also noted an individual lying on the ground. ████████ then returned inside and sat down. Later ████████ either called or texted ████████ but he would not answer. They spoke later and ████████ told him that he had left, but stated that if he needed to return to let him know. He told ████████ to call ████████ since he was speaking with ████████ I asked ████████ why he thought ████████ left the scene. ████████ stated that he could no answer for ████████ but could answer for himself. He stated that he would have left to remove himself from the situation too "cool off". I asked ████████ if he observed anyone attempting to assault ████████ He stated that he did not. As they were leaving the bar, ████████ told him that he had a knot on the back of his head and indicated that he was hit. I asked ████████ if ████████ was an aggressive person when he is intoxicated. ████████ did not answer the question directly, but indicated he has a "harsh personality". ████████ provided this office with a written statement as to his version of events.

I then spoke with Investigator Jason Owens in regards to his version of events. Jason Owens was issued a Garrity Advisement, which he signed and received a copy of. Jason Owens stated that he and his wife and child went to a pizza restaurant near ████████ for a birthday party for ████████ wife. After eating, the group decided to go to ████████ At some point during the evening the group moved to a large table near the band.

16

**DEF PROD 002523**

When he went to sit down, an unknown female tapped Jason Owens on the shoulder and told him "that guy is going to be pissed off when he sees you in his chair". She pointed to an individual, identified as ███████ on the dance floor. Jason Owens then moved places. ███████ then came and sat back down near who he believed to be his wife. The band took a break and ███ ███ begins to play and ███████ began to yell "No!" in a loud tone repeatedly. The wife attempted to calm him down. ███████ grabbed her by the arm, pulled her close to tell her something, then pushes her away. Jason Owens recognized ███████ as being intoxicated and began to think that he may harm her. ███████ then grabbed her by the back of the neck, said something, and pushed her away. As Jason Owens was watching, ███████ slammed both hands on the table and some beer bottles fell over. Jason Owens told ███████ to "chill out". ███████ then began to cuss Jason Owens and told him that he was going to "kick his ass". As the female attempted to calm him down, ███████ stood up and began to come around the table. Jason Owens stood up to prepare himself. ███████ then told Jason Owens to go outside. So they went outside together. Several of the other members of the party were outside and Jason Owens told them about the incident. After he calmed down he walked back in. Jason Owens looked for ███████ so he would know his location. Jason Owens saw him at the bar paying his tab. Jason Owens stood on the opposite side of the table. As he was walking out they met eyes and ███████ began to walk towards Jason Owens, yelling at him "Fuck you! I am going to fuck you up! Let's go outside I am going to kick you ass!", all the while putting his finger in Jason Owens' face. Jason Owens told him to leave. ███████ continued to yell at Jason Owens. Jason Owens sat his drink down, at which time ███████ stood up and got in between them. Some unknown individuals tried to grab ███ ███████ while ███████ grabbed Jason Owens under his arms. As ███ ███████ continues to approach Jason Owens and ███████, Jason Owens reaches over ███████ shoulder in an attempt to grab ███████ so he could control him. Jason Owens then stated that ███████ swung at them. He did not see contact being made, but did speak with ███████ later and was told he had a knot on the back of his head. Some unknown individuals grabbed ███████ and pushed him out the door. Jason Owens then deescalated. He then heard something occurring at the door. Jason Owens looked up and saw ███████ in what appeared to be a follow through motion of a punch. ███████ then fell to the ground. Jason Owens walked outside to check on ███████ then told him that he hit him. One of the managers then pulled ███████ Jason Owens, and ███████ to the side and asked them what happened. After they relayed their

17

CONFIDENTIAL   DEF PROD 002524

version of events the owner told them they could go back into the bar. Later, ▮▮▮▮▮▮▮ spoke with the owner of the business. ▮▮▮▮▮▮▮ then spoke with Jason Owens and informed him that the owner told him to leave. After that, Greer Police Department arrived on scene and asked ▮▮▮▮▮▮▮ to step outside. Jason Owens asked Sergeant ▮▮▮▮▮▮▮ if he needed to go outside and speak with the police. Sergeant ▮▮▮▮▮▮▮ told him to remain inside. Greer Police left shortly after. Jason Owens provided this office a written statement as to his version of events.

