IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | | |
|---|---|---|
| Nathan L. Chambers, | ) | C/A No. 6:25-cv-01068-TMC-KFM |
| Plaintiff, | ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. | ) | |
| Greenville County, Greenville County Sheriff's Office, John Hobart Lewis, Louis Ortiz, James Michael Glass, Jason Owens, Ryan Freeman, Hannah Stouffer, and Walter Bryson, | ) | |
| Defendants. | ) | |

This matter is before the court on the motion to dismiss or, in the alternative, motion for summary judgment of the defendants Greenville County, Greenville County Sheriff's Office ("GCSO"), John Hobart Lewis ("Sheriff Lewis"), Louis Ortiz, James Michael Glass, Jason Owens, Ryan Freeman, Hannah Stouffer, and Walter Bryson (hereafter "the deputies") (doc. 67). The *pro se* plaintiff, Nathan L. Chambers, brought this action pursuant to 42 U.S.C. § 1983 alleging violations of his constitutional rights. Pursuant to the provisions of 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in cases involving *pro se* litigants.

## I. BACKGROUND

The plaintiff filed his initial complaint in the Greenville County Court of Common Pleas on June 25, 2024 (doc. 1-1), and the defendants removed the matter to this court on February 24, 2025, under federal question jurisdiction (doc. 1). On June 18, 2025, the plaintiff filed an amended complaint (doc. 37), and he filed a second amended complaint on July 18, 2025 (doc. 46).

In his second amended complaint, the plaintiff alleges that on June 28, 2022, he requested emergency medical services for his fiancé's opioid overdose (doc. 46, 2nd amend. comp. ¶¶ 42, 45–46).  The plaintiff contends that Deputies Ortiz, Glass, Freeman, Stouffer, Owens, and Bryson – all of whom were GCSO deputies at the time – responded to his call (*id*. at ¶¶ 50–51, 62).  The plaintiff states that Deps. Ortiz, Glass, and Stouffer handcuffed him, and Dep. Glass "dragged Plaintiff by his hands, wrists, and arms" outside the house (*id.* at ¶ 74–77).  He also claims that Dep. Glass "slammed Plaintiff's face and body" into the plaintiff's daughter's crib, distressing the plaintiff and his daughter (*id.* at ¶ 78).  He alleges he was held for five hours in handcuffs and without water in the summer heat (*id.* at ¶¶ 93, 95), and that Deps. Ortiz, Glass, Owens, Stouffer, and Freeman searched his home "in bad faith, without probable cause, and without a search warrant" (*id.* at ¶ 97).

The plaintiff alleges ten causes of action: (1) false arrest, (2) abuse of process, (3) violation of the Fourteenth Amendment Due Process and Equal Protection Clauses and his Fourth Amendment right to be free from unreasonable searches and seizures,[1] (4) deliberate indifference/supervisor liability under 42 U.S.C § 1983, (5) gross negligence and negligence, (6) false imprisonment, (7) municipal liability under § 1983, (8) intentional and reckless infliction of emotional distress, (9) excessive force under § 1983, and (10) civil conspiracy (doc. 46 at 19–35).  The defendants filed their answer on September 20, 2025, denying the allegations and raising various affirmative defenses, including Eleventh Amendment immunity and qualified immunity (doc. 59).

On January 23, 2026, the defendants filed a motion to dismiss or, in the alternative, motion for summary judgment (doc. 67).  On January 27, 2026, pursuant to

---

[1] The plaintiff also alleged that the defendants violated his right to be free from unreasonable searches and seizures, as well as his due process and equal protection rights, under the South Carolina Constitution (doc. 46, 2nd amend. comp. ¶¶ 133–34).

2

*Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the plaintiff was advised of the motion to dismiss and motion for summary judgment procedures and the possible consequences if he failed to respond adequately (doc. 68). The plaintiff filed two motions for extension of time to file a response and a motion for leave to file excess pages (docs. 70, 73, 79). The court permitted the plaintiff to file ten extra pages for a total of forty-five pages and ultimately extended his deadline to respond to the defendants' dispositive motion until June 4, 2026 (docs. 71, 74, 82). On June 5, 2026, the plaintiff filed his response (doc. 87), and the defendant filed a reply on June 12, 2026 (doc. 90). Accordingly, this motion is now ripe for review.

## II. FACTS PRESENTED

On June 28, 2022, the deputies responded to the plaintiff's request for emergency medical services for his fiancé's opioid overdose at his residence (doc. 67-3 at 2, Ortiz aff. ¶ 3). Upon arrival, Deps. Ortiz and Freeman activated their body cameras, and the resulting videos have been reviewed by the court (doc. 67-2, Ortiz BWC 1–4; doc. 87-2 at 5, Freeman BWC). The footage depicts Dep. Ortiz knock on the front door and the plaintiff invite the deputies into his home (doc. 67-2, Ortiz BWC 1 at 0:28). The plaintiff led them past his three-year old child to the bedroom, where Dep. Ortiz helped the plaintiff's fiancé regain consciousness (*id.* at 0:34, 1:52).