I then spoke with ▮▮▮▮▮▮▮ in regards to his version of events. He was provided a Garrity Advisement, which he signed a received a copy of. ▮▮▮▮▮▮▮ advised that after eating pizza at a local Greer restaurant, the group decided to go to ▮▮▮▮▮▮▮ The first inclination that something happened was when he and several individuals were outside the bar smoking, Jason Owens comes outside and tells them that there was an individual, identified as ▮▮▮▮▮▮▮ inside the bar "showing his tail". Around closing ▮▮▮▮▮▮▮ was inside sitting at table near the band with several other individuals. As ▮▮▮▮▮▮▮ walked towards the door to leave ▮▮▮▮▮▮▮ observed a hand reach up over him pointing at Jason Owens. ▮▮▮▮▮▮▮ looked at ▮▮▮▮▮▮▮ and noted that he seemed to be speaking in an aggressive tone. He was unable to hear what he was saying. Jason Owens and ▮▮▮▮▮▮▮ began to walk towards each other, at which time ▮▮▮▮▮▮▮ gets in between them. ▮▮▮▮▮▮▮ had noted previously that ▮▮▮▮▮▮▮ was intoxicated, but not entirely "out of control". ▮▮▮▮▮▮▮ grabs Jason Owens and tries to push him back. Due to a wet floor and a lack of traction on ▮▮▮▮▮▮▮ flip flops, he is unable to push him back. ▮▮▮▮▮▮▮ then sees Jason Owens hands reaching towards ▮▮▮▮▮▮▮ and he sees ▮▮▮ ▮▮▮▮▮▮▮ hands reach towards Jason Owens. He then felt like he got hit in the back of the head. Jason Owens then released ▮▮▮▮▮▮▮ so ▮▮▮▮▮▮▮ released Jason Owens. ▮▮▮▮▮▮▮ then turns around to see ▮▮▮▮▮▮▮ falling out the door to the ground. ▮▮▮▮▮▮▮ yelled for his paramedic friends to help out. ▮▮▮▮▮▮▮ remembers people outside accusing him of hitting ▮▮▮▮▮▮▮ while others said he was breaking up the fight. Individuals associated with the bar come outside and talk to ▮▮▮▮▮▮▮. They then go back into the bar. ▮▮▮▮▮▮▮ walked by him and ▮▮▮▮▮▮▮ ▮▮▮ asked him if everything was ok. ▮▮▮▮▮▮▮ stated that it was. ▮▮▮▮▮▮▮ wife asked if they needed to leave. ▮▮▮▮▮▮▮ stated that he was not going to leave because he did not do anything and he was sure the police were on the way. Greer Police arrived on scene and the on scene Sergeant directed him outside. ▮▮▮▮▮▮▮ then told the Sergeant his

18

CONFIDENTIAL

DEF PROD 002525

version of events. ███████ then attempted to call ███████ on his telephone. At the time, ███████ did not answer. ███████ then went back over to the police officers and asked them what happened; because at the time he was still unsure. The police officers told him that ███████ fell and they were just going to transport him to the hospital. ███████ then called ███████ again, at which time ███████ answered. ███████ then asked ███████ if he needed to come back to the bar. ███████ then told ███████ that he was going to call Sergeant ███████ the following day. He considered calling him then, but did not because he was angry about the incident and was not sure what had happened. ███████ found out later that ███████ left. Some of the other members of the party came outside and told ███████ had hit ███████. I asked ███████ why ███████ left. He stated that ███████ later told him that the owner told him to leave. I asked if he knew if they told him to leave because the police were coming, ███████ did not know. I asked ███████ about the strike from ███████. ███████ stated that once he felt like he got hit, his focus shifted from pushing Jason Owens back to protecting himself. As he turns to protect himself, the only thing he saw was ███████ falling. He further stated the he is not sure if ███████ hit him, but assumed it because he was not there with anyone else. I asked ███████ if there is any doubt in his mind that he was hit. He stated no. ███████ also indicated that he was mad about the entire incident because a similar incident had happened in the past and that he would have to explain the incident. I asked ███████ if anyone else noted the injury to his head. He stated that his wife noted it the following day. He further stated that if he was put on the stand and asked if he knew for certain he was hit, he would have to say no. But if he was asked if he thought he was hit, he would say yes. He further stated that he did not believe that ███████ action's were malice because he did not observe any "smack talk" after the strike. ███████ provided this office with a written statement as to his version of events.