After the plaintiff was moving around his bedroom and sat on his bed, Dep. Ortiz told the plaintiff to get off the bed because there were drug needles on it and told him to sit in a chair (*id.* at 3:57). Dep. Ortiz started shining his flashlight around the room, and the plaintiff asked Dep. Ortiz, "Whatcha lookin' for?" (*id.* at 4:57). Dep. Ortiz responded that he was "just lookin' around," and Dep. Freeman said they were looking for drugs (*id.*). Deps. Ortiz and Freeman then questioned the plaintiff about his child in the next room, and the plaintiff admitted to using drugs "earlier" (*id.*).

3

Dep. Ortiz left the bedroom to check on the plaintiff's child, then walked into the kitchen and opened the freezer and refrigerator to determine if there was food for the child (*id.* at 6:04, 8:00; doc. 67-3 at 3–4, Ortiz aff. ¶ 12). The video depicts piles of debris in the dining room, with garbage and grime all over the house (*id.* at 8:10). Dep. Ortiz attested that the plaintiff's bedroom was strewn with drugs, needles, and other drug paraphernalia; the floor of the house was strewn with grime and hair; and the furniture was dirty with one chair having exposed springs (doc. 67-3 at 3–4, Ortiz aff. ¶¶ 9, 13). He further attested that the child's diaper had soaked through to her crib's mattress and that he did not feel the home was fit to house a child (*id.* ¶¶ 11, 13).

While Dep. Ortiz investigated the kitchen, the plaintiff remained in his bedroom and argued with Dep. Freeman when asked about the incident (doc. 87-2 at 5, Freeman BWC at 3:45). Thereafter, the plaintiff walked to his bed and moved blankets, and argued with the deputies providing medical aid to his fiancé. The deputies then told him to sit down (*id.* at 4:30). Dep. Freeman warned the plaintiff that they would arrest him if he did not "calm down" (*id.* at 4:55). Dep. Freeman then left the plaintiff's bedroom and told Dep. Ortiz that he was tired of arguing with the plaintiff while they were helping his fiancé (*id.* at 5:30). The plaintiff attests that he did not "argue[] with Defendant Freeman while he was rendering medical aid" (doc. 87-1 at 8, Chambers aff. ¶¶ 31–32).

The video shows Dep. Ortiz return to the plaintiff's bedroom and pick up what appears to be GCSO tactical gear bearing the plaintiff's name from a chair (doc. 67-2, Ortiz BWC 1 at 12:45). The plaintiff asked Dep. Ortiz, "Why are you touching my stuff, deputy?" to which Dep. Ortiz responded, "Because you're not a police officer" (*id.* at 12:56). After the plaintiff responded, "I never said that I was," Dep. Ortiz handcuffed the plaintiff, and Dep. Owens told the plaintiff he was being detained so they could conduct their investigation (*id.*

4

at 13:15).[2]  The plaintiff, who was still handcuffed, then walked out of the room under Dep. Glass' supervision (*id.* at 13:50).

The plaintiff attests that Dep. Glass "slammed or drove [his] face and body into [his] child's crib" causing the plaintiff "pain and injury and . . . distress to [his] minor child" (doc. 87-1 at 11, Chambers aff. ¶¶ 67–69).  Video footage does not depict Dep. Glass escorting the plaintiff to the porch; however, Dep. Glass and the plaintiff can be heard on the audio portion of the recording talking in the living room where his child can also be heard cooing, with no sound of any force being used on the plaintiff (doc. 67-2, Ortiz BWC 1 at 13:58).  Further, there are no signs of a struggle in the living room, nor does the child appear emotionally distressed (*id.* at 15:40).  The plaintiff is later seen casually speaking with Dep. Glass and does not appear distressed or injured (*id.*).

The plaintiff was detained on a covered porch in front of the house (doc. 67-2, Ortiz BWC 1 at 41:20).[3]  During this time, the plaintiff's father, who also lived at the residence, appeared on the scene.  The video shows that less than one hour after he was handcuffed, the plaintiff was no longer handcuffed (*id.*, Ortiz BWC 2 at 6:24).[4]  Dep. Owens asked the plaintiff if the deputies could search additional items in the plaintiff's bedroom, and the plaintiff verbally consented to the search (*id.* at 6:50).  The plaintiff was told that he could revoke his consent at any time, and his father was next to him and appeared to be

---

[2] Dep. Ortiz attested that the plaintiff's possession of law enforcement paraphernalia was investigated based on recent thefts of similar equipment from the GCSO (doc. 67-3 at 4, Ortiz aff. ¶ 17).  However, the plaintiff was not arrested or charged with any crime in connection with this incident (*id.* ¶ 18).

[3] Contrary to the plaintiff's allegations (doc. 87 at 43), the video clearly shows that the deputies gave the plaintiff a beverage during the investigation (doc. 67-2, Ortiz BWC 3 at 7:03, 10:42; *see* doc. 46, 2nd amend. comp. ¶¶ 93, 95 (alleging the defendants forced him to "remain handcuffed with no water in the summer heat" for five hours)).