I then spoke with ███████ regarding this investigation. Upon initially speaking with him I advised him that I would need to advise him of his Miranda Rights, due to the information received in this investigation thus far. ███████ requested to speak with his Police Benevolent Association attorney for advice. After speaking with his attorney, ███████ stated that he did not wish to speak with me under Miranda. I then provided him a Garrity Advisement form, which he signed and received a copy of. I then spoke with him about his version of events. ███████ stated that they met

19

CONFIDENTIAL                    **DEF PROD 002526**

the other members of the party at ██████████████████ after they arrived. After socializing for awhile, some of the members of the party sat at a table in front of the band. ████████████ stated that he did not know what started the fight, but that while he was looking at his telephone he observed the individual in question begin to yell at Jason Owens, telling him that he was going to "kick his ass". ████████████ thought that the individual was intoxicated. He observed the individual push away his wife as she was attempting to calm him down. ████████████ took Jason Owens outside to calm him down. After ten minutes, they walked back inside and sat down. ████████████ did not see the individual. At the time of the incident ████████████ was standing near the table, texting on his telephone. While texting, he felt someone push into him and his telephone fell out of his hand. ████████████ placed his hand up against whoever was pushing against him and he bent down to find his telephone. When he retrieved his telephone, he turned around to see the individual "in Jason's face". ████████████ walked over to the altercation, next to Jason Owens' left shoulder, while ████████████ stepped in between the individual and Jason Owens. ████████████ had his hands on Jason Owens; shoulders, attempting to move him back. The individual then hit ████████ in the back of the head with a glancing blow; and ████████████ then immediately hit the individual one time. Contact was made with the individual's left cheek area. The individual then stumbled out the front door, fell against the wall outside, then fell to the ground. ████████████ girlfriend took him to the back of the bar. Two individuals from the bar, whom appear to be bouncers, ask ████████████ to come outside with them. He exits with them and they asked him what happened. They told him he was "fine" and he went back inside. A few minutes later, the same bouncers came to him again and asked him to leave. He and his girlfriend then left the business through the back door. When he got home he texted someone at the bar, at which time he found out that the individual had hit his head. ████████████ asked if he needed to return. He was advised that ████████████ was speaking with Greer Police Department. He then called ████████████ and asked him the same question. He was informed that Greer Police were already leaving. ████████████ indicated that he would be willing to return if needed. ████████████ further stated that the reason he did not remain on the scene was because he felt that he and ████████████ were the victims. At the end of the interview I confirmed with ████████████ that the statement he was providing was under Garrity and I also informed him that would not change unless he provided me written permission. ████████████ provided this office with a written statement as to his version of events.

20

DEF PROD 002527

I later made contact via telephone with the employees significant others in an attempt to obtain additional information. In each of the interviews, I focused on possible eye witness testimony as to a possible strike from ███████ during the incident in question. While all of the significant others indicated that ███████ was intoxicated and verbally abusive towards Jason Owens, no one observed a physical strike from ███████ Due to those calls being made from a cellular telephone, I was not in a position to record them.

I also spoke with ████████████████ in regards to their version of events. ███████ indicated that she did not observed the incident, but stated that ███████ did. ███████ stated that he was at the incident location with his wife, ████████████████ during the incident in question. ████████████████ got up to dance and a group of individuals came and sat in their chairs. ███████ told them that the chairs were taken. They moved, but one of the male members of the party "made a face". ███████ indicated that there were words exchanged between ███████ and this individual the rest of the evening. As ███████ was leaving the bar, he said something to this individual. ███████ stated he "felt like something was going to happen" and walked over to ███████ to escort him outside. Before they reached him "he was on the ground". He stated that he did not witness the "hit". ███████ further stated that ███████ did not attempt to hit anyone. I attempted to schedule an appointment with ███████ to obtain a written statement as to his version of events. He advised me that he would call and schedule a time that would be convenient for him. As of the date of this report, I have not received a return call from ███████.

Since the date I spoke with ███████ I had made multiple attempts to contact him in regards to the video in question. On October 1st 2010 I finally made contact with ███████ and scheduled a meeting between him and Investigator ███████ from the Greenville County Sheriff's Office Technical Services Unit in order to retrieve the video. Investigator ███████ responded to the scene and informed me via telephone that the video had been "written over" and was unrecoverable.

A copy of all audio recordings associated with this case was placed into property and evidence. A copy of all interviews, with the exception of ███████ ███████ Garrity protected interview, was placed into property and evidence. On October 13th 2010 this case was sent to the 13th Circuit Solicitor's Office for review.

21

DEF PROD 002528

On November 19th 2010 I received notification from the 13th Circuit Solicitor's Office that no charges would be filed in this case.

As of the date of this report this office has conducted a complete, unbiased, and impartial investigation into the allegations presented. The evidence in this case supports multiple policy violations. The preponderance of the evidence indicates that ██████ was loud and boisterous with the Deputies in question. However, the preponderance of the evidence also strongly indicates that Deputy ██████ struck ██████ without provocation, resulting in significant injury to ██████ The evidence also confirms that Deputy ██████ left the scene immediately afterward, which supports the afore mentioned allegation. The evidence also confirms that all of the Deputies present did not report the incident to a higher authority until the following day. Therefore, the allegation of Conduct Unbecoming a Sheriff's Deputy against Deputy ██████ is SUSTAINED. A policy violation of General Order 111: Required Reporting of an Incident Involving an Employee against Sergeant ██████ Investigator ██████ Investigator ██████ and Investigator Jason Owens is SUSTAINED.