[4] The time stamps in the right corner of the video show that the plaintiff was handcuffed at 2:47 p.m. and first appears without the handcuffs at 3:40 p.m. (doc. 67-2, Ortiz BWC 1 at 13:15, Ortiz BWC 2 at 6:24).

listening to the conversation when the plaintiff consented to the search (*id.*).  The plaintiff was read his *Miranda* rights during this process (87-2 at 5, Freeman BWC at 16:36).

Approximately 25 minutes later, a South Carolina Department of Social Services ("DSS") investigator arrived (doc. 67-2, Ortiz BWC 1 at 31:10).  Dep. Ortiz told the DSS investigator what the deputies had found, and the investigator proceeded with her own investigation of the home (*id.* at 31:44).  Because they were unable to find a family member at another location who was willing to immediately take custody of the plaintiff's child, DSS took emergency protective custody of her (*id.* at 21:40).  The plaintiff was not arrested nor charged with any crime in connection with this incident (doc. 67-3 at 4, Ortiz aff. ¶¶ 16, 18).  However, the Greenville County Family Court subsequently found that the plaintiff's child had been abused and/or neglected as a result of the incident and authorized DSS to take custody of the child (doc. 67-5 at 2, 4).  The South Carolina Court of Appeals thereafter affirmed the custody order (doc. 67-6 at 3).

### III. APPLICABLE LAW AND ANALYSIS

#### A.    *Defendants' Motion to Dismiss*

The defendants first request dismissal of the plaintiff's second amended complaint under Federal Rules of Civil Procedure 37 and 41 because the plaintiff did not attend a noticed deposition on November 4, 2025 (doc. 67-1 at 8–9).  The plaintiff argues that he was incarcerated at the time, and his father called the defendants' counsel's office and reached an agreement to cancel and reschedule the deposition (doc. 87 at 14; doc. 87-1 at 2–3, J. Chambers aff. ¶¶ 24–26).  The defendants do not dispute this rendition in their reply (doc. 89).

Federal Rule of Civil Procedure 37(d)(1)(A)(i) states that the court where an action is pending may order sanctions if "a party . . . fails, after being served with proper notice, to appear for that person's deposition." Rule 37(d)(3) further states that the appropriate sanctions are those listed in Rule 37(b)(2)(A)(i)–(vi), which include "dismissing

the action or proceeding in whole or in part."  The Court of Appeals for the Fourth Circuit has developed the following four-part test for determining whether (and, if so, which) Rule 37(d) sanctions are appropriate:  "(1) whether the noncomplying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective."  *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001) (en banc).  "The legal standard for dismissals under Rule 37 is virtually the same as that for dismissals for failure to prosecute under Rule 41."  *Carter v. Univ. of W. Va. Sys., Bd. of Trs.*, 23 F.3d 400, at *2 (4th Cir. 1994).

Here, the defendants have not shown that dismissal is warranted for the plaintiff's failure to appear for his deposition.  The plaintiff produced evidence from his father attesting that he contacted the defendants' counsel's office and it was agreed that the deposition would be canceled and rescheduled (doc. 87-1 at 2–3, J. Chambers aff. ¶¶ 24–26).  The defendants have produced no evidence that they incurred any expenses for this canceled deposition or made any further attempt to reschedule or secure the plaintiff's appearance for the deposition, which had been scheduled for the day before the discovery deadline (doc. 67-8 at 2; doc. 62).  Further, the defendants did not file a motion to compel or otherwise warn the plaintiff that they would seek dismissal for his failure to appear.  *See RDLG, LLC v. Leonard*, 649 F. App'x 343, 348 (4th Cir. 2016) (stating that the Fourth Circuit requires a party receive "explicit and clear notice" before ordering the "harsh sanction" of dismissal (citing *Choice Hotels Int'l, Inc. v. Goodwin & Boone*, 11 F.3d 469, 473 n.2 (4th Cir. 1993))).  The ultimate sanction of dismissal is not appropriate here for the plaintiff's failure to appear at his deposition under the circumstances presented.  Accordingly, the undersigned recommends that the district court deny the defendants' motion to dismiss the plaintiff's action for his failure to appear for his deposition, and the undersigned will address the merits of the defendants' alternative motion for summary judgment.  *See Colleton*

*Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 418 (4th Cir. 2010) (stating that the Fourth Circuit has a "strong policy in favor of merits-based adjudication").