Respectfully Submitted,



22

DEF PROD 002529



## GREENVILLE COUNTY SHERIFF'S OFF[...]
## WRITTEN WARNING



CP·15·0076

**EXHIBIT**

**Q**

To:_MD Jason Owens_      430      881

NAME      Unit #      Star #

From:_Sgt.■■■■_      401      452

NAME      Unit #      Star #

Reference: Violation Rules and Regulations 20.09 Insubordination

Date / Time:_11/03/15   1500_

### Issue / Incident Summary:

On Friday 10/30/15 MD Owens did not respond with Inv.■■■■■■■■■■■to conduct a Knock and Talk at ■■■■■■■■■■Sgt.■■■had previously given a direct order to all Master Deputies that a MD or Sgt. had to be present on all Knock and Talk operations due to a recent SC Supreme Court Ruling concerning Knock and Talks. Sgt.■■■had also informed all Deputy II Investigators that an MD or Sgt. needed to present during all Knock and Talk Operations unless otherwise directed by an MD or Sgt.
Sgt.■■■received a call from dispatch that the resident of ■■■■■■■■■■wanted to speak with a supervisor over the incident. MD Owens was the only MD available at the time and when Sgt.■■■contacted him about the incident it was determined that MD Owens did not respond and knew the investigators were conducting a Knock and Talk. MD Owens advised that he had been in the office while the others responded to and handled the incident.

### Summary of Discussion

On Tuesday 11/03/15■■■■■■■■meet with MD Owens over the incident. MD Owens advised that he did not respond with the investigators to the Knock and Talk and acknowledged that he knew the order given by Sgt.■■■that an MD or Sgt. had to be present on all Knock and Talk Operations. MD Owens confirmed that he had not spoken with ■■■■■■■■about not responding with the investigators. MD Owens advised that he had remained in the office in case the investigators needed a search warrant obtained. MD Owens also stated that he felt the investigators were capable of handling a Knock and Talk without an MD present. Sgt.■■■explained that due to the SC Supreme Courts latest interpretation of the Knock and Talk and concerns with it that he wanted and MD or Sgt. present to confirm that all actions were within the new ruling. Lt.■■■also pointed out recent incidents where potential problems and mistakes were identified by and resolved by MDs that otherwise may have gone unnoticed and may have later caused issues when prosecuting cases.

### Recommendation to Employee:

Follow all direct orders given unless otherwise told by the original supervisor or other supervisor as long as you make the second supervisor aware of the original order.
If you do not completely understand an order then always ask for clarification until you completely understand the order given.
Discuss with the original supervisor if a situation arises where you believe that the original order given needs to be removed or changed and do not deviate unless agreed upon by the supervisor.

_✓*881/430_

**Employee's Signature / Unit # / Star #**

**Supervisor's Signature / Unit # / Star #**

Original – Platoon      Copy – Division Commander      Copy – O.P.S.      Copy - Sheriff

CONFIDENTIAL

**DEF PROD 002232**



## Greenville County Sheriff's Office
### Office of Professional Standards
### Internal Affairs Investigation

**EXHIBIT**

**R**

**OT-24-004**

**Employee(s) Involved:**

**Master Deputy Walter Bryson *1569 #623**

**Complainant(s):**

**Incident Location:**

**Allegations and Findings:**

**N/A – Documented to File –**

Evidence on File:

CONFIDENTIAL

Video ☒  Audio ☒  Photographs ☐  Other ☐

CONFIDENTIAL

DEF PROD 005045

**AGENCY I.D.**
SC0230500

## SIMPSONVILLE POLICE DEPARTMENT
### INCIDENT REPORT

**CASE NUMBER**
0 5 - ⬤ 4 - 0 1 6 7 4 3

**NCIC**
INQ. | ENTD.

| INCIDENT TYPE | COMPLETED | FORCED ENTRY | PREMISE TYPE | UNITS ENTERED | TYPE VICTIM |
|---|---|---|---|---|---|
| 1. 13B - ASSAULT - SIMPLE | ☒YES ☐NO | ☐YES ☐NO | 28 | | ☒ Individual / ☐ Business / ☐ Financial Inst. / ☐ Government / ☐ Relig. Orgn. / ☐ Soc./Public / ☐ Other / ☐ Unknown / ☐ Police Off. |
| 2. 999 - DISTURBANCE/ COMPLAINT CALL | ☒YES ☐NO | ☐YES ☐NO | 28 | | |
| 3. | ☐YES ☐NO | ☐YES ☐NO | | | |