## B.    *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 states as to a party who has moved for summary judgment: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As to the first of these determinations, a fact is deemed "material" if proof of its existence or nonexistence would affect the disposition of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the district court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings; rather, he must demonstrate that specific, material facts exist that give rise to a genuine issue. *Id.* at 324. Under this standard, the existence of a mere scintilla of evidence in support of the plaintiff's position is insufficient to withstand the summary judgment motion. *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

8

### C.    Fourth Amendment[5]

In his second amended complaint, the plaintiff alleges that the deputies violated his Fourth Amendment rights by falsely arresting and imprisoning him and using excessive force[6] against him (doc. 46 at 21–24, 33–34).  The plaintiff also alleges that the deputies invaded his privacy by unlawfully entering his residence and seizing his property (*id.* at 21–23).  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  Section 1983 actions premised on false arrest and/or false imprisonment are analyzed as actions claiming unreasonable seizures in violation of the Fourth Amendment.  *See, e.g., Brown v. Gilmore*, 278 F.3d 362, 367–68 (4th Cir. 2002) (recognizing that a plaintiff alleging a § 1983 false arrest claim needs to show that the officer arrested him without probable cause to establish an unreasonable seizure under the Fourth Amendment); *Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) (stating claims of false arrest and false imprisonment "are essentially claims alleging a seizure of the person in violation of the Fourth Amendment").

### 1.    Unreasonable Search

The defendants argue that there was no unreasonable search because the plaintiff invited the deputies into his residence and consented to the bedroom search (doc. 67-1 at 12–13).  The defendants further argue that, once inside the residence, the deputies

---

[5] While the plaintiff alleges Fourteenth Amendment due process and equal protection claims (doc. 46 at 21–23), such claims are not proper under these facts because "[t]he Fourth Amendment was tailored explicitly for the criminal justice system, and its balance between individual and public interests always has been thought to define the 'process that is due' for seizures of person or property in criminal cases." *Smith v. Travelpiece*, 31 F.4th 878, 884 (4th Cir. 2022) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 125 n.27(1975)).

[6] In his second amended complaint, the plaintiff alleges only that he brings his excessive force claim under § 1983 (doc. 46 at 33).  However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)).  Excessive force claims in effectuating an arrest or other seizure are governed by the Fourth Amendment.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).

had probable cause to determine that the plaintiff had committed the crime of unlawful conduct towards a child (S.C. Code Ann. § 63-5-70), which was an exigent circumstance permitting a warrantless search of the kitchen (*id.* at 13–14). The plaintiff argues that he only gave limited consent to enter his residence to assist with the medical emergency and there were no exigent circumstances regarding his child's welfare (doc. 87 at 22, 25–31).

Although the Fourth Amendment's protection against an unreasonable search by government agents is broad, it is not unlimited. *U.S. v. Gray*, 491 F.3d 138 (4th Cir. 2007). "A government agent's search is unreasonable when it infringes on an expectation of privacy that society is prepared to consider reasonable." *United States v. Castellanos*, 716 F.3d 828, 832 (4th Cir. 2013) (internal quotation marks omitted). An individual waives his reasonable expectation of privacy when he voluntarily consents to a search, and the ensuing search comports with the Fourth Amendment to the extent that it is consistent with the consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). However, the mere fact that a suspect consents to a search, either orally or in writing, does not necessarily foreclose a challenge to the search or a civil action based on an alleged violation of the Fourth Amendment. Whether consent is voluntarily given, as opposed to coerced by law enforcement pressure, is judged by the totality of the circumstances. *United States v. Mendenhall*, 446 U.S. 544, 557 (1980) (citing *Schneckloth*, 412 U.S. at 227). "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)" and "[w]hether the accused knew that he possessed a right to refuse consent . . . ." *U.S. v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996) (citations omitted).

Here, the body-worn camera video shows the plaintiff invite the deputies into his home and later consent to their search of his bedroom (doc. 67-2, Ortiz BWC 1 at 0:28,

10

Ortiz BWC 2 at 6:50). The plaintiff was told that he could revoke his consent at any time. The plaintiff attests that he was "not in a position where [he] felt free to refuse the deputies' requests" because he was handcuffed and under police control (doc. 87-1 at 14, Chambers aff. ¶¶ 96–97). However, this is contradicted by the video as the plaintiff was not handcuffed when he was asked for consent to search, when he questioned the deputies about the search, nor when he asked that any search be limited to his bedroom (doc. 67-2, Ortiz BWC 2 at 7:49). *See Simmons v. Whitaker*, 106 F.4th 379, 385 (4th Cir. 2024) (stating that a court can reject a non-movant's factual account only if video evidence "blatantly" or "clearly" contradicts his account of the facts) (citing *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)). The plaintiff also attests that he "did object to Defendant Glass" (doc. 87-1 at 16, N. Chambers aff. ¶ 118) and argues that he "did in fact vehemently object to Defendant Glass" (doc. 87 at 10). Nonetheless, the video shows him casually sitting and talking with Dep. Glass about other things and not voicing any vehement objection after he gave his consent to the search (doc. 67-2, Ortiz BWC 2 at 10:15, 11:18, 22:38). In viewing the totality of the circumstances, the plaintiff's consent was voluntary.

Furthermore, once lawfully inside the home, the deputies could conduct a limited search related to the welfare of the plaintiff's young child. "[A] police officer may search a home without a warrant if, in an emergency, 'the exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.'" *Hunsberger v. Wood*, 570 F.3d 546, 553 (4th Cir. 2009) (quoting *Mincey v. Arizona*, 437 U.S. 385, 394 (1978)). An exigent circumstance is one where "real immediate and serious consequence" could occur if the police delay action in order to obtain a warrant. *Welsh v. Wisconsin*, 466 U.S. 740, 751 (1984).