**E V E N T**

INCIDENT LOCATION (SUBDIVISION, APARTMENT AND NUMBER, STREET NAME AND NUMBER) ███████ | ZIP CODE 29680 | WEAPON TYPE 40

| INCIDENT DATE | 24 HR. CLOCK | TO | DATE | 24 HR. CLOCK | DISP. DATE | DISP. TIME | TIME ARRIVED | DEPART. TIME | LOCATION NO. |
|---|---|---|---|---|---|---|---|---|---|
| 09/15/2024 | 2212 | | 09/15/2024 | 2214 | 09/15/2024 | 2212 | 2214 | 2300 | C |

| COMPLAINANT'S NAME (LAST, FIRST, MIDDLE) | RELATIONSHIP TO SUBJECT #1 #2 #3 | RESIDENT | RACE | SEX | AGE | ETH | DAYTIME PHONE | EVENING PHONE |
|---|---|---|---|---|---|---|---|---|
| PERSON, UNKNOWN/UNTRACKED | NE | J S O U | U | U | 00 | U | H B | H B |

ADDRESS | CITY | STATE | ZIP CODE | LOCATION NO. C

**V I C T I M**

| VICTIM'S NAME (LAST, FIRST, MIDDLE) | RELATIONSHIP TO SUBJECT #1 #2 #3 | RESIDENT | RACE | SEX | AGE | ETH | DAYTIME PHONE | EVENING PHONE |
|---|---|---|---|---|---|---|---|---|
| , JUVENILE VICTIM | | J S O U | W | M | ████ | N | H D | H D |

HEIGHT | WEIGHT | HAIR | EYES | FACIAL HAIR, SCARS, TATOOS, GLASSES, CLOTHING, PHYSICAL PECULIARITIES, ETC.

ADDRESS | CITY | STATE | ZIP CODE | LOCATION NO.

**# 1**

VISIBLE INJURY (VICT. 1)  ☐YES ☒NO  EXPLAIN –

VICTIM (NO. 1) USING:  ALCOHOL: ☐YES ☒NO ☐UNK.     DRUGS: ☐YES ☒NO ☐UNK.

☐TWO-MAN VEH.  ☐ONE-MAN VEH.  ☐DETECTIVE/SPL.ASMT.  ☐OTHER  ☐ALONE  ☐ASSISTED      J - This Jurisdiction  S - State  O - Out of State  U - Unknown

**S U B J E C T # 1**

☒ SUSPECT  ☐ RUNAWAY  ☐ WANTED  ☐ WARRANT  ☐ ARREST  ☐ JAIL  ☐ SUMMONS

| SUBJECT NAME (LAST, FIRST, MIDDLE) | RACE | SEX | AGE | ETH. | DATE OF BIRTH | HEIGHT | WEIGHT | HAIR | EYES |
|---|---|---|---|---|---|---|---|---|---|
| BRYSON, DODSON | W | M | 30 | N | | | | BRO | |

FACIAL HAIR, SCARS, TATOOS, GLASSES, CLOTHING, PHYSICAL PECULIARITIES, ETC.

ADDRESS ███████ | CITY ███████ | STATE | ZIP CODE | LOCATION NO.

SUBJECT (NO. 1) USING:ALCOHOL: ☒YES ☐NO ☐UNK.   ARRESTED NEAR OFFENSE SCENE ☐YES ☒NO   DATE/TIME OF OFFENSE 09/15/2024  2212   DATE/TIME OF ARREST

DRUGS: ☐YES ☒NO ☐UNK. TYPE:     TOTAL # ARRESTED  0

**Offenses:**
ASSAULT - SIMPLE
DISTURBANCE/ COMPLAINT CALL

**N A R R A T I V E**

On 09/15/2024, around 2212 hours, I, CPL ███████ responded with my blue lights and sirens engaged to ███████ in the City of ███████ in reference to an possible Assault in progress.

Print Date: 09/16/2024 10:35:49 AM

JURISDICTION OF THEFT LAW ENFORCEMENT AGENCY | JURISDICTION OF RECOVERY LAW ENFORCEMENT AGENCY

**P R O P E R T Y**

| TYPE (GROUP) | | | | | | TOTAL VALUE |
|---|---|---|---|---|---|---|
| Burned | | | | | | |
| Count./Forged | | | | | | |
| Dest./Damaged | | | | | | |
| Recovered | | | | | | |
| Seized | | | | | | |
| Stolen | | | | | | |
| Unknown | | | | | | |