To determine whether entry and search under the exigent-circumstances doctrine is proper, a court must consider whether the circumstances known to law enforcement at the time would create an "objectively reasonable belief that an emergency

existed that required immediate entry to render assistance or prevent harm to persons or property within." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir. 1992). "[A]s a general matter, 'the absence of responsible adult supervision of children is an exigent circumstance justifying a warrantless entry.'" *United States v. Taylor*, 624 F.3d 626, 632 (4th Cir. 2010) (quoting *Georgia v. Peterson*, 543 S.E.2d 692, 696 (Ga. 2001)). Nonetheless, "[t]he scope of the ensuing search after entry must also be reasonable." *United States v. Lane*, Cr. No. 6:24-cr-00297-DCC, 2024 WL 5132187, at *7 (D.S.C. Dec. 17, 2024).

Here, as discussed above, the plaintiff had already given consent to Dep. Ortiz' presence inside the residence to provide emergency medical aid to the plaintiff's fiancé. While he was lawfully inside the plaintiff's residence, Dep. Ortiz saw a young child and no adults caring for the child. The only adults[7] in the home had used drugs earlier, with one of them recovering from an overdose. Dep. Ortiz conducted a brief emergency search of the kitchen and dining room to determine if he needed to call DSS to conduct an emergency investigation. The physical conditions of the home and the adults within the home posed an immediate threat to the child's safety. Therefore, the brief warrantless search of the kitchen and dining room, which was sufficiently limited in time and scope, was reasonable under the Fourth Amendment.

### 2. Unreasonable Seizure

Next, the defendants argue that the deputies' seizure of the plaintiff and the illicit drugs was lawful (doc. 67-1 at 16–20). The defendants claim that the South Carolina drug overdose immunity statute (S.C. Code Ann. § 44-53-1920) did not prohibit their seizure of the drugs, and they lawfully handcuffed the plaintiff to protect the scene of his fiancé's overdose and the investigation into the child's condition (*id.*). The defendants also claim

---

[7] When the deputies arrived, the plaintiff and his fiancé were the only adults at home with the child (doc. 67-2, Ortiz BWC 1 at 5:20). The plaintiff's father arrived later after the plaintiff phoned him while the deputies were present (*id.* at 24:15).

that the deputies had probable cause to believe that the plaintiff had committed the crime of unlawful conduct towards a child (S.C. Code Ann. § 63-5-70) (doc. 67-1 at 13–14, 17–20). The plaintiff argues, without citation to any legal authority, that any search and seizure must have been related to the ongoing medical emergency (doc. 87 at 22). The plaintiff argues that his detention exceeded the length "contemplated by *Terry*"[8] (*id.* at 17–20). In his response to the defendants' motion for summary judgment, the plaintiff does not address his claim for the defendants' seizure of his personal property (*see id.*).

"A 'seizure' of property occurs," for Fourth Amendment purposes, "when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A court determining whether a given seizure was reasonable must "'careful[ly] balanc[e] [the] governmental and private interests'" at play. *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 71 (1992) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985)). As explained above, the plaintiff consented to the search of his bedroom. While South Carolina's overdose immunity statute prohibits the criminal prosecution of the plaintiff for certain enumerated offenses (S.C. Code Ann. §44-53-1920), this statue's application did not prohibit the deputies from seizing illegal drugs found during a lawful search nor prohibit them from investigating the crime of unlawful conduct towards a child (S.C. Code Ann. § 63-5-70). The incident report states that the deputies only seized drugs (doc. 67-4 at 5). The deputies' seizure of illicit drugs found in the plaintiff's bedroom was reasonable under the Fourth Amendment.

Regarding the seizure of the plaintiff, a Fourth Amendment "seizure of the person . . . occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business. *Kaupp v. Texas,*

---

[8] *Terry v. Ohio*, 392 U.S. 1 (1968).

13

538 U.S. 626, 629 (2003).  Whether a seizure violates the Fourth Amendment turns on whether it is conducted in an objectively reasonable manner.  *Scott v. Harris*, 550 U.S. 372 (2007).  In determining whether a particular seizure is reasonable, courts "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  *United States v. Place*, 462 U.S. 696, 703 (1983).