**A D M I N I S T**

| SUBJECT IDENTIFIED | SUBJECT LOCATED | ☐ACTIVE ☐UNFOUNDED | ☐ADM. CLOSED | ☐ARRESTED UNDER 18 ☐ARRESTED 18 AND OVER | ☐EX-CLEAR UNDER 18 ☒EX-CLEAR 18 AND OVER |
|---|---|---|---|---|---|
| ☒YES ☐NO | ☒YES ☐NO | | | | |

REASON FOR EXCEPTIONAL CLEARANCE:   1. ☐ OFFENDER DEATH   2. ☐ NO PROSECUTION   3. ☐ EXTRADITION DENIED   4. ☒ VICTIM DECLINES COOPERATION   5. ☐ JUVENILE - NO CUSTODY

| REPORTING OFFICER(S) | DATE | UNIT NUMBER | APPROVING OFFICER | DATE | UNIT NUMBER |
|---|---|---|---|---|---|
| ███████ | 09/15/2024 | C3 | ███████ | 09/16/2024 | C1 |

FOLLOW-UP INVESTIGATION  OFFICER
☐YES ☐NO

CONFIDENTIAL

DEF PROD 005049

| AGENCY I.D. SC0230500 | SIMPSONVILLE POLICE DEPARTMENT SUPPLEMENTAL INCIDENT REPORT | CASE NUMBER 0 5 - ●4 - 0 1 6 7 4 3 | NCIC INQ. ENTD. |
|---|---|---|---|

☐ ORIGINAL REPORT    ☐ SUPPLEMENTAL REPORT    ☒ ADDITIONAL VICTIMS    ☐ ADDITIONAL STOLEN PROPERTY

☐ MODIFIES ORIGINAL    ☐ CASE STATUS CHANGE    ☐ ADDITIONAL OFFENDERS    ☐ ADDITIONAL RECOVERED PROPERTY    PAGE 1

**VICTIM SUBJECT OVERPRFL**

☐ COMPLAINANT
☒ VICTIM # 002
☐ SUBJECT #
☐ RUNAWAY
☐ WANTED
☐ WARRANT
☐ ARREST
☐ JAIL
☐ SUMMONS
☐ _____

| NAME (LAST, FIRST, MIDDLE) | RELATIONSHIP TO SUBJECT #1 #2 #3 | RESIDENT J S O U | RACE W | SEX F | AGE | D.O.B. | ETH N |
|---|---|---|---|---|---|---|---|

| HEIGHT | WEIGHT | HAIR BLN | EYES | FACIAL HAIR, SCARS, TATOOS, GLASSES, CLOTHING, PHYSICAL PECULIARITIES, ETC. |
|---|---|---|---|---|

| ADDRESS | CITY | STATE | ZIP CODE | LOCATION NO. | DAY PHONE H B | EVENING PHONE H B |
|---|---|---|---|---|---|---|

☒ VICTIM NO. 002  VISIBLE INJURY: ☒ NO ☐ YES   EXPLAIN:

VICTIM USING ALCOHOL: ☒ NO ☐ YES ☐ UNK.   DRUGS: ☒ NO ☐ YES TYPE:

☐ TWO-MAN VEH. ☐ DETECTIVE/SPL.ASMT ☐ ALONE   ☐ UNK ☐ ONE-MAN VEH. ☐ OTHER   ☐ ASSISTED

☐ SUBJECT NO. _____   USING ALCOHOL: ☐ NO ☐ YES   USING DRUGS: ☐ NO ☐ YES TYPE   ☐ UNKNOWN

**NARRATIVE**

| | JURISDICTION OF THEFT LAW ENFORCEMENT AGENCY | JURISDICTION OF RECOVERY LAW ENFORCEMENT AGENCY |
|---|---|---|

**ADMIN/ST**

| SUBJECT IDENTIFIED ☒ YES ☐ NO | SUBJECT LOCATED ☒ YES ☐ NO | ☐ ACTIVE ☐ UNFOUNDED | ☐ ADM. CLOSED | ☐ ARRESTED UNDER 18 ☐ ARRESTED 18 AND OVER | ☐ EX-CLEAR UNDER 18 ☒ EX-CLEAR 18 AND OVER |
|---|---|---|---|---|---|

REASON FOR EXCEPTIONAL CLEARANCE: 1. ☐ OFFENDER DEATH   2. ☐ NO PROSECUTION   3. ☐ EXTRADITION DENIED   4. ☒ VICTIM DECLINES COOPERATION   5. ☐ JUVENILE - NO CUSTODY

| REPORTING OFFICER(S) | DATE 09/15/2024 | UNIT NUMBER C3 | APPROVING OFFICER | DATE 09/16/2024 | UNIT NUMBER C1 |
|---|---|---|---|---|---|
| | | | FOLLOW-UP INVESTIGATION OFFICER ☐ YES ☐ NO | | |