The Fourth Amendment permits investigatory stops, also known as "*Terry* stops."  It has long been recognized that a distinction exists regarding police action during an investigative stop as opposed to during an arrest.  "Brief stops in order to determine the identity of a suspicious individual or to maintain the status quo while obtaining more information are permitted if reasonable in light of the facts known to the officers at the time."  *United States v. Perate*, 719 F.2d 706, 709 (4th Cir. 1983) (citing *Adams v. Williams*, 407 U.S. 143, 146 (1972); *Terry*, 392 U.S. at 20–22).  The constitutionality of a *Terry* stop is based upon "whether, at the time of the seizure, the police officer had a 'reasonable suspicion' that the person seized was 'involved in criminal activity.'"  *United States v. Kehoe*, 893 F.3d 232, 237 (4th Cir. 2018) (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev.*, 542 U.S. 177, 185 (2004)).  Further, this "reasonable suspicion" cannot be based upon an "'unparticularized suspicion or hunch,'" and "the government agent must articulate a particularized, objective basis for his or her actions."  *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  "To determine whether an officer had such a basis for 'suspecting legal wrongdoing,' 'reviewing courts . . . must look at the 'totality of the circumstances' of each case.'"  *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

The Supreme Court of the United States, however, has declined to establish a bright-line rule for determining the appropriate length of an investigatory detention.  *U.S. v. Sharpe*, 470 U.S. 675, 685–86 (1985).  In determining whether a detention is too

14

long in duration to be justified as an investigative stop (and has become an arrest), the appropriate question is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly during which time it was necessary to detain the defendant." *Id.* at 686. A court making this assessment should consider whether the police are acting in a swiftly developing situation, and should balance the law enforcement objectives against the invasion of the individual's Fourth Amendment interests. *Id.* The question is whether the detention lasted longer than was necessary, given its purpose. *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

Here, Dep. Ortiz seized the plaintiff when he limited his movement by instructing him to sit in a specific chair and later handcuffing him. However, this limited seizure was reasonable under the circumstances. As set out above, the deputies had valid consent from the plaintiff to enter the residence. Once inside, they found evidence of active drug use with an overdose victim and drug paraphernalia. Further, the plaintiff admitted his own earlier drug use. Given these factors and the condition of the home as depicted in the videos, the deputies certainly had reasonable suspicion to believe that the plaintiff had violated South Carolina Code Annotated § 63-5-70 for unlawful conduct toward a child by "plac[ing] the child at unreasonable risk of harm affecting the child's life, physical or mental health, or safety. Indeed, the family court subsequently ruled that the plaintiff had abused and/or neglected his child during this incident and that the return of the child to the plaintiff's residence would place the child "at an unreasonable risk of harm" (doc. 67-5 at 2).

Further, the length of the plaintiff's detention was reasonable. Approximately five minutes after handcuffing the plaintiff, Dep. Ortiz called DSS to report the condition of the child and the home (doc. 67-2, Ortiz BWC 1 at 17:36). The deputies

15

detained the plaintiff on the porch for approximately three hours[9] while they removed the illicit drugs from the home and waited for the DSS investigator to arrive and complete her investigation. Further, the video reveals that the plaintiff's father extended the deputies' presence by having numerous and lengthy phone calls with the plaintiff's sister about taking custody of the child. The undersigned finds that the officers were not dilatory in pursuing this means of investigation. *See United States v. Nunez-Betancourt*, 766 F. Supp. 2d 651, 658 (E.D.N.C. 2011) (finding over-three-hour detention of suspect in handcuffs to be reasonable where officers waited for immigration agent to arrive and interview determine the suspect's immigration status). Accordingly, the defendants are entitled to summary judgment on this claim.

### 3.    Excessive Force

The defendants also request summary judgment on the plaintiff's excessive force claim because the only force used against him was the handcuffs and this level of force was justified to detain him (doc. 67-1 at 21–22). The plaintiff argues that "handcuffing without making a formal arrest when the person is not posing a threat nor is at risk of evading detection is unreasonable" and cites *E.W. by and through T.W. v. Dolgos*, 884 F.3d 172 (4th Cir. 2018) (doc. 87 at 32).

"Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). However, "[t]he Fourth Amendment bars police officers from using *excessive* force

---

[9] The plaintiff argues in his response to the motion for summary judgment that he was detained "for over four (4) hours" (doc. 87 at 17), and he alleges in his second amended complaint that he was detained in handcuffs for five hours (doc. 46, 2nd amend. comp. ¶ 93). However, the video shows the deputies detained him for approximately three hours, as he was first detained in a chair at 2:38 p.m. and was moving around freely by 5:38 p.m. (doc. 67-2, Ortiz BWC 1 at 3:57 to Ortiz BWC 4 at 5:05). As noted above, the plaintiff was handcuffed at approximately 2:47 p.m. and first appears without the handcuffs at 3:40 p.m. (doc. 67-2, Ortiz BWC 1 at 13:15, Ortiz BWC 2 at 6:24). Thus, he was handcuffed for less than one hour of the approximately three-hour detention.

to effectuate a seizure." *Yates v. Terry*, 817 F.3d 877, 884 (4th Cir. 2016) (emphasis added). "Courts evaluate a claim of excessive force based on an 'objective reasonableness' standard." *Id.* (quoting *Graham*, 490 U.S. at 399). "Courts are to carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 884–85 (citations and internal quotation marks omitted). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Courts may also consider "other 'objective circumstances potentially relevant to a determination of excessive force.'" *Dolgos*, 884 F.3d at 179 (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)).