CONFIDENTIAL

DEF PROD 005050

# INCIDENT REPORT SUPPLEMENTAL

Page #:  1

Case Number: 05-24-016743

| Officer:00442 ▓▓▓ | Date Entered/Changed: 09/15/2024    Reviewer: 00419 | Review Date: 09/16/2024 |
| --- | --- | --- |

DETAILED STATEMENT OF INVESTIGATION:     On 09/15/2024, around 2212 hours, I, CPL ▓▓▓▓ responded to ▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ in reference to an possible Assault in progress. Upon arrival, Officer ▓▓▓▓ and I arrived on scene knocking on the door several times. Male subject Dodson Bryson (DOB: 05/27/1994) answered the door stepping outside. Dodson was informed the reason for the call and Dodson stated everything was fine. I observed another male subject walking down the stairs from inside the residence and a female upstairs that appeared to be crying. I then stepped past Dodson and asked the female if she was okay and she shook her head no. The male subject that was walking down the stairs stated he would like to speak with me away from Dodson. The male subject identified as ▓▓▓▓▓▓▓▓ stated Dodson is his stepdad. ▓▓▓ stated he was inside his bedroom attempting to go to sleep when he heard Dodson yelling at his mother ▓▓▓▓▓▓▓▓▓▓▓ and slamming things. ▓▓▓ stated he then walked into his mothers bedroom and observed her crying and his baby brother screaming at the top of his lungs. ▓▓▓ stated he said to Dodson "you need to fucking stop or i am calling the god damn cops". ▓▓▓ stated he went to call the cops and that's when Dodson grabs him and pushes him against the wall. ▓▓▓ stated Dodson then took his phone out of his hands and hides it so he was unable to call the cops. ▓▓▓ also stated Dodson was yelling at ▓▓▓ calling her a "worthless cunt."

At this time, Officer ▓▓▓ was currently speaking with Dodson while I was speaking with ▓▓▓ Officer ▓▓▓ (C7), arrived on scene and I informed him to start speaking with ▓▓▓ who was currently inside the residence upstairs. ▓▓▓ then stated in his mothers room they just got new blinds last week, but Dodson recently broke them the new ones. ▓▓▓ was asked if he needed EMS or if he was hurt, and ▓▓▓ stated Dodson grabbed his face when Dodson was taking his phone away from him, but stated he was not injured. I then walked into the residence to speak with ▓▓▓

Once I made it up the stairs inside the residence, ▓▓▓ was currently speaking with Officer ▓▓▓ and I heard ▓▓▓ state Dodson works for Greenville County as a deputy. ▓▓▓ was asked if anything was physical between Dodson and her and she stated no. ▓▓▓ stated it was only physical when Dodson pushed her son ▓▓▓ into the wall while attempting to grab his phone. I then asked ▓▓▓ what was Dodson screaming about prior to ▓▓▓ coming into the bedroom and she stated she had said something and Dodson was mad at whatever she said to him. ▓▓▓ then stated Dodson called her a "bitch" and a "cunt." ▓▓▓ stated nothing happened physically between them two, but this is the first time in a while Dodson had alcohol due to being in homicide investigations.

After speaking with ▓▓▓ I began to speak with Officer ▓▓▓ and I was informed Dodson stated he would leave for the night and his mother would come get him. I then walked outside and stepped away from the residence to call and speak with Lt ▓▓▓▓▓ After I spoke with Lt ▓▓▓ I went back inside the residence and it came to the conclusion ▓▓▓ and Dodson have been married two years and they have not been to family court for ▓▓▓ to be under Dodson's custodial rights. ▓▓▓ was informed and she stated she did not want charges for Assault and for them to handle the situation themselves. Both ▓▓▓▓▓▓ willingly provided written statements of the incident and I provided Officer ▓▓▓ a complain withdrawal form for ▓▓▓ to fill out. I then waited downstairs with Dodson until his mother picked him up and I then cleared the scene.

My body-worn camera was on during this incident.
This case is closed due to victim refusal.

CONFIDENTIAL

**DEF PROD 005051**

# INCIDENT REPORT SUPPLEMENTAL

Page #: 1

Case Number: 05-24-016743

| Officer: 00464 ███████ | Date Entered/Changed: 09/15/2024 | Reviewer: 00419 | Review Date: 09/16/2024 |
|---|---|---|---|

**DETAILED STATEMENT OF INVESTIGATION:** On 09/15/2024 at 2212 hours, I, PTL. ███████ (C-4) responded to ███████ ███████ in response to domestic problems. It was stated through dispatch that there was an active assault in progress and the caller could hear a female saying "do not hit me".