The use of handcuffs, "properly applied and maintained for even a lengthy period, is 'not a use of force that offends contemporary standards of decency so as to satisfy the objective component of an excessive force claim.'" *Wilson v. Frame*, C.A. No. 2:19-cv-00103, 2020 WL 1482145, at *9 (S.D.W.V. Mar. 23, 2020) (quoting *Holley v. Johnson*, C.A. No. 7:08-cv-00629, 2010 WL 2640328, at *14 n.2. (W.D. Va. June 30, 2010)). However, as noted in *Wilson*, "both the Supreme Court and other courts within this Circuit have repeatedly held that the use of restraints can be unconstitutional if [law enforcement] officers do not meet certain minimum standards." *Id.*

Here, no reasonable jury could conclude that the plaintiff's handcuffing was objectively unreasonable. Dep. Ortiz reasonably suspected that the plaintiff had committed the felony of unlawful conduct toward a child due to the condition of the home. Further, the plaintiff having used drugs earlier and was moving around the bedroom as deputies

attempted to revive his overdosed fiancé. The handcuffs were applied for no longer than one hour, and the plaintiff does not provide any evidence that any of the deputies improperly applied the handcuffs. Contrary to the plaintiff's argument, "[t]he use of handcuffs in this instance was 'reasonably necessary to maintain the status quo and protect [officer] safety during an investigative stop.'" *Lytes v. Smith*, 11 F. Supp. 3d 527, 540 (D.S.C.), *aff'd*, 585 F. App'x 51 (4th Cir. 2014) (quoting *United States v. Crittendon*, 883 F.2d 326, 329 (4th Cir.1989)). Accordingly, the use of handcuffs here was not unreasonable.

Furthermore, as discussed above, the undersigned finds that the plaintiff has failed to present evidence upon which a reasonable jury could determine that the Dep. Glass committed excessive force against the plaintiff by striking, shoving, and slamming his head into his child's crib. Here, the objective evidence – particularly Dep. Ortiz's body-worn camera footage – clearly contradicts the plaintiff's allegation. The plaintiff attests that Dep. Glass "slammed or drove [his] face and body into [his] child's crib" causing the plaintiff "pain and injury and . . . distress to [his] minor child" (doc. 87-1 at 11, Chambers aff. ¶¶ 67–69). On the recording, Dep. Glass and the plaintiff can be heard talking in the living room where his child can also be heard cooing, and there is no sound of any force being used on the plaintiff (doc. 67-2, Ortiz BWC 1 at 13:58). There are no signs of a struggle in the living room, and the child does not appear emotionally distressed (*id.* at 15:40). Further, when the plaintiff appears on the video minutes later, he shows no sign of injury and makes no mention of any force being used upon him by Dep. Glass (*id.*). *See Simmons v. Whitaker*, 106 F.4th 379, 385 (4th Cir. 2024) (stating that a court can reject a non-movant's factual account only if video evidence "blatantly" or "clearly" contradicts his account of the facts) (citing *Scott v. Harris*, 550 U.S. 372, 378–80 (2007)); *see also Williams v. City of Charlotte*, No. 23-1665, 2025 WL 841836, at *3 (4th Cir. Mar. 18, 2025) (affirming summary judgment

on an excessive force claim where police body-worn camera footage only had audio of the use of force and did not show the takedown itself).

Based upon the foregoing, the defendants' motion for summary judgment should be granted as to the plaintiff's excessive force claims.

### D.    *Municipal Liability*

Next, Greenville County, Sheriff Lewis, and the GCSO (collectively "supervisory defendants") argue that summary judgment should be granted as to the plaintiff's § 1983 *Monell*[10] claim because there was no violation of any of the plaintiff's constitutional rights (doc. 67-1 at 22–23).  They further argue that there is no evidence of any unconstitutional policies or procedures or a failure to supervise or train (*id.* at 23–25). The plaintiff contends that there is *Monell* liability because the GCSO failed to properly investigate his complaint after the incident giving rise to this action; the GCSO did not take any action regarding prior false arrests and illegal searches and seizures; and some of the deputies have misconduct histories (doc. 87 at 11–13, 39–41).

Municipalities and other local government units cannot be sued on a respondeat superior theory for the unconstitutional acts of their employees.  *Monell*, 436 U.S. at 690–91. However, local governing bodies, such as counties and municipal corporations, are "persons" that can be sued directly under § 1983 when alleged unconstitutional action executes governmental policy or custom.  *Id.*  To establish municipal liability, a plaintiff must show that the defendants' policies caused the constitutional violation.  *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 784 (1997).  A municipality is responsible only when execution of its policy or custom – made by its lawmakers or individuals whose acts "may fairly be said to represent official policy" – inflicts injury.  *Id.* (quoting *Monell*, 436 U.S. at 694); *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987).

---

[10] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).

"A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a "custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999)).