Due to the nature of the call, I responded to the scene signal 3 (lights and siren). CPL. ███████ and I then arrived on scene, and while at the front door, I did not hear any screaming or anything being thrown. I then knocked on the door, where I met with Walter Bryson (DOB: 05/27/1994). I stated to Walter that we received a call about an active assault in progress at this address, and I proceeded to ask if everyone was okay, and Walter stated that everyone in the house was good. When CPL. ███████ went to ask Walter if everyone in the house was good again, ███████ ███████ came downstairs and told CPL. ███████ that he wanted to speak with her off to the side. While I started talking to Walter, his wife, ███████ came downstairs and told Walter that he needed to leave.

After figuring out that some sort of altercation did happen, Walter admitted to me that he had gotten mad and he had thrown a chair, but the chair did not hit anyone. Walter then further stated that after he had thrown the chair, he and ███████ got into a verbal altercation, and that was it. I then asked Walter if he had thrown the chair at ███████ and he replied no; he threw the chair while he was alone in the living room. ███████ then stated that Walter also threw a controller at the blinds, to which Walter then admitted that he did throw a game controller at the blinds. PTL. ███████ then showed up on scene, and I had him talk with ███████ upstairs in the apartment. While talking with Walter alone outside, I asked him what started the altercation tonight, and he stated that he was by himself with his kid and stuff got heated after throwing the game controller. While talking with Walter, he would not explain to me the reason the altercation started other than saying it was from life and that nothing physical happened.

PTL. ███████ then came outside, and CPL. ███████ and I went inside to talk with ███████ While inside the apartment, I was informed from CPL. ███████ that Walter was a deputy with the Greenville County Sheriff's Office. While inside the apartment, ███████ stated that he wanted to leave because he was not going to stay with Walter, who had put his hands on him. I then asked ███████ where he put his hands on him, and he stated that in the process of calling 911, Walter pushed his phone against his face and took his phone to prevent him from calling. I then looked at ███████ face; however, I did not observe any redness or marks. ███████ then took me to the master bedroom, where he stated that Walter pushed him against the wall, next to the bed. While in the master bedroom, I observed an Xbox controller on the bed and the blinds above the bed to be damaged. ███████ then went back into the living room with ███████ where he stated that he was not staying at the apartment with Walter and that his girlfriend was going to pick him up.

While talking with ███████ I asked if this was the first time this has happened, and she stated no. ███████ claimed that Walter had started drinking recently. ███████ then further stated that when Walter drinks, he would start a verbal altercation with her, claiming she was a bad mom, which he did tonight. ███████ then went to her bedroom to avoid an argument; however, Walter followed ███████ into the master bedroom and started calling her a "cunt" and a "bitch" before throwing an Xbox controller at the blinds. ███████ then came into the bedroom, where he told Walter not to talk to his mother like that. ███████ then went to call 911, when Walter pushed him against the wall, taking ███████ phone, to prevent him from calling 911. ███████ then stated that she then called Walter's mother to come and pick him up before we showed up on scene. ███████ then stated to me that Walter had been in the homicide division, and while working homicide, their relationship began to fall apart.

After awhile, it was found that Walter was not the father of ███████ and had no custodial rights over him. Due to Walter being a deputy, CPL. ███████ notified LT. ███████ (C-1) of the incident to notify Walter's supervisor. At this time, I gave ███████ a written statement form, which was filled out, and ███████ stated that she did not want to press charges for assault on ███████ was then given a complaint withdrawal form, which was also filled out. Walter's mother then showed up on scene to pick up Walter, where they left the scene without further incident.

*There is no further information.*

DEF PROD 005052

# INCIDENT REPORT SUPPLEMENTAL

Page #:  1

Case Number: 05-24-016743

| Officer:00419 | Date Entered/Changed: 09/16/2024 | Reviewer: 00442 | Review Date: 09/16/2024 |
|---|---|---|---|

DETAILED STATEMENT OF INVESTIGATION: On 09/15/2024, I, LT. ▓▓▓▓▓ was contacted by Cpl. ▓▓▓▓▓ in reference to this incident. She advised me that the male party in this case, Dodson Bryson, had gotten into a verbal altercation with his wife while being heavily intoxicated, and that during that verbal altercation he got into a physical altercation with his teenage stepson. I was informed that Bryson pushed his stepson into a wall by his face while taking his phone away so that he could not call law enforcement. I immediately notified Captain ▓▓▓▓▓ and LT. ▓▓▓▓▓ with the Greenville County Sheriff's Office.

This concludes my involvement in this case.

CONFIDENTIAL

**DEF PROD 005053**