However, *Monell* claims "require a predicate constitutional violation to proceed[,] [f]or 'supervisors and municipalities cannot be liable under § 1983 without some predicate constitutional injury at the hands of the individual [state] officer, at least in suits for damages.'" *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012) (quoting *Waybright v. Frederick Cnty.*, 528 F.3d 199, 203 (4th Cir.2008)). There can be no *Monell* liability if the individual officers inflicted no constitutional harm. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

Here, the plaintiff's *Monell* claim fails for multiple reasons. First, as discussed above, none of the deputies violated any of the plaintiff's constitutional rights, and a *Monell* claim cannot survive "where there is no underlying constitutional violation by the employee." *Young v. City of Mt. Rainier*, 238 F.3d 567, 579 (4th Cir. 2001); *see Anderson v. Caldwell Cnty. Sheriff's Office*, 524 F. App'x 854, 862 (4th Cir. 2013) ("No actionable claim against supervisors or local governments can exist without a constitutional violation committed by an employee.").

Further, even if the deputies had violated the plaintiff's constitutional rights, he fails to provide evidence supporting his *Monell* claims. The plaintiff argues that the supervisory defendants' failure to properly investigate his formal complaint violated "GCSO's well established policy" (doc. 87 at 40). However, violations of internal office policies "are not actionable under § 1983 unless the alleged breach of policy rises to the

20

level of a constitutional violation." *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) (citing *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir. 1997)).  The plaintiff has not produced any evidence showing that the defendants' failure to follow their own policy on handling the plaintiff's complaint deprived him of his constitutional rights.

The plaintiff also argues that Dep. Owens failed to properly supervise subordinate deputies regarding "knock and talk" procedure in 2015; that Dep. Glass had prior issues with alcohol; and that Dep. Bryson engaged in domestic violence in 2024 (doc. 87 at 12–13, 39–41).  However, there are no allegations that any officer used a "knock and talk" procedure in this incident or that Dep. Bryson used excessive force against the plaintiff.  While the plaintiff provided an affidavit in which he attested that Dep. Glass told him about his "prior alcohol-related issues" (doc. 87-1 at 24, N. Chambers aff. ¶ 191), there is no evidence that Dep. Glass was impaired at the time of the subject incident involving the plaintiff.  Further, any purported domestic violence attributed to Dep. Bryson has absolutely nothing to do with this case.  Based upon the foregoing, the plaintiff has failed to establish a *Monell* claim, and the defendants should be granted summary judgment.

### E.    *Qualified Immunity*

Sheriff Lewis and the deputies further argue that they are entitled to qualified immunity (doc. 67-1 at 25–28).  The undersigned agrees.

Qualified immunity protects government officials performing discretionary functions from civil damage suits as long as the conduct in question does not "violate clearly established rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  To determine whether qualified immunity applies, a district court must decide (1) whether any right was violated, and (2) whether that right was "clearly established" at the time of the alleged violation. *Somers v. Devine*, 132 F.4th 689, 696 (4th Cir. 2025).  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs

of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The Fourth Circuit employs a split burden of proof for the qualified immunity defense. *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022).  "The plaintiff bears the burden on the first prong, and the officer bears the burden on the second prong." *Id.* (citing *Henry v. Purnell*, 501 F.3d 374, 377–78 & n.4 (4th Cir. 2007)). "If the answer to *either* is 'no,' qualified immunity bars the claim."  *Gelin v. Maryland*, 132 F.4th 700, 713 (4th Cir. 2025) (emphasis added).  Here, as discussed above, the plaintiff has failed to demonstrate that Sheriff Lewis or the deputies violated his constitutional rights.  Thus, these individual defendants are entitled to qualified immunity on the plaintiff's § 1983 claims.

## F.    State Law Claims

The defendants further move for summary judgment on the plaintiff's state law claims for negligence/gross negligence, IIED, civil conspiracy, and false imprisonment (doc. 67-1 at 30–33).  Should the district judge adopt the undersigned's recommendation and find that the defendants are entitled to summary judgment on the plaintiff's § 1983 claims, only the plaintiff's state law claims will remain.  Therefore, it is recommended that the district judge decline to exercise supplemental jurisdiction over the plaintiff's state law claims, deny the defendants' motion for summary judgment on the state law claims as moot, and remand his remaining claims to state court.  *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has dismissed all claims over which it has original jurisdiction . . . ."); s*ee also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."). "With all its federal questions gone, there may be the authority to keep it in federal court

under 28 U.S.C. §§ 1367(a) and 1441(c) (2000), but there is no good reason to do so."
*Waybright v. Frederick Cnty, MD*, 528 F.3d 199, 209 (4th Cir. 2008).

### IV. CONCLUSION AND RECOMMENDATION

Wherefore, based upon the foregoing, the undersigned recommends that the district judge grant the defendants' motion for summary judgment on the plaintiff's § 1983 claims and deny as moot the remainder of that motion as to the state court claims (doc. 67). The undersigned further recommends that the district judge decline to exercise supplemental jurisdiction over the remaining state law claims and remand these claims to the Greenville County Court of Common Pleas. Should the district judge adopt this recommendation, the plaintiff's motion for hearing (doc. 80) will be rendered moot.

IT IS SO RECOMMENDED.

s/Kevin F. McDonald
United States Magistrate Judge

July 7, 2026
Greenville, South Carolina

***The attention of the parties is directed to the important notice on the following page.***

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
250 East North Street, Suite 2300
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).